| | |
|---|---|
| Jeffrey S. Chiesa<br>Ronald L. Israel<br>Kathryn Pearson<br>CHIESA SHAHINIAN &<br>GIANTOMASI PC<br>105 Eisenhower Parkway<br>Roseland, NJ 07068<br>Telephone: (973) 325-1500<br>jchiesa@csglaw.com<br>risrael@csglaw.com<br>kpearson@csglaw.com | Mark B. Blocker (*pro hac vice*)<br>Scott D. Stein (*pro hac vice*)<br>Caroline A. Wong (*pro hac vice*)<br>SIDLEY AUSTIN LLP<br>One South Dearborn Street<br>Chicago, IL 60603<br>Telephone: (312) 853-7000<br>mblocker@sidley.com<br>sstein@sidley.com<br>caroline.wong@sidley.com |

Attorneys for Defendants

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| ANN LEWANDOWSKI, on her own behalf, on behalf of all others similarly situated, and on behalf of the Johnson & Johnson Group Health Plan and its component plans,<br><br>Plaintiff,<br><br>v.<br><br>JOHNSON & JOHNSON AND THE PENSION & BENEFITS COMMITTEE OF JOHNSON & JOHNSON,<br><br>Defendants. | Case No. 3:24-cv-00671<br><br>**Hon. Zahid N. Quraishi**<br>**Hon. Rukhsanah L. Singh** |

**DECLARATION OF ROSA SEXTON IN SUPPORT OF DEFENDANTS'**
**MOTION TO DISMISS THE AMENDED COMPLAINT**

Rosa Sexton, of full age, hereby certifies as follows:

1. My name is Rosa Sexton. I have been employed at Johnson & Johnson for 35 years. I am currently the Head of J&J's Global Health and Welfare Benefits organization. I have knowledge of the matters set forth herein, in part based on a review of documents and data provided to me by the service administrator for medical and prescription drug expenses relating to Plaintiff Ann Lewandowski under the Johnson & Johnson Group Health Plan (the "Plan").

2. Ms. Lewandowski has been a participant in the Plan in 2022, 2023, and 2024.

3. The Plan offers participants multiple medical plan options, and each of those options has different cost-sharing provisions and amounts.

4. In each year, Ms. Lewandowski chose the Premier HSA Medical Plan ("Premier HSA"). She elected individual coverage (*i.e.*, coverage only of herself, not any spouse or children). Under this plan, Ms. Lewandowski pays monthly premiums. The premium amounts are established at the beginning of the year, and do not change during the course of the year.

5. Under the Premier HSA option in each year in which Ms. Lewandowski has been a participant in the Plan, the Plan and participants have shared healthcare costs (other than premiums) as follows.

a. Before the Plan starts to pay benefits, a participant has to pay an initial amount (a "deductible") for covered services, including medical services and prescription drugs. There are limited exceptions to this requirement. For example, participants do not have to pay anything, even a deductible, for certain in-network preventive care services and prescription drugs. Under the Premier HSA option, Ms. Lewandowski's deductible was $1,400 in 2022, $1,500 in 2023, and $1,600 in 2024, which in each year was the lowest IRS-permitted deductible for individual coverage under an HSA-eligible health plan. Moreover, in each year, Johnson & Johnson gave Premier HSA participants with individual coverage, including Ms. Lewandowski, a $500 company contribution to their HSA accounts that could be used to offset the deductible.

b. After the participant pays the annual deductible, the Plan generally pays 80% of the allowed amount (negotiated rate) under the Plan for covered in-network health services – *i.e.*, the Plan pays 80% of this cost while the participant pays the remaining 20%. That 20% is referred to as "coinsurance."

c. For prescription drugs, there are additional limitations on cost-sharing. If a participant has met her annual deductible and obtained

   a drug at an in-network pharmacy, the participant generally pays 20% of the cost of the drug (15% for drugs ordered through the mail order pharmacy available under the Plan), up to a maximum of $125 per prescription for a 30-day retail supply. The Plan pays the remaining amount.

  d. The Plan also limits participants' annual total cost-sharing obligations through a total out-of-pocket maximum. This means that after a participant meets the annual deductible and pays a certain additional amount for coinsurance, the participant has no further cost-sharing obligations for covered in-network healthcare expenses that year. Under the Premier HSA option, Ms. Lewandowski's out-of-pocket maximums in each of 2022, 2023, and 2024 have been $3,500 for in-network services. This $3,500 out-of-pocket maximum was considerably lower than the cap on annual out-of-pocket maximums that HSA-eligible plans like the Premier HSA could have established under applicable law and IRS guidance.

