Michael Eisenkraft
COHEN MILSTEIN SELLERS &
TOLL, PLLC
88 Pine Street, 14th Floor
New York, New York 10005
(212) 838-7797
meisenkraft@cohenmilstein.com

Michelle Yau (*pro hac vice*)
Daniel Sutter (*pro hac vice*)
1100 New York Ave. NW, Fifth Floor
Washington, D.C. 20005
(202) 408-4600
myau@cohenmilstein.com
dsutter@cohenmilstein.com

Kai Richter (*pro hac vice*)
400 South 4th Street #401-27
Minneapolis, MN 55415
(612) 807-1575
krichter@cohenmilstein.com

Jamie Crooks (*pro hac vice*)
Michael Lieberman (*pro hac vice*)
FAIRMARK PARTNERS, LLP
1001 G Street NW
Suite 400 East
Washington, DC 20001
(619) 507-4182
jamie@fairmarklaw.com
michael@fairmarklaw.com

Michael Casper
WHEELER, DIULIO & BARNABEI P.C
1650 Arch Street, Suite 2200
Philadelphia, PA 19103
(215) 971-1000
mcasper@wdblegal.com

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| ANN LEWANDOWSKI, on her own behalf, on behalf of all others similarly situated, and on behalf of the Johnson & Johnson Group Health Plan and its component plans,<br><br>       Plaintiff,<br><br> v.<br><br>JOHNSON AND JOHNSON AND THE PENSION & BENEFITS COMMITTEE OF JOHNSON AND JOHNSON,<br><br>       Defendants. | No. 3:24-cv-00671-ZNQ-RLS |

## PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE FIRST AMENDED CLASS ACTION COMPLAINT

# **TABLE OF CONTENTS**

INTRODUCTION ................................................................... 1

BACKGROUND ..................................................................... 3
    I.     Prescription Drug Plans Generally ...................................... 3
    II.    Defendants' Mismanagement of J&J's Prescription Drug
         Program ....................................................................... 5
    III.   Defendants' Failure to Produce Requested Plan Documents and
         Contracts .................................................................... 9
    IV.   Plaintiff's Claims ........................................................10

STANDARD OF REVIEW ........................................................10
    I.     Standard on Rule 12(b)(6) Motion ...................................10
    II.    Standard on Rule 12(b)(1) Motion ...................................11

ARGUMENT.........................................................................12
    I.     Plaintiff Has Standing to Bring This Action......................12
        A.   Plaintiff Has Suffered Economic Harm in the Form of Inflated
           Premiums, and Will Bear All of Those Premiums Going Forward 15
        B.   Plaintiff Also Paid Inflated Out-of-Pocket Amounts for Prescription
           Drugs, and Will Continue to Do So in the Future .........................19
        C.   Plaintiff's Standing Is Not Limited to the Drugs She Purchased....21
    II.    Plaintiff States Plausible Claims Against Defendants under
         ERISA ........................................................................24
        A.   Plaintiff Plausibly Alleges that Defendants Breached Their
           Fiduciary Duties (Counts I and II)................................................25
        B.   Plaintiff States a Claim for Failure to Comply With Her Requests
           for Documents (Count III)............................................................37

CONCLUSION .................................................................40

i

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                                    **Page(s)**

*AARP v. EEOC*,
226 F. Supp. 3d 7 (D.D.C. 2016) ....................................................................15

*Acosta v. Bd. of Trs. of Unite Here Health*,
2023 WL 2744556 (N.D. Ill. Mar. 31, 2023)...................................................15

*Aetna Inc. v. Insys Therapeutics, Inc.*,
330 F.R.D. 427 (E.D. Pa. 2019) ......................................................................15

*Askew v. R.L. Reppert, Inc.*,
2016 WL 447060 (E.D. Pa. Feb. 5, 2016) .......................................................39

*Bafford v. Northrop Grumman Corp.*,
994 F.3d 1020 (9th Cir. 2021)..........................................................................38

*Barling v. UEBT Retiree Health Plan*,
145 F. Supp. 3d 890 (N.D. Cal. 2015)..............................................................39

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)..........................................................................................11

*Beverly Enters., Inc. v. Trump*,
182 F.3d 183 (3d Cir. 1999)..............................................................................36

*Bio-Med. Applications of Ky., Inc. v. Coal Exclusive Co., LLC*,
782 F. Supp. 2d 438 (E.D. Ky. 2011)...............................................................40

*Bodor v. Maximus Fed. Servs., Inc.*,
2021 WL 4941503 (E.D. Pa. Oct. 22, 2021) ....................................................20

*Boley v. Universal Health Servs., Inc.*,
36 F.4th 124 (3d Cir. 2022)...........................................................22, 23, 24

*Braden v. Wal-Mart Stores, Inc.*,
588 F.3d 585 (8th Cir. 2009)......................................................................11, 31

*Brotherston v. Putnam Invs., LLC*,
907 F.3d 17 (1st Cir. 2018) ................................................................................2

*City of Columbus v. Trump*,
   453 F. Supp. 3d 770 (D. Md. 2020) ................................................................14

*Clemens v. ExecuPharm Inc.*,
   48 F.4th 146 (3d Cir. 2022) ..........................................................................21

*Cohen v. Indep. Blue Cross*,
   820 F. Supp. 2d 594 (D.N.J. 2011) ..............................................................38

*Collins v. Yellen*,
   594 U.S. 220 (2021) ..................................................................................1, 13

*Const. Party of Pa v. Aichele*,
   757 F.3d 347 (3d Cir. 2014) ..........................................................................12

*Davis v. Wells Fargo*,
   824 F.3d 333 (3d Cir. 2016) ..........................................................................12

*D'Addario v. Johnson & Johnson*,
   2023 WL 239395 (D.N.J. Jan. 18, 2023) ......................................................32

*Dieffenbach v. Barnes & Noble, Inc.*,
   887 F.3d 826 (7th Cir. 2018) ........................................................................20

*DiFelice v. U.S. Airways, Inc.*,
   497 F.3d 410 (4th Cir. 2007) ........................................................................33

*Dinicola-Ortiz v. GEICO Indem. Co.*,
   2024 WL 1827611 (D.N.J. Apr. 26, 2024) ....................................................12

*Eden Surgical Ctr. v. Budco Grp., Inc.*,
   2010 WL 2180360 (C.D. Cal. May 27, 2010) ..............................................40

*Finkelman v. NFL*,
   810 F.3d 187 (3d Cir. 2016) ....................................................................21, 22

*Futterman v. United Emp. Benefit Fund*,
   2021 WL 5163302 (N.D. Ill. Nov. 5, 2021) ..................................................38

*Gonzalez de Fuente v. Preferred Home Care of N.Y. LLC*,
   2020 WL 5994957 (E.D.N.Y. Oct. 9, 2020) ..................................................18

*Hartig Drug Co. Inc. v. Senju Pharm. Co. Ltd.*,
   836 F.3d 261 (3d Cir. 2016) ................................................................36

*In re Horizon Healthcare Servs. Inc. Data Breach Litig.*,
   846 F.3d 625 (3d Cir. 2017) ................................................................12

*Hughes v. Nw. Univ.*,
   595 U.S. 170 (2022) ...............................................................1, 30

*In re Ins. Brokerage Antitrust Litig.*,
   579 F.3d 241 (3d Cir. 2009) ................................................................14

*Johnson v. PNC Fin. Servs. Grp., Inc.*,
   2022 WL 973581 (W.D. Pa. Mar. 31, 2022) ...............................................29, 31

*Knudsen v. MetLife Grp., Inc.*,
   2023 WL 4580406 (D.N.J. July 18, 2023).........................................................17

*Kollman v. Hewitt Assocs., LLC*,
   487 F.3d 139 (3d Cir. 2007) ................................................................38

*In re Lincoln Nat'l COI Litig.*,
   620 F. Supp. 3d 230 (E.D. Pa. Aug. 9, 2022) ...................................................17

*Maiuro v. Fed. Express Corp.*,
   843 F. Supp. 935 (D.N.J. 1994) ................................................................40

*Mator v. Wesco Distrib., Inc.*,
   102 F.4th 172 (3d Cir. 2024)................................1, 2, 11, 25, 29, 30, 32, 34, 35

*McCaffree Fin. Corp. v. ADP, Inc.*,
   2023 WL 2728787 (D.N.J. Mar. 31, 2023).......................................................30

*McDonough v. Horizon Blue Cross Blue Shield of N.J., Inc.*,
   2011 WL 4455994 (D.N.J. Sept. 23, 2011) ......................................................38

*McGowan v. Barnabas Health, Inc.*,
   2021 WL 1399870 (D.N.J. Apr. 13, 2021)..........................................11, 29, 35

*MSPA Claims 1, LLC v. Tenet Fla., Inc.*,
   918 F.3d 1312 (11th Cir. 2019).....................................................................20

*Nicolas v. Trs. of Princeton Univ.*,
  2017 WL 4455897 (D.N.J. Sept. 25, 2017) ......................................................29

*Peterson v. Ins. Servs. Off., Inc.*,
  2021 WL 1382168 (D.N.J. Apr. 13, 2021) ......................................................29

*Petruska v. Gannon Univ.*,
  462 F.3d 294 (3d Cir. 2006) ..........................................................................12

*Pfeil v. State St. Bank & Tr. Co.*,
  671 F.3d 585 (6th Cir. 2012) .........................................................................33

*Pinnell v. Teva Pharms. USA, Inc.*,
  2020 WL 1531870 (E.D. Pa. Mar. 31, 2020) .................................................29

*Saltzman v. Indep. Blue Cross*,
  384 F. App'x 107 (3d Cir. 2010) ...............................................................39, 40

*Scott v. UnitedHealth Grp., Inc.*,
  540 F. Supp. 3d 857 (D. Minn. 2021) ......................................................18, 19