6.  Ms. Lewandowski incurred significant medical expenses in each of 2022, 2023, and 2024 (through May). As a result, Ms. Lewandowski reached her maximum out-of-pocket cost in each year, such that, for the vast majority of the

healthcare expenditures made on her behalf under the Plan, she had no cost-sharing obligations. Specifically, Ms. Lewandowski met her annual in-network limit on cost-sharing in August 2022, May 2023, and April 2024.

7.  The chart below shows the following totals for Ms. Lewandowski for each year she participated in the Plan, based on the date that the medical services or prescription drugs were provided: (a) allowed amount, (b) deductible, (c) coinsurance, (d) patient responsibility, and (e) Plan responsibility, *i.e.*, the amount the Plan was responsible for paying.[1]

| Year | Allowed Amount | Deductible | Coinsurance | Total Patient Responsibility | Total Plan Responsibility |
|---|---|---|---|---|---|
| 2022 | $171,535 | $1,400 | $2,100 | $3,500 | $168,035 |
| 2023 | $201,382 | $1,500 | $2,000 | $3,500 | $197,882 |
| 2024 (through May) | $84,788 | $1,600 | $1,900 | $3,500 | $81,288 |

8.  The allowed amount is the amount paid to providers for medical services and prescription drugs provided to Ms. Lewandowski. It includes both amounts the Plan was responsible for paying and, if applicable, the amounts payable by Ms. Lewandowski in deductibles and coinsurance. The deductible is the

---

[1] These figures are based on the data available to Johnson & Johnson as of the date of this declaration.

amount Ms. Lewandowski had to pay for covered services each year before the Plan started to pay. The coinsurance is the amount Ms. Lewandowski paid for services after meeting her deductible but before she met her out-of-pocket maximum. And the last two columns above show the portion of the approved amounts that Ms. Lewandowski and the Plan were expected to pay, respectively. For example, for services provided in 2023, the Plan paid healthcare providers $197,882 for healthcare services and products (including prescription drugs) provided to Ms. Lewandowski. Ms. Lewandowski herself paid $3,500 – reflecting her deductible and coinsurance amounts, up to her maximum out-of-pocket limit. This year (2024), as of May, Ms. Lewandowski has already met her maximum out-of-pocket limit, meaning she will have no further cost-sharing obligations for in-network services for the remainder of 2024.

9. Virtually all of Ms. Lewandowski's healthcare expenditures are for medical services, not prescription drugs payable under the prescription drug benefit administered by Express Scripts (ESI). In each of 2022, 2023, and 2024, she would have reached her maximum out-of-pocket limit based solely on benefits provided under her health plan, without regard to the cost of any prescription drugs obtained under the prescription drug benefit administered by ESI. For example, prescription drug costs obtained under the prescription drug benefit administered by ESI were just $445.13 (0.26%) of the allowed amounts for Ms. Lewandowski's covered

healthcare expenses for 2022, and $339.77 (0.17%) for 2023. The figures for 2024 will likely be very similar – Ms. Lewandowski has already hit her out-of-pocket maximum in 2024 because of her significant medical expenditures. What these data show is that regardless of how much Ms. Lewandowski's prescription drugs cost (or regardless of how much she contends in this lawsuit that they should have cost), the cost of prescription drugs obtained under the prescription drug benefit administered by ESI had no impact on her total out-of-pocket expenses under the Plan.

10. For example, for services provided in 2023, Ms. Lewandowski incurred approximately $201,042 (based on allowed amounts) for medical benefits alone, compared to approximately $340 for prescription drugs obtained under the prescription drug benefit administered by ESI. All of these were in-network expenses. As noted above, the Plan generally pays 80% of allowed amounts, and the patient is responsible for 20%. 20% of the $201,042 for non-drug medical expenses is approximately $40,208. Of that amount, Ms. Lewandowski paid her $1,500 deductible and another $2,000 in coinsurance until she reached the maximum in-network out-of-pocket limit of $3,500. The Plan paid the remaining balance. The same analysis applies to 2022 and 2024. Thus, the cost of Ms. Lewandowski's prescription drugs had no impact on her out-of-pocket expenditures.

11. Based on my current knowledge and the documents and data provided to me as referenced above, I declare under penalty of perjury that the foregoing is true.

Dated: June 28, 2024  
New Brunswick, New Jersey

By: *Rosa Sexton*
Rosa Sexton