*Seibert v. Nokia of Am. Corp.*,
  2024 WL 2316551 (D.N.J. May 22, 2024) ....................................................11

*Silva v. Enovik Corp.*,
  2020 WL 12574912 (D.N.J. Dec. 30, 2020) ..................................................29

*Pension Benefit Guar. Corp. ex rel. St. Vincent Cath. Med. Ctrs. Ret.
  Plan v. Morgan Stanley Inv. Mgmt. Inc.*,
  712 F.3d 705 (2d Cir. 2013) ..........................................................................31

*Sweda v. Univ. of Pa.*,
  923 F.3d 320 (3d Cir. 2019) .....1, 2, 10, 11, 23, 24, 25, 26, 29, 30, 31, 34, 35, 36

*Thole v. U.S. Bank N.A.*,
  590 U.S. 538 (2020) ................................................................................14, 15

*Tibble v. Edison Int'l*,
  843 F.3d 1187 (9th Cir. 2016) (en banc) .......................................................26

*TransUnion LLC v. Ramirez*,
  594 U.S. 413 (2021) ......................................................................................12

*In re U.S. Off. of Pers. Mgmt. Data Sec. Breach Litig.*,
   928 F.3d 42 (D.C. Cir. 2019) ...............................................................................20

*Van v. LLR, Inc.*,
   962 F.3d 1160 (9th Cir. 2020)..............................................................................20

*Winsor v. Sequoia Benefits & Ins. Servs., LLC*,
   62 F.4th 517 (9th Cir. 2023)................................................................................18

**Statutes**

29 U.S.C. § 1001(a) ..............................................................................................25

29 U.S.C. § 1024(b)(4) ...........................................................................2, 10, 37, 39

29 U.S.C. § 1101(a)(1)(A) .....................................................................................26

29 U.S.C. § 1104....................................................................................................25

29 U.S.C. § 1104(a) ........................................................................................10, 25

29 U.S.C. § 1109(a) ..............................................................................................10

29 U.S.C. § 1132(a) ....................................................................................10, 13, 39

29 U.S.C. § 1132(c) ........................................................................................10, 37

**Other Authorities**

29 C.F.R. § 2575.502c-1 ........................................................................................37

Restatement (Third) of Trusts § 88 cmt. a (2007).................................................26

Fed. R. Civ. P. 12(b)(1)....................................................................................11, 12

Fed. R. Civ. P. 12(b)(6)..............................................................................10, 11, 36

**INTRODUCTION**

This is a straightforward case arising from the failure of ERISA plan fiduciaries (namely, Johnson & Johnson and its Pension & Benefits Committee) to appropriately select and monitor a plan service provider and control plan expenses. Allegations of excessive fees like those asserted here have repeatedly been held sufficient to state a claim for breach of fiduciary duty under ERISA. Under binding Supreme Court and Third Circuit precedent, it would constitute reversible error to dismiss such claims. *See Hughes v. Nw. Univ.*, 595 U.S. 170, 174 (2022); *Sweda v. Univ. of Pa.*, 923 F.3d 320, 330-34 (3d Cir. 2019); *Mator v. Wesco Distrib., Inc.*, 102 F.4th 172, 184-89 (3d Cir. 2024) (all reversing dismissal of excess fee claims). Indeed, Plaintiff's allegations are even more detailed and the alleged fee excesses even more extreme than other cases that have proceeded past a motion to dismiss.

Defendants attempt to cloud the issues by contesting standing, but the Court should see clearly through their arguments. Defendants' fiduciary breaches cost Plaintiff money—the "prototypical form of injury in fact." *Collins v. Yellen*, 594 U.S. 220, 222 (2021). First, the Plan's overpayments were passed on to her in the form of monthly premiums, which Plaintiff alleges were higher than they would have been absent Defendants' fiduciary breaches. Second, Plaintiff was forced to pay more out-of-pocket at the pharmacy counter than she would have paid absent Defendants' fiduciary breaches. Those forms of pocketbook harm straightforwardly

1

satisfy Article III's requirements. Defendants' incantation that Plaintiff "received all of the benefits she was contractually entitled to receive" is a non-sequitur; Plaintiff's complaint is not that Defendants denied her prescription-drug benefits, but that the cost of those benefits was unreasonably high due to Defendants' fiduciary breaches.[1]

Defendants' contentions regarding the adequacy of Plaintiff's pleading are also meritless. Each of Defendants' arguments directly contradicts binding Third Circuit precedent and ignores the allegations in the Amended Complaint:

- Plaintiff is not required to directly allege how Defendants' process for managing the Plan was flawed. *See Sweda*, 923 F.3d at 332. In any event, she has done so. *See* Am. Compl. ("AC"), ECF 44, ¶¶ 139-48.

- Plaintiff is not required to support her cost allegations "with any comparisons to other plans," *Mator*, 102 F.4th at 185 (citing *Sweda*). Once again, however, she has done so. *See* AC ¶ 177.

- Plaintiff is not obligated to rebut Defendants "explanation" for the challenged conduct. *See Mator*, 102 F.4th at 184; *Sweda*, 923 F.3d at 326. Regardless, she has done that too. *See* AC ¶ 127.

Finally, Defendants' arguments regarding Count III also fail. A "typewritten" request for documents (AC ¶ 204) is a "written" request, *see* 29 U.S.C. § 1024(b)(4), and a request for "contracts" is expressly encompassed within the relevant statute. *See id.* Accordingly, Plaintiff respectfully requests that the Court deny Defendants' motion to dismiss in its entirety.

---

[1] The fact that Johnson & Johnson shares a portion of the drug costs of the Plan is immaterial; it cannot escape its fiduciary responsibilities to the health plan on account of its employer contributions any more than the sponsor of a 401(k) plan can walk away from its fiduciary duties on account of its matching contributions. *See Brotherston v. Putnam Invs., LLC*, 907 F.3d 17, 29 (1st Cir. 2018).

## BACKGROUND

Defendant Johnson & Johnson ("J&J") is a medical technologies and pharmaceutical company with more than 130,000 employees worldwide. AC ¶ 13. The employees and retirees of J&J and its affiliated companies receive healthcare benefits, including prescription-drug benefits, through the J&J Group Health Plan and its component plans (the "Plan" or "Plans"). *Id.* ¶¶ 13-14. Plaintiff Ann Lewandowski was employed by J&J from November 2021 until April 2024 as a healthcare policy and advocacy director, and she is a participant in the Salaried Medical Plan component of the Group Health Plan. *Id.* ¶¶ 12, 190.[2]

All or most of the Plan's expenses are paid from the J&J Salary Medical VEBA ("VEBA Trust"), a trust fund that is funded by a combination of employer and employee contributions, along with investment income. *Id.* ¶ 15. J&J is the Plan sponsor and a fiduciary of the Plan. *Id.* ¶ 17. The Pension & Benefits Committee of J&J ("Committee") is the Plan administrator and also a Plan fiduciary. *Id.* ¶ 16.

## I.    Prescription Drug Plans Generally

The vast majority of employee health plans, including the J&J Plan, include coverage for prescription drugs. Generally speaking, the employee is responsible for a portion of a monthly insurance premium (and in some cases, the full premium

---

[2] J&J terminated Ms. Lewandowski's employment in April 2024, shortly after she filed this lawsuit. *Id.* ¶ 12. Plaintiff opted into continued health coverage through the Consolidated Omnibus Budget Reconciliation Act (COBRA) on May 7, 2024, and is making all required health plan payments. *Id.* ¶¶ 12, 195.

amount) and for the full cost of purchased prescriptions until meeting any applicable deductible. *Id.* ¶ 21. Once the deductible is met, the plan begins to cover a portion of the cost, and the employee continues to pay either a co-pay or co-insurance for each prescription. *Id.*

The list of prescription drugs covered by a prescription-drug plan is called a "formulary." *Id.* ¶ 33. Formularies are typically divided into multiple tiers, and plans provide different levels of coverage, or no coverage at all, depending on the specific drug at issue. *Id.* Formularies are powerful tools for plan fiduciaries to control prescription-drug costs. For example, when a lower-priced generic version of a drug becomes available, a prudent fiduciary adds the generic to its formulary and either removes the brand-name drug or disincentivizes its use. *Id.* ¶ 35.

Prescription drug benefits for self-funded group health plans are usually managed and administered by a pharmacy benefits manager ("PBM") selected by the plan's fiduciaries. *Id.* ¶ 37. PBMs negotiate rates with a network of pharmacies where participants can obtain prescriptions, maintain the plan's formulary, process beneficiaries' claims, and contract with drug manufacturers to secure price reductions. *Id.* PBMs are therefore central to determining the price of drugs paid by group health plans.

When a plan participant or beneficiary obtains a prescription drug from a pharmacy, the PBM acts as a middleman, paying the pharmacy for the cost of the

drug, minus the participant's out-of-pocket responsibility, and then collecting payment from the plan. *Id.* ¶ 38. Critically, however, the PBM may attempt to collect more money from the plan than it paid to the pharmacy, known as the "spread," and then pocket the difference. *Id.* ¶¶ 45-46. PBMs can also receive rebates and discounts from drug manufacturers in exchange for formulary placement. *Id.* ¶¶ 51-52.

## II.   Defendants' Mismanagement of J&J's Prescription Drug Program

Defendants contracted with Express Scripts, Inc. to serve as the Plan's PBM. In the contract, Defendants agreed to terms regarding drug prices, formulary management, pharmacy networks, and administrative services. *Id.* ¶¶ 14, 93.

Instead of prudently managing the Plans' prescription-drug program and carefully monitoring the PBM and prescription drug costs, Defendants effectively gave Express Scripts free rein without any meaningful monitoring or review. *Id.* ¶ 233. Defendants' mismanagement allowed Express Scripts to engage in unreasonable spread pricing, retain rebates from drug manufacturers, steer plan beneficiaries to Express Scripts' more-expensive pharmacy, and design formularies favoring expensive brand name drugs over lower-priced generics. *See id.* ¶¶ 91-103, 128-48. The result is more compensation to Express Scripts, higher expenses for the Plans, and increased costs for participants. *Id.* ¶¶ 72-76, 190-98.

To illustrate, the average pharmacy pays just $81.90 to obtain 90 units of the generic-specialty drug teriflunomide (the generic form of Aubagio, used to treat

multiple sclerosis). *Id.* ¶ 114. But Defendants agreed to make the Plans and their participants/beneficiaries pay Express Scripts **$10,239.69** for each 90-unit prescription – a whopping **12,403%** markup that Express Scripts keeps for itself. *Id.* Meanwhile, a participant or beneficiary could walk into a retail pharmacy and, *using no insurance at all*, pay a far lesser amount for the same 90-day prescription – $40.55, for example, at Wegmans, or $77.41 at Rite Aid. *Id.* ¶ 115.

This is not an isolated example. The Amended Complaint provides numerous instances of Defendants' failure to negotiate with Express Scripts for prices close to pharmacy acquisition cost or available market prices, resulting in the Plan and participants/beneficiaries paying exorbitant prices to Express Scripts. *See id.* ¶¶ 103-22. Across all generic-specialty drugs for which there is publicly available data on acquisition costs, Defendants agreed to make the Plan and its beneficiaries pay, on average, a markup of **498%** above what it costs pharmacies to acquire those drugs. *Id.* ¶¶ 5, 103.

The Plan and participants/beneficiaries are also significantly overpaying for generic drugs not designated as "specialty" on the Express Scripts formulary. For example, the generic, non-specialty drug valacyclovir has an average acquisition cost of $82.80 for a 180-unit prescription. *Id.* ¶ 124. Yet Defendants agreed to make the Plan and its participants/beneficiaries pay $303.68 for the same quantity – a **266.80%** markup. *Id.* Ms. Lewandowski was required to pay that inflated amount

out-of-pocket – even though that price was much higher than the price available to any person with no insurance. *Id.* ¶ 198. Indeed, for the 14 generic, non-specialty drugs Plaintiff has been prescribed since August 2022, Defendants' negotiated prices reflect an average **230.05%** markup above pharmacy acquisition cost. *Id.* ¶¶ 6, 125.

A prudent fiduciary would not have agreed to these exorbitant costs. *Id.* ¶ 6. In addition, Defendants mismanaged the Plan's prescription-drug program by:

(i) *Failing to engage in an open bidding process for a PBM or survey the market.* Contrary to the practices of other fiduciaries, Defendants did not engage in an open request for proposal ("RFP") process in selecting the Plan's PBM or undertake other prudent measures such as a market study. *See id.* ¶¶ 60, 94, 100. Had they done so, they would have realized that other PBMs offered the same drugs for as much as 90% less. *See id.* ¶¶ 144-46.

(ii) *Allowing the selection of a PBM to be guided by consultants and/or brokers with publicly known conflicts of interest.* Defendants retained Aon to assist them with selecting and negotiating with a PBM. *Id.* ¶ 96. According to public reporting, Aon receives indirect compensation from PBMs to which it steers clients. *Id.*

(iii) *Steering Plan participants toward the PBM's mail-order pharmacy.* Defendants agreed to terms under which Plan participants are led to obtain their prescriptions from the PBM's own mail-order pharmacy, Accredo, even though that pharmacy's prices are routinely higher than what retail pharmacies charge for the same drugs. *Id.* ¶¶ 129-34.

(iv) *Failing to disincentivize high-priced branded drugs in favor of lower-priced generics.* Defendants failed to steer participants/beneficiaries toward lower-priced generic drugs, e.g., by offering the participants a lower out-of-pocket responsibility or replacing the brand-name drug on the formulary. *Id.* ¶¶ 135-38. The decision not to do so was based on Express Scripts' conflicted recommendations, rather than a prudent independent and ongoing assessment of the formulary. *Id.* ¶ 135.

When fiduciaries fail to manage their prescription drug program and fail to monitor the Plans' PBM and prescription drug costs, employees like Ms. Lewandowski bear much of the financial burden. As a participant of the Plan, Plaintiff paid monthly premiums for her prescription-drug coverage and out-of-pocket amounts for co-pays, co-insurance, and deductibles. *Id*. ¶ 190. Because of Defendants' mismanagement, Plaintiff and other class members who purchase overpriced prescription drugs through the Plans paid higher out-of-pocket costs on inflated prescription drug prices, higher coinsurance, and higher premiums for the prescription-drug portion of the Plans. *Id*. ¶¶ 72-75, 190-94, 196-201.[3] The higher health care costs are also passed on to J&J employees in the form of lower wages or limited wage growth. *Id*. ¶ 76.

Express Scripts' practices are not new. As detailed in the Amended Complaint, as early as 2010, prominent media outlets, government entities, and research organizations reported on PBM tactics and conflicts of interest, and warned plan administrators about the financial harms to plan participants that result when they fail to act prudently and instead allow PBMs to enrich themselves at the expense of plans and their participants. *Id*. ¶¶ 149-70. J&J itself recognized that PBMs "serve

---

[3] With respect to premiums, Defendants set the required employee contributions each year as a percentage of expected spending by the Plan. *Id*. ¶ 192. This percentage has remained consistent and stable over time. *Id*. Accordingly, if the Plan's expenses had been lower, this would have reduced the amount of required employee contributions each year, including Plaintiff's contributions. *Id*. ¶ 194.

as middlemen with an aim towards increasing insurers' and their own profits," *id.* ¶ 171, and that "[t]oo often [] rebates and discounts are not shared with patients, leaving the sickest patients paying higher out-of-pocket costs." *Id.* ¶ 173. But unlike J&J, fiduciaries of many other plans saved their plans and their beneficiaries millions of dollars by, *inter alia*, contracting with alternative PBMs after an open bidding process or surveying the market, actively managing and negotiating drug costs, and exercising direct control over their formularies. *See id.* ¶¶ 175-89.

**III.   Defendants' Failure to Produce Requested Plan Documents and Contracts**

On December 20, 2023, Plaintiff sent a typewritten request through the online portal messaging system established by Defendants, requesting a copy of all plan documents. *Id.* ¶ 204. On February 19, 2024, more than 30 days after Plaintiff's initial request and after this lawsuit was filed, the Committee belatedly provided Plaintiff with a document entitled "General/Administrative Information Plan Details." *Id.* ¶ 207. The Committee did not provide any other Plan documents. *Id.*

Plaintiff, through counsel, then sent letters on February 20, 2024 and March 4, 2024, to repeat her request for Plan documents and provide additional detail on the scope of her requests. *Id.* ¶¶ 208-09. This correspondence made clear that Plaintiff's request included "All contracts and agreements under which the Plans' prescription drug benefit is operated, including but not limited to all contracts and agreements with Express Scripts." *Id.* ¶ 209. In addition, Plaintiff requested the

formulary used by the Plan. *Id.* ¶ 101. However, Defendants refused to produce either the PBM contract or the formulary. *See id.* ¶¶ 101, 210.

## IV.   Plaintiff's Claims

On behalf of herself and all others similarly situated, Plaintiff asserts two sets of claims under ERISA. In Counts 1 and 2, Plaintiff alleges that Defendants breached their fiduciary duties under 29 U.S.C. § 1104(a) by failing to prudently manage the Plans' prescription drug program and carefully monitor the Plan's PBM and prescription drug costs, entitling Plaintiff and the class to plan-wide relief pursuant to 29 U.S.C. § 1109(a) and 29 U.S.C. § 1132(a)(2) and other relief pursuant to 29 U.S.C. § 1132(a)(3). In Count 3, Plaintiff alleges that Defendants failed to timely provide Plan documents and contracts upon request as required under 29 U.S.C. § 1024(b)(4), entitling Plaintiff to relief under 29 U.S.C. § 1132(c).

## STANDARD OF REVIEW

## I.   Standard on Rule 12(b)(6) Motion

When considering a Rule 12(b)(6) motion to dismiss, a court must "construe the complaint in the light most favorable to the plaintiff … to determine whether it contains sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Sweda*, 923 F.3d at 325 (cleaned up). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 325-26.

The allegations are sufficient if they "move the claim 'from conceivable to *plausible*'," a standard "less demanding" than a probability requirement. *Mator*, 102 F.4th at 189 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

In evaluating whether this standard has been met, the Court must "employ a holistic approach, considering all … well-pleaded factual allegations," as well as the "underlying substantive law," bearing in mind "ERISA's protective function." *Sweda*, 923 F.3d at 326, 331. And contrary to Defendants' arguments (Defs.' Br. 24), Plaintiff is <u>*not*</u> required to "directly address the process by which the plan was managed." *Seibert v. Nokia of Am. Corp*., 2024 WL 2316551, at *3 (D.N.J. May 22, 2024) (cleaned up) (*quoting Braden v. Wal-Mart Stores, Inc*., 588 F.3d 585, 596 (8th Cir. 2009). Instead, "[a] plaintiff's allegations are sufficient if a court can reasonably infer that the process was flawed." *Id*. at *3 (internal quotation marks omitted). "Because participants usually do not have direct evidence of how fiduciaries reached their decisions, the complaint need only provide an inference of mismanagement by circumstantial evidence, rather than direct allegations of matters observed firsthand." *McGowan v. Barnabas Health, Inc.*, 2021 WL 1399870, at *5 (D.N.J. Apr. 13, 2021) (internal quotation marks omitted) (citing *Sweda,* 923 F.3d at 332).

## II.    Standard on Rule 12(b)(1) Motion

In reviewing a facial challenge to standing under Rule 12(b)(1), the court must "apply the same standard as on review of a motion to dismiss under Rule 12(b)(6)."

*In re Horizon Healthcare Servs. Inc. Data Breach Litig.*, 846 F.3d 625, 633 (3d Cir. 2017) (citing *Petruska v. Gannon Univ.*, 462 F.3d 294, 299 n.1 (3d Cir. 2006)). In reviewing a factual challenge, the court may "weigh and consider evidence outside the pleadings." *Davis v. Wells Fargo*, 824 F.3d 333, 346 (3d Cir. 2016) (quoting *Const. Party of Pa v. Aichele*, 757 F.3d 347, 358 (3d Cir. 2014)). However, where "the evidence before the Court is inconclusive" or the evidence submitted by the defendant does not undermine plaintiff's theory of standing, the claims should proceed. *See Dinicola-Ortiz v. GEICO Indem. Co.*, 2024 WL 1827611, at *6 (D.N.J. Apr. 26, 2024). As the Third Circuit has held, "dismissal via a Rule 12(b)(1) factual challenge to standing should be granted sparingly." *Davis*, 824 F.3d at 350.

## ARGUMENT

### I.    Plaintiff Has Standing to Bring This Action

Defendants begin by disputing Plaintiff's standing to assert her breach of fiduciary duty claims.[4]   That is easily answered.  Standing requires: (1) an injury in fact that is concrete, particularized, and actual or imminent; (2) that is traceable to the challenged action of the defendant; and (3) that would likely be redressed by judicial relief. *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 422 (2021).  Plaintiff alleges that Defendants' fiduciary breaches caused her two specific forms of harm: She paid more in monthly premiums for her healthcare coverage and incurred greater

---

[4] Defendants do not challenge Plaintiff's standing to assert her claim in Count III.

out-of-pocket expenses for her prescription drugs.  *See, e.g.*, AC ¶¶ 75, 139, 190-95 (premiums), 198-200 (out-of-pocket).   Plaintiff also alleges that both of these monetary harms will continue for as long as she remains enrolled in the Plan.  *See id.* ¶¶ 12, 196, 201.  A "pocketbook injury is a prototypical form of injury in fact." *Collins*, 594 U.S. at 222.   Make-whole relief will redress the past harm, and injunctive and equitable relief will redress the future harm.  *See* AC ¶¶ 253, 255-57. Article III requires nothing more.

Defendants resist this straightforward conclusion with a non-sequitur: they argue that Plaintiff lacks standing because she "does not claim she was denied any benefits to which she is entitled."  Defs.' Br. 12.  This is irrelevant, as Plaintiff is not bringing a claim for denial of benefits under 29 U.S.C. § 1132(a)(1)(B). Rather, Plaintiff is bringing breach of fiduciary duty claims under 29 U.S.C. §§ 1132(a)(2) and (3), alleging that Defendants agreed to unreasonable prices and other terms for the Plans' prescription-drug program, and that these fiduciary failures increased her premiums and her out-of-pocket costs.  *See* AC ¶¶ 91-127 (agreeing to unreasonable prices); ¶¶ 129-34 (steering to more expensive pharmacies); ¶¶ 135-38 (failing to disincentivize branded drugs vis-à-vis generics); ¶¶ 191-200 (resulting in higher premiums and out-of-pocket costs). That Plaintiff does not *also* allege that Defendants violated the terms of the Plan has no relevance to whether she has standing to pursue the breach of fiduciary duty claims she actually brought.

This case is nothing like *Thole v. U.S. Bank N.A.*, 590 U.S. 538 (2020).  The plaintiffs in *Thole* were retired participants in a pension plan who paid no monthly premium and received "a fixed payment each month" that did "not fluctuate with the value of the plan or because of the plan fiduciaries' good or bad investment decisions." *Id.* at 540.  They *conceded* that they did not allege "any monetary injury." *Id.* Their theory of standing was that they did not need to allege monetary injury because ERISA allowed them to stand in the shoes of the pension plan as "representatives" or "assignees" and recover for losses to the plan that were not passed through to participants. *See id.* at 543-44. The Supreme Court rejected that argument, holding that "[t]here is no ERISA exception to Article III" and that plaintiffs must always allege a personal, concrete stake in the lawsuit. *Id.* at 547.

Here, unlike the plaintiffs in *Thole*, Plaintiff alleges specific monetary injury—*i.e.*, that she paid (and will continue to pay) inflated premiums and inflated out-of-pocket costs for prescription drugs. AC ¶¶ 75, 139, 190-95, 198-200.  Courts routinely recognize these types of monetary harms as sufficient for Article III standing.  *See, e.g.*, *In re Ins. Brokerage Antitrust Litig.*, 579 F.3d 241, 275 (3d Cir. 2009) ("Because the plaintiffs … suffered economic harm in the form of higher premiums …, the named plaintiffs have standing[.]");  *City of Columbus v. Trump*, 453 F. Supp. 3d 770, 787 (D. Md. 2020) ("The increase in premiums constitutes economic harm and is therefore a classic and paradigmatic form of injury in fact."

(cleaned up)); *Aetna Inc. v. Insys Therapeutics, Inc.*, 330 F.R.D. 427, 430 (E.D. Pa. 2019) ("MSI has proven Article III standing … due to its higher premiums."); *AARP v. EEOC*, 226 F. Supp. 3d 7, 18 (D.D.C. 2016) ("An increase in premiums would certainly constitute an injury."). There "is no ERISA exception" to these cases. *Thole*, 590 U.S. at 547. Accordingly, Plaintiff has standing. *See Acosta v. Bd. of Trs. of Unite Here Health*, 2023 WL 2744556, at \*3 (N.D. Ill. Mar. 31, 2023) (finding plaintiffs had standing based on similar allegations and rejecting "Defendants' attempts to fit these facts to *Thole*").[5]

### A.   Plaintiff Has Suffered Economic Harm in the Form of Inflated Premiums, and Will Bear All of Those Premiums Going Forward

Defendants question the plausibility of Plaintiff's allegations that her premiums increased as a result of their fiduciary breaches. *See* Defs.' Br. 14-15 (calling allegations "speculative" and "conclusory"). This argument is baseless. It is common sense, basic math, and unquestionably plausible that everyone's premiums increase when overall plan spending increases. Expenses don't pay themselves. And Plaintiff alleges the specific chain of causation with respect to the J&J Plan: The Plan's expenses are paid from the VEBA Trust, which is continually funded by a combination of employer and employee contributions.  AC ¶¶ 15, 191.  The amount

---

[5] If Plaintiff does not have standing, it is difficult to see who would. ERISA's fiduciary protections would be virtually unenforceable for health plan participants. Nor is it clear that other Plan participants would feel comfortable stepping forward, given that J&J terminated Plaintiff after this lawsuit was filed. *See supra* at 17 & n.2.

of required contributions is set by Defendants based on the Plans' expected spending for each calendar year—*i.e.*, Defendants set total contributions at the amounts necessary to cover expected costs. *Id.* ¶ 191.  It follows that when Plan spending is inflated by fiduciary misconduct, the required contributions are inflated as well. *Id.*

Responsibility for these inflated contributions are split proportionally between J&J and its employees. Over the past 10 years, Defendants have consistently allocated responsibility for contributions to maintain a fixed ratio between employer contributions and employee contributions.  *Id.* ¶¶ 192-93.  Based on this 10-year history, Plaintiff plausibly alleges that "if Defendants stopped causing the Plans to overspend on prescription drugs by millions of dollars each year[,] employee contributions would be lower as well, in order to maintain the same split between employer and employee contributions to which Defendants have demonstrated their commitment." *Id.* ¶ 193.  Plaintiff, as an employee who paid her required monthly premiums, has thus "paid more in premiums than she would have paid absent Defendants' fiduciary breaches." *Id.* ¶ 194; *see id.* ¶ 190.

Notably, Defendants submitted a declaration from J&J's Head of Global Health & Welfare Benefits that disputes Plaintiff's allegations with respect to out-of-pocket costs, *see* ECF 53, but that declaration does not dispute *any* of the just-described allegations about how Defendants pass on overcharges to employees through increased premiums. Defendants cannot rebut Plaintiff's standing

16

allegations "[b]y focusing on 'out-of-pocket' costs" and ignoring other "real economic harms" that Plaintiff has suffered. *See In re Lincoln Nat'l COI Litig.*, 620 F. Supp. 3d 230, 264 (E.D. Pa. Aug. 9, 2022).

Indeed, Plaintiff's harm is even more straightforward, and does not depend on how contributions are divided between J&J and its employees. After Plaintiff filed this lawsuit, J&J terminated her employment. AC ¶ 12.  Plaintiff is continuing her coverage through COBRA, which by statute means that her premiums are now 102% of the *combined* employer and employee contributions for similarly situated individuals under the Plans. *Id.* Accordingly, regardless of how Defendants have or would allocate contributions between J&J and employees, Plaintiff is now paying the entirety of the premiums in amounts inflated by Defendants' fiduciary violations.

The cases Defendants cite are all distinguishable, as the Amended Complaint includes the detail that the complaints in those cases lacked.  In *Knudsen v. MetLife Grp., Inc.*, 2023 WL 4580406 (D.N.J. July 18, 2023), *appeal pending*, No. 23-2430 (3d Cir.), the plaintiffs claimed that their employer improperly pocketed certain drug rebates instead of allocating those rebates to the plan.  *Id.* at *1.  But they alleged no plausible basis—only "conjecture," *id.* at *5—from which to conclude that allocating rebates to the plan would have decreased employee premiums. *Id.* at *5. They alleged only that "it *may* have been consistent with [Defendant's] fiduciary duties for Defendant to reduce ongoing contributions on account of the rebates

collected by the Plan," without any facts suggesting that the defendant actually would have done so.  Complaint, *Knudsen v. MetLife Group, Inc.*, No. 23-cv-00426 (D.N.J. Jan. 25, 2023), ECF 1, ¶ 36 (emphasis added).  Here, in contrast, Plaintiff specifically details Defendants' consistent ten-year practice of allocating increases in Plan spending proportionally between J&J and employees, AC ¶¶ 190-96, and expressly alleges both that Plaintiff "has paid more in premiums than she would have paid absent Defendants' fiduciary breaches," *id.* ¶ 194, and that she "will be required in the future to pay more in premiums than she would be required to pay absent Defendants' fiduciary breaches," *id.* ¶ 196.

Equally inapposite is *Winsor v. Sequoia Benefits & Ins. Servs., LLC*, 62 F.4th 517 (9th Cir. 2023), where the plaintiffs did not allege that their employer "has changed or would change employee contribution rates based on [the] alleged breaches of fiduciary duty, or that employee contribution rates are tied to overall premiums."  *Id.* at 524; *see id.* ("Plaintiffs do not expressly allege that they would pay lower contributions in the future if Defendants' commissions were eliminated."). Here, as just described, Plaintiff alleges exactly that.  *See* AC ¶¶ 75, 139, 190-95. In *Gonzalez de Fuente v. Preferred Home Care of N.Y. LLC*, 2020 WL 5994957 (E.D.N.Y. Oct. 9, 2020), the plaintiffs were not responsible for any premium payments and expressly alleged that they "do not use" the plan. *Id.* at *2. And in *Scott v. UnitedHealth Grp., Inc.*, 540 F. Supp. 3d 857 (D. Minn. 2021), the plaintiffs

argued that they "do not need to allege that their payroll contributions have increased … in order to state an injury." *Id.* at 863. Here, of course, Plaintiff specifically alleged what the *Scott* plaintiffs disclaimed.

### B. Plaintiff Also Paid Inflated Out-of-Pocket Amounts for Prescription Drugs, and Will Continue to Do So in the Future

As for out-of-pocket costs, Defendants do not deny that their conduct resulted in Plaintiff being charged unreasonable amounts at the prescription counter. *See* AC ¶ 198 (Plaintiff charged $303.68 for drug available for $90.50); *id.* ¶ 199 (Plaintiff charged $18.72 for drug available for $6.38); *id.* ¶ 200 (Plaintiff and Plan charged $37.19 for drug available for $14.28). Defendants instead make a convoluted argument that these overpayments did not cause Article III harm because Plaintiff exceeded her "out-of-pocket maximum" each year. Defs.' Br. 17-20.[6] In Defendants' view, the fact that their conduct inflicted $210 of harm upon Plaintiff at the start of 2023 is irrelevant because she would have had to pay $210 for some other medical procedure several months later anyway. *Id.*

---

[6] Defendants state that "[t]he vast majority of expenditures related to Plaintiff in each year were for medical services." Defs.' Br. 19. That is inaccurate. As the Amended Complaint explains, Plaintiff receives two annual infusions of the drug ocrelizumab. AC ¶ 212. The Plan pays approximately $80,000 for each infusion—a massive overpayment given that the average sales price of that drug is just $35,000. *Id.* ¶ 214. Plaintiff also offered to get the infusion at a site that would charge the Plan only $40,000, but Defendants refused to approve her request. *Id.* ¶ 216. Accordingly, "the vast majority of expenditures related to Plaintiff in each year" were in fact for the drug ocrelizumab, and Defendants caused the Plan to overpay for that drug by about $40,000 per infusion. *Id.* ¶¶ 212-16. These overpayments likewise contributed to increased premiums for plan participants/beneficiaries.

19

That is not the law.  Plaintiff was harmed at the moment she was overcharged by $210 for her first prescription. *See* AC ¶ 198. At that point in time, she had $210 less than she otherwise would have had due to Defendants' misconduct – a clear injury.  Whether she potentially may have "saved" $210 on some other transaction several months later does not retroactively extinguish the Article III injury she suffered when she was overcharged. Even "[t]he temporary loss of use of one's money constitutes an injury in fact for purposes of Article III." *Van v. LLR, Inc.*, 962 F.3d 1160, 1164 (9th Cir. 2020). Courts are unanimous on this. *See, e.g.*, *MSPA Claims 1, LLC v. Tenet Fla., Inc.*, 918 F.3d 1312, 1318 (11th Cir. 2019) ("The inability to have and use money to which a party is entitled is a concrete injury."); *In re U.S. Off. of Pers. Mgmt. Data Sec. Breach Litig.*, 928 F.3d 42, 66 (D.C. Cir. 2019) ("The delay in those Plaintiffs' receipt of their refunds, and the forgone time value of that money, is an actual, tangible pecuniary injury"); *Dieffenbach v. Barnes & Noble, Inc.*, 887 F.3d 826, 828 (7th Cir. 2018) ("The plaintiffs have standing … because unauthorized withdrawals from their accounts cause a loss (the time value of money) even when banks later restore the principal.").  As another court put it, "Plaintiff's claims to economic loss, even temporary, is a concrete and actual injury sufficient to establish standing." *Bodor v. Maximus Fed. Servs., Inc.*, 2021 WL 4941503, at *2 (E.D. Pa. Oct. 22, 2021).

Even if Defendants' arguments about whether Plaintiff hit her out-of-pocket maximum in the past were relevant to the standing analysis, it is entirely speculative that she will hit her out-of-pocket maximum in the future. In the meantime, "Plaintiff will be required in the future to pay more out-of-pocket for prescription drugs than she would be required to pay absent Defendants' unlawful conduct." AC ¶ 201. This further supports her standing to bring suit. *See Clemens v. ExecuPharm Inc.*, 48 F.4th 146, 152 (3d Cir. 2022) ("allegations of future injury suffice if the threatened injury is certainly impending or there is a substantial risk that the harm will occur" (citations and quotation marks omitted)).

### C.  Plaintiff's Standing Is Not Limited to the Drugs She Purchased

Finally, Defendants argue that even if Plaintiff has standing to challenge Defendants' conduct with respect to the specific drugs she was prescribed, she "lacks standing to challenge generic specialty drug prices" because she was not prescribed any generic-specialty drugs.   Defs.' Br. 21. This misconstrues the nature of Plaintiff's claims and ignores circuit precedent. First of all, Defendants' fiduciary breaches resulted in *plan-wide* overcharges that increased monthly premiums for everyone, including Plaintiff, regardless of which drugs they were personally prescribed, or whether they were prescribed any drugs at all. *See* AC ¶¶ 75-76, 123, 191-94. That makes Defendant's citation to *Finkelman v. NFL*, 810 F.3d 187 (3d Cir. 2016), entirely inapposite. The plaintiff there alleged that the NFL's conduct

inflated the price of Super Bowl tickets. *Id.* at 188-89.  He did not have standing because he did not buy a ticket, and therefore suffered no concrete harm. *Id.* at 195. But imagine if the NFL charged a monthly subscription fee for the *option* to buy tickets to NFL games, and that monthly fee was inflated by illegal conduct.  A plaintiff who paid the inflated monthly fee would suffer harm even in months that he did not exercise his option to buy a ticket – because the subscription fee itself was inflated.  That is the proper analogy here in light of Plaintiff's monthly premiums, and it confirms standing.[7]

Even setting premiums aside and focusing on out-of-pocket harm, circuit precedent forecloses Defendant's argument.  Plaintiff's claims are based on Defendants' lack of prudence with respect to a single comprehensive PBM contract covering all types of drugs. *See, e.g.*, AC ¶ 8. As Defendants previously acknowledged, "[t]he gravamen of her claims is that the Plan fiduciaries allowed participants to be charged excessive prices for 'prescription drugs *in general*.'" ECF 37 at 2 (emphasis added).  That is directly analogous to *Boley v. Universal Health Servs., Inc.*, 36 F.4th 124 (3d Cir. 2022), where the plaintiffs alleged that their

---

[7] The same point answers Defendants' argument that Plaintiff cannot challenge Defendants' imprudence in "agreeing to steer beneficiaries toward Express Scripts' mail-order pharmacy, Accredo," AC ¶ 129, and "failing to disincentivize the use of high-price branded drugs on the Plan's formulary in favor of lower-priced generics," *id.* ¶ 135; *see* Defs.' Br. 23. Those fiduciary breaches resulted in plan-wide overcharges that increased monthly premiums for everyone, including Plaintiff, regardless of which drugs they were personally prescribed, or whether they were prescribed any drugs at all.

employer "lacked a prudent investment evaluation process when choosing and evaluating investments offered to [retirement] Plan participants." *Id.* at 131 (cleaned up). The defendant argued that plaintiffs only had standing with respect to the specific investment options they chose, not other investment options they did not choose. That is the same argument Defendants make here—that Plaintiff can bring her challenge only with respect to the prescription drugs she took, not others.

The Third Circuit rejected this argument: "Article III does not prevent the Named Plaintiffs from representing parties who invested in funds that were allegedly imprudent due to the same decisions or courses of conduct." *Id.* at 132. The court explained that the plaintiffs were not alleging "thirty-seven individual breaches of fiduciary duty, but rather several broader failures … affecting multiple funds in the same way." *Id.* So too here. Plaintiff is not alleging individual breaches of fiduciary duty for each prescription drug, but rather that Defendants' overall failures in selecting, negotiating with, and supervising their PBM affected multiple prescription drugs in the same way. She has standing to challenge those overall failures. *See id.*; *see also Sweda*, 923 F.3d at 334 n.10 (plaintiffs had standing because they invested in some of the underperforming investment options).

Defendants' efforts to distinguish *Boley* and *Sweda* are unavailing. Defendants concede that the plaintiffs in those cases "claimed that investment options offered through their 401(k) retirement plans were imprudent," and that they

23

had standing to challenge *all* the investment options because each plaintiff "invested in *one or more* of the challenged investments." Defs.' Br. 22 (emphasis added). Likewise here, Plaintiff claims that prescription drug prices offered through her health plan were imprudent, and she has standing with respect to *all* of the offered drugs because she was prescribed "one or more" of them.  The prescription drugs that Plaintiff was not prescribed are in the exact same economic position as the investment options that the *Boley* and *Sweda* plaintiffs did not select.

## II.     Plaintiff States Plausible Claims Against Defendants under ERISA

Defendants' substantive challenges to the Amended Complaint are just as baseless as their standing challenges. The Supreme Court, Third Circuit, and numerous district courts have all recognized – consistent with established trust law and the text of ERISA itself – that fiduciaries have a responsibility to monitor plan costs and ensure such costs are reasonable. Here, the Amended Complaint is replete with extensive, detailed allegations showing that Defendants breached this basic duty with respect to management of the Plan's prescription-drug program. These allegations are more than sufficient to state a claim.

It is equally clear that plan administrators have a duty to turn over contracts and other basic documents relating to the operation of a plan under ERISA § 1024 (codified at 29 U.S.C. § 1024).  Plaintiff properly alleges that Defendants breached that duty by failing to turn over the General/Administrative Information Plan Details

within 30 days of Plaintiff's request as mandated by law, and by failing to turn over the Plan's PBM contract or formulary at all. Defendants' failure to produce these documents upon request directly supports Plaintiff's claim in Count III, and also lends further support for Plaintiff's breach of fiduciary duty claim in Counts I and II (*i.e.*, if Defendants have nothing to hide, why are they hiding it?).

## A.    Plaintiff Plausibly Alleges that Defendants Breached Their Fiduciary Duties (Counts I and II)

"Congress enacted ERISA to protect 'employees and their dependents' whose 'well-being and security' was affected by 'the lack of ... adequate safeguards' for employee benefit plans." *Mator*, 102 F.4th at 183 (citing 29 U.S.C. § 1001(a)). One of the important ways it did so is by establishing certain fiduciary duties in 29 U.S.C. § 1104, which are drawn from trust law. *See Sweda*, 923 F.3d at 327.

Under this section of ERISA, plan fiduciaries must act "solely in the interest of the participants and beneficiaries … for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) *defraying reasonable expenses of administering the plan*."  29 U.S.C. § 1104(a)(1)(A) (emphasis added). In addition, fiduciaries must act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B). These twin fiduciary duties are considered "the highest known to the law." *Sweda*, 923 F.3d at 333.

One necessary component of carrying out these duties is "monitor[ing] plan expenses" and ensuring that they are "reasonable". *Sweda*, 923 F.3d at 328-29; *see also* Restatement (Third) of Trusts § 88 cmt. a (2007) ("Implicit in a trustee's fiduciary duties is a duty to be cost conscious."); *Tibble v. Edison Int'l*, 843 F.3d 1187, 1198 (9th Cir. 2016) (en banc) ("Wasting beneficiaries' money is imprudent .… trustees are obliged to minimize costs."); 29 U.S.C. § 1101(a)(1)(A). In this regard, "fiduciaries should be vigilant in negotiation of the specific formula and methodology" by which fee payments will be made, including any indirect compensation that will be paid in the form of "revenue sharing … to plan service providers." *Sweda*, 923 F.3d at 328. In addition, fiduciaries of large plans such as the J&J Plan must consider the plan's size and its bargaining power to obtain products at "lower cost" than other purchasers in the market. *Id.* at 328-29.

Plaintiff plausibly alleges that Defendants breached their duty to monitor and control expenses by allowing the Plan (and its participants and beneficiaries) to pay excessive drug costs. *See supra* at 5-9.  As set forth in detail in the Amended Complaint, "an analysis of the prices that Defendants agreed to make the Plans and their participants/beneficiaries pay for generic drugs reveals a staggering markup from acquisition costs for those drugs, a staggering markup from the prices that would be charged by a[n] [alternative] 'pass-through' PBM, and a staggering markup from the prices charged to comparable plans by other traditional PBMs."

26

AC ¶ 97.  Among other things, Plaintiff alleges that:

- "Across all generic-specialty drugs … for which there is publicly available data on average acquisition costs, Defendants agreed to make the Plans and their beneficiaries pay, on average, a markup of ***498%*** above what it costs pharmacies to acquire those drugs*." Id.* ¶ 5; *see also id.* ¶¶ 103-16. In some cases, the markups were over 1,000% (*id.* ¶¶ 110, 112), over 5,000% (*id.* ¶¶ 106, 108) or even over 10,000% (*id.* ¶¶ 3, 114). *See id.* ¶ 116 (chart showing markups for all 42 drugs for which there is publicly-available data on acquisition costs).

- "The Plans' prices for the 53 drugs designated as specialty on the Express Scripts formulary for which [the government] *does not* publish a NADAC [National Average Drug Acquisition Cost] … are just as unreasonable." *Id.* ¶ 117; *see also id.* ¶¶ 118-21.[8]

- "Defendants' mismanagement has also caused the Plans and their participants/beneficiaries to overpay for generic drugs that are not designated as 'specialty' on the … Express Scripts formulary." *Id.* ¶ 123. The average markup that Plaintiff paid on drugs she has been prescribed since August 2022 was 230%, meaning that she paid more than three times as much as the actual drug acquisition cost. *See id.* ¶¶ 124-25.

- Express Scripts' pharmacy prices are not only severalfold higher than drug acquisition costs, but "routinely higher than the prices at other pharmacies." *Id.* ¶ 7; *see also id.* ¶¶ 105, 107, 109, 111, 113, 115, 118-21, 130-31.

- "Defendants squandered their bargaining power and, for many drugs, agreed to make the Plans and their participants/beneficiaries pay more than someone would pay if they just walked into a retail pharmacy and filled the same prescription *without* using insurance." *Id.* ¶ 100; *see also id.* ¶¶ 3, 118, 121.

- Defendants agreed to make the Plans and their participants/beneficiaries pay, on average, over two to four times as much as the PepsiCo plan for the same drugs. *Id.* ¶ 177.

---

[8] Because Defendants concealed the Plan's formulary from her, a public version of the Express Scripts formulary was used for purposes of the Amended Complaint. *See* AC ¶ 101.

- If Defendants had contracted with a pass through PBM such as Smith Rx (which is fully capable of providing the Plan the same level of service), they would have saved the Plan over 90% on generic-specialty drugs, and several millions of dollars per year overall, accounting for all drugs, fees, and rebates. *See id.* ¶¶ 144-46.

Further, with respect to process, Plaintiff alleges:

- Defendants failed to conduct an open and diligent RFP process to obtain competitive bids for PBM services and ensure that rates and terms were reasonable. *See id.* ¶¶ 55, 60, 94, 100. Nor did Defendants conduct market surveys or take other measures to ensure reasonable pricing and terms. *See id.* ¶¶ 61, 100.

- "Defendants failed to adequately consider contracting with a pass-through PBM, instead of Express Scripts, for all of the Plans' prescription-drug needs." *Id.* ¶ 143.

- Defendants failed to re-negotiate their contract with Express Scripts, *see id.* ¶ 61, and failed to ensure that manufacturer drug rebates (also known as revenue sharing) were fully passed on to the Plan instead of retained in full or in part by Express Scripts or its affiliated entities, *see id.* ¶¶ 14, 51-53, 90, contrary to J&J's own "written policy supporting pass-through rebates," *id.* ¶ 172.

- "Defendants allowed their selection of a PBM for the Plans to be guided or managed by a broker with a conflict of interest." *Id.* ¶ 96.

- Defendants also were subject to a conflict of interest because J&J is a leading drug maker that earns billions of dollars a month selling drugs, and benefits from high drug prices. *Id.* ¶ 5.

- "Defendants imprudently agreed to a pricing model in which the prices the Plans and their participants/beneficiaries pay for generic drugs … are based on a discount from AWP[9] [which is highly manipulable, *see id.* ¶ 43] rather than on a fixed unit-price schedule or with reference to actual pharmacy acquisition costs for those drugs." *Id.* ¶ 98. Fiduciaries of comparable plans that have adopted a fixed-unit cost schedule instead of

---

[9] AWP stands for "Average Wholesale Price." But it is not a true representation of actual market prices and is referred to by many in the industry as "ain't what's paid." *Id.* ¶ 43.

one based on AWP "have reduced their prescription-drug spending by 30% or more as a result." *Id.* ¶ 141.

- "Defendants also illogically agreed to a pricing model in which some or all generic-specialty drugs are treated the same as branded specialty drugs, instead of being priced as generic drugs." *Id.* ¶ 99; *see also id.* ¶ 142.

- "Defendants have further mismanaged the Plans [] by agreeing to steer beneficiaries toward Express Scripts' mail-order pharmacy, Accredo, even though Accredo's prices are routinely higher than the prices retail pharmacies charge for the same drugs." *Id.* ¶ 129; *see also id.* ¶¶ 130-34.

- Defendants also "fail[ed] to disincentivize the use of high-priced branded drugs on the Plans' formulary in favor of lower-priced generics." *Id.* ¶ 135; *see also id.* ¶ 138.

In other ERISA cases, similar allegations of excess fees to plan service providers have repeatedly been held sufficient to create an inference of a breach of fiduciary duty. *See, e.g.*, *Mator*, 102 F.4th at 184-88; *Sweda*, 923 F.3d at 330-34; *Johnson v. PNC Fin. Servs. Grp., Inc.*, 2022 WL 973581, at *5-6 (W.D. Pa. Mar. 31, 2022); *McGowan*, 2021 WL 1399870, at *5; *Peterson v. Ins. Servs. Off., Inc.*, 2021 WL 1382168, at *5 (D.N.J. Apr. 13, 2021); *Silva v. Enovik Corp.*, 2020 WL 12574912, at *7-8 (D.N.J. Dec. 30, 2020); *Pinnell v. Teva Pharms. USA, Inc.*, 2020 WL 1531870, at *3-6 (E.D. Pa. Mar. 31, 2020); *Nicolas v. Trs. of Princeton Univ.*, 2017 WL 4455897, at *4 (D.N.J. Sept. 25, 2017).[10] The allegations here are on all fours with those that the Third Circuit found sufficient in both *Sweda* and *Mator*.

---

[10] Although many of these cases involved recordkeeping or investment fees, there is no reason to treat prescription drug charges any differently. Defendants do not even attempt to argue that prescription drug costs are exempted from the fiduciary duty to monitor plan costs and ensure that such costs are reasonable. *See* Defs.' Br. 23-32.

*See Sweda*, 923 F.3d at 330 ("Sweda alleged that Penn paid excessive administrative fees, failed to solicit bids from service providers, failed to monitor revenue sharing, failed to leverage the Plan's size to obtain lower fees or rebates, and failed to comprehensively review Plan management"); *Mator*, 102 F.4th at 185 ("[T]he Mators allege the Plan's fees were several times larger than what similar plans paid; the Plan's fiduciary did not negotiate a fee cap or solicit bids …; the asset-based fee structure caused the Plan's fees to rise when there was no corresponding increase in services; and similarly situated fiduciaries requested proposals and negotiated with [service providers] to keep fees reasonable.").

Defendants invite reversible error by asking the Court to dismiss Plaintiff's claims here. *See, e.g.*, *Hughes*, 595 U.S. at 174 (holding district court erred in dismissing ERISA action alleging that defendants "failed to monitor and control [] fees …, resulting in unreasonably high costs to plan participants"); *Mator*, 102 F.4th at 191 (vacating district court order dismissing ERISA breach of fiduciary duty claims relating to excessive fees); *Sweda*, 923 F.3d at 340 (same).[11]

---

[11] Defendants do not cite a single controlling case that dismissed an excess fee claim such as that asserted here. As noted above, *Mator* (which Defendants refer to as "*Wesco*") *vacated* an order granting a motion to dismiss. The other appellate cases that Defendants rely upon are out-of-circuit. Finally, the district court cases that Defendants cite are also non-binding, and actually undercut their position that "overall" comparisons of total plan costs are what matter at the pleading stage. *See* Defs.' Br. 26, 28 (discussed *infra* at 33-34). The *McCaffree* case cited by Defendants held exactly the opposite. *See McCaffree Fin. Corp. v. ADP, Inc.*, 2023 WL 2728787, at *13 (D.N.J. Mar. 31, 2023) (rejecting comparisons of "total plan costs" in lieu of specific product comparisons).

### 1. Plaintiff Is Not Obligated to Allege Additional Facts Beyond Those in the Amended Complaint

Defendants advance two arguments for why Plaintiff's extensive allegations are insufficient to state a claim. Both are meritless.

*First*, Defendants argue that "[t]he Amended Complaint contains no allegations concerning the process by which the Plan selected or negotiated with [Express Scripts]." Defs.' Br. 26. However, it is black-letter ERISA law that a plaintiff is not required to directly allege the details of a defendant's behind-the-scenes process. *See Sweda*, 923 F.3d at 332 (citing *Pension Benefit Guar. Corp. ex rel. St. Vincent Cath. Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 718 (2d Cir. 2013)); *Braden*, 588 F.3d at 596. Courts instead "recognize that 'ERISA plaintiffs generally lack the inside information necessary to make out their claims in detail unless and until discovery commences.'" *Johnson*, 2022 WL 973581, at *6 (quoting *Braden*, 588 F.3d at 598). That is especially so here, where J&J has refused to even turn over its PBM contract, despite Plaintiff's lawful request for it. *See supra* at 9-10; *infra* at § II.B. The Court may infer from the circumstantial evidence set forth in the Amended Complaint that Defendants' process was flawed—*i.e.*, that outcomes this bad plausibly resulted from an imprudent process. *See Sweda*, 923 F.3d at 332. And even if direct allegations of deficiencies in process were required (which they are not), Plaintiff has identified several deficiencies in Defendants' processes. *See supra* at 28-29; AC ¶¶ 139-48.

31

_Second_, Defendants argue that the Amended Complaint does not contain cost comparisons between the J&J Plan and other plans. _See_ Defs.' Br. 28. This is false. Plaintiff _does_ compare the Plan's prescription drug costs to those of another large plan (the Pepsico plan), and alleges the Plan paid two to four times more even though both Defendants and Pepsico used Express Scripts for their PBM services. _See id._ ¶ 177.  Regardless, once again, such comparisons are not required to support an alleged breach of fiduciary duty based on a failure to monitor and control plan expenses. "Sweda did not support that allegation with any comparisons to other plans," _Mator_, 102 F.4th at 185, and Plaintiff is not required to do so either. The question at this stage is simply whether Plaintiff has alleged enough factual content to "nudge the claim across the line from conceivable or speculative to plausible." _D'Addario v. Johnson & Johnson_, 2023 WL 239395, at *5 (D.N.J. Jan. 18, 2023). Plaintiff's detailed, data-driven allegations that Defendants agreed to "a markup of 498%" over an objective baseline for generic-specialty drugs, AC ¶¶ 103-22, agreed to "a markup of 230.05%" over an objective baseline for generic non-specialty drugs, _id._ ¶¶ 123-26, and agreed to the other unreasonable terms described above undoubtedly make it plausible that Defendants' process was flawed.

Plaintiff also provides dozens of comparisons between how much Defendants agreed to pay Express Scripts for specific drugs, how much another PBM charges its clients for the same drugs, and how much a customer _not using insurance_ would

pay for the same drugs at retail pharmacies. *See id.* ¶¶ 100-27, 145-47. Defendants' assertion that the drugs in these comparisons were "cherry-picked" (Defs.' Br. 26) ignores Plaintiff's allegations.[12] The Complaint analyzed two objectively defined categories of drugs available under the plan: "*all* generic-specialty drugs ... for which there is publicly available data*,*" *id.* ¶ 5 (emphasis added),[13] and *all* generic drugs that Plaintiff herself was prescribed, *id.* ¶¶ 124-25. Plaintiff provided detailed and comprehensive cost comparisons for *all* drugs within these objectively defined categories. *Id.* ¶¶ 116, 124.

Defendants are also wrong in arguing that comparisons may not be based on individual drugs or categories of drugs, and must be made "overall" (Def's Br. 26, 28) for all drugs on the plan formulary. *See DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 423 (4th Cir. 2007) ("Under ERISA, the prudence of investments or classes of investments offered by a plan must be judged individually.... Here the relevant 'portfolio' that must be prudent is *each* available Fund considered on its own …, not the full menu of Plan funds."); *Pfeil v. State St. Bank & Tr. Co.*, 671 F.3d 585, 597 (6th Cir. 2012) ("A fiduciary cannot avoid liability for offering imprudent investments merely by including them alongside a larger menu of prudent

---

[12] Defendants' accusation of cherry-picking is also hypocritical given that they refused to produce the Plan's comprehensive formulary for all drugs. *See supra* at 9-10 & *infra* at II.B.

[13] Specialty drugs are "a significant driver of premiums for all plan participants," AC ¶ 79, and "typically account for more than 50% of a prescription-drug plan's overall spend," *id.* ¶ 84.

investment options."), *abrogated on other grounds*, *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409 (2014). In any event, Plaintiff alleges that Defendants overpaid "on prescription drug costs across the Plans as a whole, after accounting for all charges for all drugs, fees, and rebates." AC ¶ 146; *see id*. ¶¶ 127, 141.

Finally, Plaintiff also compares Defendants' inattention to prescription drug costs to numerous other plan sponsors who have been more attentive and taken basic measures that Defendants failed to adopt. *See id.* ¶¶ 175-89. This is also consistent with *Sweda*, and further demonstrates the sufficiency of Plaintiff's claims. *See Sweda*, 923 F.3d at 330-31 ("Sweda offered examples of similarly situated fiduciaries who acted prudently, such as fiduciaries at Loyola Marymount who hired an independent consultant to request recordkeeping proposals and consolidated services with a single provider. Sweda pointed to similar moves at Pepperdine, Purdue, and CalTech, as well as Caltech's negotiation for $15 million in revenue sharing rebates."). Indeed, Defendants failed to heed *J&J's own guidance* to police PBMs more actively. *See* AC ¶¶ 171-74; *see also id.* ¶¶ 149-70 (detailing guidance from multiple other sources).[14]

---

[14] Defendants are wrong in asserting that cost comparisons must also include nuanced comparisons of "quality of services" between service providers. *See Mator*, 102 F.4th at 182 (district court erred in dismissing claim even though "the Mators 'allege[d] no facts about the level of services provided to the Plan's participants' and did 'not allege the complete nature and scope of services provided by the alleged comparator plans.'"); *id.* at 186 n.4 ("[I]t would be virtually impossible for a plaintiff to identify plans that buy precisely the same bundle of services as a defendant plan.

If Plaintiff's extensive and detailed allegations are not sufficient to state a plausible breach of fiduciary duty claim based on a failure to control plan expenses, it is difficult to see what would be. Defendants "buck[] the Third Circuit's" pleading standards. *See McGowan*, 2021 WL 1399870, at *6 (citing *Sweda*, 923 F.3d at 331).

### 2. Defendants Are Not Entitled to an Inference in Their Favor at the Pleading Stage

Defendants argue that "J&J has every incentive" to negotiate reasonable drug prices for the Plan because it shares part of those costs. Defs.' Br. 31. However, "the law expects more than good intentions. 'A pure heart and an empty head are not enough.'" *Sweda*, 923 F.3d at 329 (cleaned up). Whatever J&J's motivations may have been,[15] J&J did not adequately monitor and control prescription drug costs.

Although Defendants attempt to offer an "explanation" for the high prices (Defs.' Br. 31), Third Circuit law is clear that an ERISA plaintiff is not required to "rule out every possible lawful explanation" for the challenged conduct. *Mator*, 102 F.4th at 184 (citations omitted); *see also Sweda*, 923 F.3d at 326 ("To the extent that the District Court required Sweda to rule out lawful explanations for Penn's conduct, it erred."). In any event, the purported explanation – that Defendants negotiated the

---

That would make it more important for courts not to disregard every less-than-identical comparator."). Regardless, Plaintiff alleges that the services provided by Express Scripts are no better than less-expensive PBMs. *See* AC ¶¶ 55, 60, 143-44, 146-47.

[15] As noted above, J&J has a conflict of interest as a drug manufacturer that benefits from higher drug prices and does billions of dollars more in business with Express Scripts on its product side than on its benefits side. *See* AC ¶ 5.

"best overall deal" for the "prescription drug program as a whole" – is anything but "obvious." *See* Defs.' Br. 31. Nothing in the Amended Complaint suggests that Defendants negotiated a good deal (let alone the best overall deal) for the Plan. To the contrary, Plaintiff alleges a "pervasive and systematic problem of unreasonable prescription drug charges," AC ¶ 9, and further alleges that "[t]he Plans' extraordinarily high prices for generic drugs are not offset by special discounts from Express Scripts for other kinds of drugs." *Id.* ¶ 127. Thus, even if Plaintiff were required to rebut Defendants' "explanation" – which she is not – she has done so.

"At this stage, her factual allegations must be taken as true, and every reasonable inference from them must be drawn in her favor." *Sweda*, 923 F.3d at 331. The Court may not engage in factfinding or consider extrinsic evidence on a motion to dismiss under Rule 12(b)(6). *See Hartig Drug Co. Inc. v. Senju Pharm. Co. Ltd.*, 836 F.3d 261, 274 (3d Cir. 2016); *Beverly Enters., Inc. v. Trump*, 182 F.3d 183, 190 n.3 (3d Cir. 1999). However, even if the applicable standard of review were otherwise, the two self-serving declarations that Defendants submit in support of their motion say nary a word about the "deal" that Defendants supposedly negotiated for the Plan or the terms of that deal.  Nor have Defendants produced a copy of the PBM contract, as Plaintiff requested. Quite simply, there is *zero* evidence to support Defendants' argument that they negotiated the "best overall deal" for the Plan. Defendants turn the motion to dismiss standard on its head by asking the Court to

draw an inference in their favor, and there is absolutely no reason to do so on this record (especially since Defendants refused to produce the PBM contract at issue).

**B.  Plaintiff States a Claim for Failure to Comply With Her Requests for Documents (Count III)**

Under 29 U.S.C. § 1024(b)(4), a plan administrator must, upon written request of any participant or beneficiary, furnish a copy of plan documents, trust agreements, contracts, and other documents "under which the plan is established or operated." The court may impose penalties of up to $110 per day and "such other relief as it deems proper" for a plan administrator's failure to disclose such documents within 30 days. 29 U.S.C. § 1132(c)(1); 29 C.F.R. § 2575.502c-1.

Plaintiff states a valid claim in Count III that Defendants failed to timely provide documents she repeatedly requested in writing through Defendants' online portal and letters from her counsel. On December 20, 2023, Plaintiff sent a typewritten request for a copy of all plan documents, including (but not limited) to the "General/Administrative Information Plan Details." AC ¶¶ 204-05. On February 19, 2024, **61 days later** (and not coincidentally, after this suit was filed) Defendants belatedly produced the "General/Administrative Information Plan Details," but did not provide any other documents. *Id*. ¶ 207. Plaintiff then repeated her request for Plan documents in follow-up letters from counsel dated February 20, 2024 and March 4, 2024, specifically including "all contracts and agreements with Express Scripts." *Id*. ¶¶ 208-09. Plaintiff also requested a copy of the formulary used by the

Plan. *Id*. ¶¶ 5, 101. Yet, Defendants have refused to produce any contracts with Express Scripts or the Plan's formulary. *Id*. ¶¶ 101, 210.

Defendants' assertion that Plaintiff "does not allege sufficient detail" about her first request for documents (Defs.' Br. 33) is without merit. The Complaint "alleges that Plaintiff made 'a typewritten request through [an] online portal messaging system' on the website of a third-party plan administrator, Alight." Defs.' Br. 33 (quoting AC ¶ 204). The Complaint further identifies what was requested: "all plan documents, including the 'General/Administrative Information Plan Details' document." AC ¶ 204. Nothing further is required. It is "plainly true that a typed request … qualifies as a written request." *Bafford v. Northrop Grumman Corp.*, 994 F.3d 1020, 1030 (9th Cir. 2021) ("an adequate electronic writing suffices"); *accord Futterman v. United Emp. Benefit Fund*, 2021 WL 5163302, at *4 (N.D. Ill. Nov. 5, 2021) ("An email is plainly a form of written communication"). And Defendants do not contend that they lacked notice or understanding of what was being requested. *See Kollman v. Hewitt Assocs., LLC*, 487 F.3d 139, 146 (3d Cir. 2007) ("[T]he touchstone is whether the request provides the necessary clear notice to a reasonable plan administrator[.]").[16]

---

[16] The other cases relied on by Defendants are simply inapposite. *See McDonough v. Horizon Blue Cross Blue Shield of N.J., Inc.*, 2011 WL 4455994, at *7 (D.N.J. Sept. 23, 2011) (dismissing claim where plaintiff neither alleged a written request was made nor that defendant failed to respond); *Cohen v. Indep. Blue Cross*, 820 F. Supp. 2d 594, 609 (D.N.J. 2011) (complaint did not allege that beneficiary made any request for documents).

Defendants also unlawfully withheld the Express Scripts contract and the Plan's formulary. The Third Circuit has made clear that "documents are part of a coverage plan if they … describe … the operation and administration of the plan" or "specify the basis on which payments are made to and from the plan." *Saltzman v. Indep. Blue Cross*, 384 F. App'x 107, 112 (3d Cir. 2010). The Express Scripts contract, which includes terms regarding the prices the Plan will pay for prescription drugs and other formulary management details, *see* AC ¶¶ 41-44, 93-100, describes "the operation and administration of the plan" and "specif[ies] the basis on which payments are made to and from the plan." *Saltzman*, 384 F. App'x at 112; *see also* Defs.' Br. 8 (acknowledging that "The Plan's overall prescription drug costs are negotiated between J&J and ESI [Express Scripts]."). The contract is thus within the scope of § 1024(b)(4) and must be produced. *See Askew v. R.L. Reppert, Inc.*, 2016 WL 447060, at \*12 (E.D. Pa. Feb. 5, 2016), *aff'd*, 721 F. App'x 177 (3d Cir. 2017) (requiring disclosure of contract that "dictate[d] important aspects about the participants' benefits under the 401(k) Plan and who is or is not responsible for the management and investment of plan funds"); *Barling v. UEBT Retiree Health Plan*, 145 F. Supp. 3d 890, 896 (N.D. Cal. 2015) (fining plan administrator for failure to produce contract).

Defendants also were required to produce the Plans' formulary. Again, *Saltzman* is controlling. In reviewing a claim for benefits under ERISA

§ 1132(a)(1)(B), the court squarely held that "the formulary is a plan document" and "is essential to the administration of the plan." 384 F. App'x at 113. The court reasoned, in language equally applicable here, that "the formulary describes the operation of the plan, specifies the basis upon which payments are made, and puts the plan participants on notice as to the scope of their benefits and is essential to a participant's understanding of what copayment he or she will be required to pay for certain drugs." *Id.*; *see also Bio-Med. Applications of Ky., Inc. v. Coal Exclusive Co., LLC*, 782 F. Supp. 2d 438, 443-44 (E.D. Ky. 2011) ("pricing methodology" discoverable pursuant to § 1024(b) request); *Eden Surgical Ctr. v. Budco Grp., Inc.*, 2010 WL 2180360, at *5-7 (C.D. Cal. May 27, 2010) (ordering production of "fee schedule" because it "provide[s] individual participants with information about the plan and benefits"); *Maiuro v. Fed. Express Corp.*, 843 F. Supp. 935, 944 (D.N.J. 1994) (defendant ordered to produce "formulas" for purposes of determining benefits).

## **<u>CONCLUSION</u>**

For the above reasons, Defendants' motion to dismiss should be denied.[17]

Dated: July 22, 2024                    Respectfully Submitted,

                                        */s/ Michael Eisenkraft*
                                        Michael Eisenkraft (NJ Bar No. 016532004)
                                        COHEN MILSTEIN SELLERS & TOLL, PLLC

---

[17] In the alternative, Plaintiff respectfully requests leave to replead and an opportunity for any necessary jurisdictional discovery.

88 Pine Street, 14th Floor
New York, New York 10005
(212) 838-7797
meisenkraft@cohenmilstein.com

Michelle Yau (admitted *pro hac vice*)
Daniel Sutter (admitted *pro hac vice*)
COHEN MILSTEIN SELLERS & TOLL, PLLC
1100 New York Ave. NW, Fifth Floor
Washington, D.C. 20005
(202) 408-4600
myau@cohenmilstein.com
dsutter@cohenmilstein.com

Kai Richter (admitted *pro hac vice*)
COHEN MILSTEIN SELLERS & TOLL, PLLC
400 South 4th Street #401-27
Minneapolis, MN 55415
(612) 807-1575
krichter@cohenmilstein.com

Jamie Crooks (admitted *pro hac vice)*
Michael Lieberman (admitted *pro hac vice)*
FAIRMARK PARTNERS, LLP
1001 G Street NW
Suite 400 East
Washington, DC 20001
(619) 507-4182
jamie@fairmarklaw.com
michael@fairmarklaw.com

Michael Casper
WHEELER, DIULIO & BARNABEI, P.C
1650 Arch Street, Suite 2200
Philadelphia, PA 19103
(215) 971-1000
mcasper@wdblegal.com

*Attorneys for Plaintiff and the Proposed Class*

41

## **<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on this 22nd day of July, 2024, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record.

*/s/ Michael Eisenkraft*
Michael Eisenkraft