# EXHIBIT A

**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 23-2420
_____

MARLA KNUDSEN; WILLIAM DUTRA, AS
REPRESENTATIVES OF A CLASS OF SIMILARLY
SITUATED PERSONS, AND ON BEHALF
OF THE METLIFE OPTIONS & CHOICES PLAN,
                                                              Appellants

v.

METLIFE GROUP, INC.

_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 2:23-cv-00426)
District Judge: Honorable William J. Martini
_____

Argued: May 21, 2024

Before:   RESTREPO, FREEMAN, and MCKEE, *Circuit
Judges.*

(Opinion filed: September 25, 2024)

Charles Gokey **[Argued]**
Carl F. Engstrom
Engstrom Lee
323 N Washington Avenue
Suite 200
Minneapolis, MN 55401
 *Counsel for Appellants*

James O. Fleckner
Christopher J.C. Herbert
David Rosenberg
Goodwin Procter
100 Northern Avenue
Boston, MA 02210

Jaime A. Santos **[Argued]**
Goodwin Procter
1900 N Street NW
Washington, DC 20036
 *Counsel for Appellee*

––––––––––––––––

OPINION OF THE COURT

––––––––––––––––

McKEE, *Circuit Judge*.

 The Employee Retirement Income Security Act, 29
U.S.C. § 1001 *et seq.* ("ERISA"), is a rather complicated
statute that uniformly regulates employee benefit plans, like
pension plans and certain health insurance plans, to protect
plan participants and beneficiaries.[1]

 Named Plaintiffs Marla Knudsen and William Dutra
bring this putative ERISA class action on behalf of participants

––––––––––––––––

[1] *Gobeille v. Liberty Mut. Ins. Co.*, 577 U.S. 312, 323–24
(2016); *Aetna Health Inc. v. Davila*, 542 U.S. 200, 208
(2004).

in the MetLife Options & Choices Plan (the "Plan") against Defendant MetLife Group, Inc. ("MetLife"), the asserted Plan administrator and fiduciary. Plaintiffs claim that their former employer, MetLife, has misappropriated the Plan's funding in violation of ERISA. Plaintiffs allege that MetLife's illegal conduct has caused them to pay higher out-of-pocket costs, mainly in the form of insurance premiums, and that MetLife owes them those misappropriated funds. More specifically, Plaintiffs allege that MetLife violated its ERISA obligations by diverting $65 million in drug rebates from the Plan to itself from 2016 to 2021. The District Court dismissed Plaintiffs' suit for lack of standing, and this appeal followed. For the reasons that follow, we will affirm.

## I.

## A.

MetLife "sponsors the Plan to provide" medical, prescription drug, dental, disability, life insurance, and other "benefits to its employees and employees of its affiliates and their families."[2] MetLife is the "administrator" of the Plan within the meaning of 29 U.S.C. § 1002(16)(A)[3] and the asserted "fiduciary" and "party-in-interest" to the Plan within the meaning of 29 U.S.C. §§ 1002(14)(A)–(C), (21)(A), and 1102(a).[4]

The Plan was established on January 1, 1992, and as of December 31, 2021, it had 36,962 participants and over $1.4 billion in assets.[5] "The Plan is self-funded, meaning that benefits are paid by a trust holding plan assets or by . . . [MetLife], and not by a third-party insurance company."[6] MetLife is responsible for paying the claims and bearing the financial risk associated with making those payments. The Plan has two primary funding sources: Plan participants' health insurance premiums and MetLife's contributions.[7] "After collecting the employee portion of the cost of coverage, [MetLife] transfers the total cost of coverage to several trust funds held by the Plan. During the last five years, Plan

---

[2] Compl. ¶ 9, JA 114; *see id.* ¶ 16, JA 116.

[3] MetLife Options and Choices Plan, SA 008.

[4] Compl. ¶¶ 10–12, JA 114–15.

[5] *Id.* ¶¶ 16–17, JA 116.

[6] *Id.* ¶ 19, JA 116.

[7] *Id.* ¶ 20, JA 116–17.

participants have paid . . . around 30% of overall contributions to the Plan."[8]  After accounting for any co-pay (a fixed fee paid at the point of service for medical care or prescription drugs), deductible (an amount the insured pays for medical services or drugs before the Plan will pay covered expenses), or co-insurance (a percentage of the cost of medical services or drugs that the insured pays after satisfying the deductible) paid by Plan participants, either the Plan pays claims from the trust funds[9] or MetLife pays claims from its own general assets.[10]

During the relevant period, the Plan hired Express Scripts as its exclusive pharmacy benefit manager ("PBM") and paid Express Scripts between $3.2 million and $6.3 million in annual compensation.  Pursuant to their agreement, Express Scripts "negotiate[d] volume discounts and rebates with drug manufacturers."[11]   Plan documents expressly provided that MetLife would receive prescription-drug rebates from Express Scripts and "appl[y] these [rebates] toward[] Plan expenses."[12]  But, according to the Plan documents, "[t]hese rebates are not considered in calculating any co-payments or Coinsurance under the Plan."[13]  From 2016 to 2021, "the Plan was credited with approximately $65 million in drug rebates pursuant to its contract with Express Scripts."[14]  However, MetLife directed 100% of the $65 million in drug rebates to itself.

Relying on several court cases and United States Department of Labor advisories, Plaintiffs assert that MetLife's contract with Express Scripts was itself a Plan asset. Plaintiffs also assert that the rebates were Plan assets because "they were received as a result of MetLife's exercise of its fiduciary authority in entering into the PBM contract and/or allocating the rebates, and were obtained at the expense of plan participants."[15]   Consequently, in their Complaint, Plaintiffs assert that MetLife violated ERISA when MetLife directed the

---

[8] *Id.* ¶ 21, JA 117.

[9] *Id.* ¶ 22, JA 117.

[10] *See* MetLife Options and Choices Plan, SA 015.

[11] Compl. ¶ 27, JA 119.

[12] Summary Plan Description, SA 220.

[13] *Id.*

[14] Compl. ¶ 31, JA 121.

[15] *Id.* ¶ 30, JA 120.

$65 million in rebates, i.e., plan assets, to itself instead of to the Plan.

      Plaintiffs claim they would have received "multiple benefits" if MetLife had not violated ERISA:[16]

> *First*, it may have been consistent with its fiduciary duties for [MetLife] to reduce ongoing contributions on account of the rebates collected by the Plan. *Second*, [MetLife] may have . . . reduced co-pays and co-insurance for pharmaceutical benefits. *Third*, [MetLife] may have distributed rebates to participants in proportion to their contributions to the Plan.[17]

The purported effect of the claimed violations is that Plaintiffs "did not receive these benefits, and therefore paid excessive amounts toward the cost of coverage, co-pays, and/or co-insurance [(collectively, 'out-of-pocket costs')], and have otherwise been denied their equitable interest in Plan drug rebates."[18]

      Knudsen and Dutra were MetLife employees during the relevant period. They participated in the Plan for medical and prescription drug coverage for themselves and their dependents, and they paid for their coverage through payroll deductions. As Plan participants, Knudsen and Dutra paid "a fixed percentage (depending on job title and coverage type) of contributions for spousal and dependent coverage."[19] They respectively paid about $400 and $500 per month.[20] They also paid out of pocket to cover residual prescription drug costs that were not fully covered by the Plan.

---

[16] *Id*. ¶ 36, JA 123.

[17] *Id*.

[18] *Id*. ¶ 37, JA 123. On appeal, Plaintiffs acknowledged that Plan documents "inform[] insureds that any co-payment or coinsurance they owe for a given drug purchase will not be offset by any rebates paid on that drug purchase." Pl. Br. 22–23. As a result, they framed their alleged injury as paying increased premiums.

[19] Compl. ¶¶ 13–14, JA 115.

[20] *Id*.

Plaintiffs seek to represent a class of "[a]ll participants and beneficiaries of the Plan since January 24, 2017," excluding fiduciaries.[21]   Their Complaint sets forth four claims: Count I alleges a violation of 29 U.S.C. § 1103(a), (c) because MetLife "failed to hold Plan assets in trust and instead transferred Plan assets to itself for its own benefit"; Count II alleges a violation of 29 U.S.C. § 1106(a)(1)(D) because MetLife illegally transacted with a party-in-interest; Count III alleges a violation of 29 U.S.C. § 1106(b)(1), (b)(3) because MetLife illegally transacted with itself as fiduciary of the Plan; and Count IV alleges that MetLife breached ERISA's Fiduciary Standard of Care, 29 U.S.C. § 1104(a)(1).[22] Plaintiffs seek disgorgement of profits as well as injunctive and declaratory relief.

**B.**

The District Court dismissed Plaintiffs' Complaint pursuant to Federal Rule of Civil Procedure 12(b)(1) for lack of Article III standing and denied as moot MetLife's Rule 12(b)(6) motion to dismiss for failure to state a claim.   The District Court concluded that "Plaintiffs do not have a concrete stake in the outcome of this lawsuit and have not pled facts to demonstrate an individualized injury."[23]   Relying primarily on the Supreme Court's decision in *Thole v. U.S. Bank N.A.*,[24] and our decision in *Perelman v. Perelman*,[25] the District Court explained that "Plan participants here have no legal right to the general pool of Plan assets," and "any asserted injury to the Plan is not an injury to Plaintiffs themselves."[26]   Furthermore, the Court "observe[d] that Plaintiffs do not contend that they did not receive their promised benefits" but instead "allege that they paid excessive out-of-pocket costs."[27]   The District Court explained that excessive out of pocket costs are "not an individual injury" "in the context of this kind of defined

---

[21] *Id*. ¶ 43, JA 125.

[22] *Id*. ¶¶ 52–67, JA 127–29.

[23] *Knudsen v. Metlife Grp.*, Inc., No. 2:23-CV-00426 (WJM), 2023 WL 4580406, at *6 (D.N.J. July 18, 2023).

[24] 590 U.S. 538 (2020).

[25] 793 F.3d 368 (3d Cir. 2015).

[26] *Knudsen*, 2023 WL 4580406, at *5.

[27] *Id*.

benefit-type Plan."[28]   The Court reasoned that Plaintiffs' allegations that MetLife "'may' have reduced co-pays and co-insurance or that Plan participants 'may' have received a proportionate distribution of rebates," if not for MetLife's purported ERISA violations, were "speculative and conclusory."[29]  The Court based its holding on the Complaint's lack of factual matter that MetLife's ERISA violations either caused Plaintiffs to pay more for their health insurance benefits or deprived them of those benefits.[30]  Accordingly, the Court concluded that it was mere "conjecture" whether, if successful, Plaintiffs' suit would result in either reduced out-of-pocket costs for, or distribution of disgorged funds to, Plan participants.[31]

## II.

The District Court properly exercised jurisdiction over this action pursuant to 28 U.S.C. § 1331.  We have appellate jurisdiction to review the appeal pursuant to 28 U.S.C. § 1291.[32]

When a case is dismissed at the pleading stage for lack of standing, our review focuses on whether the complaint "contain[s] sufficient factual matter that would establish standing if accepted as true."[33]  The burden of establishing

---

[28] *Id*. (citations omitted).

[29] *Id*. (quoting Compl. ¶ 36, JA 123).

[30] *Id*.

[31] *Id*.

[32] Since the District Court dismissed the Complaint for lack of standing pursuant to Federal Rule of Civil Procedure 12(b)(1), the Order of Dismissal is a final order even though the Complaint was dismissed without prejudice.  *See Cottrell v. Alcon Labs.*, 874 F.3d 154, 164 n.7 (3d Cir. 2017) ("Because the absence of standing leaves the court without subject matter jurisdiction to reach a decision on the merits, dismissals 'with prejudice' for lack of standing are generally improper." (citation omitted)).

[33] *In re Horizon Healthcare Servs. Inc. Data Breach Litig.*, 846 F.3d 625, 633 (3d Cir. 2017) (internal quotation marks omitted).  We are also free to review several Plan documents provided by MetLife (Express Scripts PBM Agreement,

standing rests with the plaintiff.[34]   A complaint dismissed pursuant to Federal Rule of Civil Procedure 12(b)(1) "is [reviewed] *de novo*, accepting the facts alleged in the complaint as true and construing the complaint in the light most favorable to the non-moving party."[35]   As always, our review must rest on "well-pleaded factual allegations" and not "mere conclusory statements."[36]   Failure to allege facts "that affirmatively and plausibly suggest . . . standing to sue" will result in dismissal of the complaint.[37]

**III.**

"Under Article III, a case or controversy can exist only if a plaintiff has standing."[38]   To establish Article III standing, a plaintiff must show three "irreducible" elements.[39]   "The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."[40]

An injury-in-fact is "an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical."[41]   "To be

---

MetLife Options and Choices Plan, and the Summary Plan Description), given that they were considered by the District Court, Plaintiffs have not objected to their authenticity, and these documents are integral to the Complaint.  *See Est. of Roman v. City of Newark*, 914 F.3d 789, 796–97 (3d Cir. 2019).

[34] *Finkelman v. Nat'l Football League* ("*Finkelman I*"), 810 F.3d 187, 194 (3d Cir. 2016) (citing *Berg v. Obama*, 586 F.3d 234, 238 (3d Cir. 2009)).

[35] *Potter v. Cozen & O'Connor*, 46 F.4th 148, 153 (3d Cir. 2022).

[36] *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009).

[37] *Finkelman I*, 810 F.3d at 194 (quoting *Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 145 (2d Cir. 2011)).

[38] *United States v. Texas*, 599 U.S. 670, 675 (2023).

[39] *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).

[40] *Spokeo v. Robins*, 578 U.S. 330, 338 (2016).

[41] *In re Schering Plough Corp. Intron/Temodar Consumer Class Action*, 678 F.3d 235, 244 (3d Cir. 2012) (quoting *Lujan*, 504 U.S. at 560).

'concrete,' an injury must be 'real, or distinct and palpable, as opposed to merely abstract.'"[42]  "[T]o be sufficiently 'particularized,' an injury must 'affect the plaintiff in a personal and individual way.'"[43]  Establishing an injury-in-fact at the motion to dismiss stage "is not Mount Everest.  The contours of the injury-in-fact requirement, while not precisely defined, are very generous, requiring only that [a] claimant allege[] some specific, identifiable trifle of injury."[44]  The focus of the injury-in fact inquiry is "*whether* the plaintiff suffered harm."[45]

"Fair traceability requires a causal connection between the injury-in-fact and a defendant's conduct; the injury cannot result from 'the independent action of some third party not before the court.'"[46]  To establish a causal connection, the plaintiff must at least allege that the defendant's challenged action is the "but for" cause of the injury, "even where the conduct in question might not have been the proximate cause of the harm."[47]

Finally, a plaintiff establishes redressability by showing "that it is 'likely, as opposed to merely speculative,' that the alleged injury will be redressed by a favorable decision."[48]  While traceability looks backward and asks, "did the

---

[42] *Finkelman I*, 810 F.3d at 193 (quoting *N.J. Physicians, Inc. v. President of the United States,* 653 F.3d 234, 238 (3d Cir. 2011)).

[43] *Id*. (quoting *Lujan*, 504 U.S. at 560 n.1).

[44] *In re Horizon*, 846 F.3d at 633 (alteration in original) (quoting *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 278 (3d Cir. 2014)).

[45] *Toll Bros. v. Twp. of Readington*, 555 F.3d 131, 142 (3d Cir. 2009).

[46] *Lutter v. JNESO*, 86 F.4th 111, 127 (3d Cir. 2023) (quoting *Lujan*, 504 U.S. at 560).

[47] *Edmonson v. Lincoln Nat'l Life Ins. Co.*, 725 F.3d 406, 418 (3d Cir. 2013) (citing *The Pitt News v. Fisher*, 215 F.3d 354, 360–61 (3d Cir.2000)).

[48] *Finkelman I*, 810 F.3d at 194 (quoting *Lujan*, 504 U.S. at 561).

defendant[] cause the harm?" redressability looks forward and
asks, "will a favorable decision alleviate the harm?"[49]

   Plaintiffs' theory of standing can be summarized as:
Plaintiffs paid more for their health insurance because MetLife
illegally kept $65 million in rebates instead of using those
rebates to reduce Plaintiffs' out-of-pocket expenses. The
District Court determined that *Thole* and *Perelman*
categorically bar an ERISA plaintiff's assertion of injury based
on increased out-of-pocket costs and therefore Plaintiffs lacked
standing. While we do not read those precedents so broadly,
we nevertheless agree that Plaintiffs have not established
injury-in-fact.

   In *Perelman*, we confronted whether a pension plan
beneficiary had standing to bring an ERISA suit and dismissed
for lack of standing.[50] There, Jeffrey Perelman was a
participant in General Refractories Company's employee
pension plan—a defined-benefit plan.[51] He alleged that his

---

[49] *Toll Bros.*, 555 F.3d at 142.

[50] 793 F.3d at 373–76.

[51] *Id.* at 371. "A defined benefit plan . . . consists of a general
pool of assets rather than individual dedicated accounts. Such
a plan, as its name implies, is one where the employee, upon
retirement, is entitled to a fixed periodic payment. The asset
pool may be funded by employer or employee contributions,
or a combination of both." *Hughes Aircraft Co. v. Jacobson*,
525 U.S. 432, 439 (1999) (citations and internal quotation
marks omitted). On the other hand, a "defined contribution
plan is one where employees and employers may contribute
to the plan, and the employer's contribution is fixed and the
employee receives whatever level of benefits the amount
contributed on his behalf will provide. A defined
contribution plan provides for an individual account for each
participant and for benefits based solely upon the amount
contributed to the participant's account." *Id.* (citations and
internal quotation marks omitted). On the other hand,
employee sponsored health plans typically come in two
varieties: fully insured or self-funded plans. *N. Cypress Med.
Ctr. Operating Co., Ltd. v. Aetna Life Ins. Co.*, 898 F.3d 461,
468 (5th Cir. 2018). "Under fully insured ERISA plans [the

father, Raymond Perelman, as trustee of the plan, "breached his fiduciary duties by covertly investing [p]lan assets in the corporate bonds of struggling companies owned and controlled by Jeffrey's brother."[52]

Jeffrey argued that he established injury in fact in two ways: first, he was injured because the plan "suffered a net diminution in assets of approximately $1.3 million," and second, "due to this diminution in assets, the [p]lan's risk of default increased dramatically."[53]   In rejecting Jeffrey's first argument, we reasoned that pension plan participants could not establish injury-in-fact based on financial harm to plan assets because participants "are entitled only to a fixed periodic payment, and have no 'claim to any particular asset that composes a part of the plan's general asset pool.'"[54]   We suggested that although Jeffrey's second argument, the increased risk of theory, might be legally cognizable,[55] it was "entirely speculative" under the alleged circumstances.[56]

Several years later, in *Thole*, the Supreme Court essentially agreed with our analysis in *Perelman*.  In *Thole*, the Supreme Court held that the plaintiffs—also pension plan participants—did not have a "concrete stake" in their ERISA suit because even if the fiduciary illegally caused a $750 million loss to the plan's assets, the plaintiffs "would still receive the exact same monthly benefits that they [we]re already slated to receive."[57]

The *Thole* plaintiffs were two retired participants in the defendant U.S. Bank's retirement plan.[58]   "Of decisive

---

insurer] acts as a direct insurer; it guarantees a fixed monthly premium . . . and bears the financial risk of paying claims. But under self-funded ERISA plans, [the insurer] acts only as a third-party administrator; the employer is responsible for paying claims and bearing the financial risk."  *Id.*

[52] *Id*. at 370.
[53] *Id*. at 373–74.
[54] *Id*. at 374 (quoting *Hughes Aircraft*, 525 U.S. at 440).
[55] *Id*. 374–75.
[56] *Id*. at 375.
[57] 590 U.S. at 541.
[58] *Id*. at 540.

importance" to the Court's decision was that the retirement plan was a defined-benefit plan, as opposed to a defined-contribution plan, such that "retirees receive[d] a fixed payment each month, and the payments d[id] not fluctuate with the value of the plan or because of the plan fiduciaries' good or bad investment decisions."[59] The plaintiffs had "been paid all of their monthly pension benefits" that they were "legally and contractually entitled to receive."[60]

Thus, the Court concluded that the plaintiffs lacked standing because the "outcome of th[e] suit would not affect their future benefit payments."[61] In contrast, had the plaintiffs "not received their vested pension benefits, they would of course have [had] Article III standing to sue."[62] The Court declined to answer whether plan participants would have standing "if the mismanagement of the plan was so egregious that it substantially increased the risk that the plan and the employer would fail and be unable to pay the participants' future pension benefits."[63]

MetLife argues that *Thole* and *Perelman* resolve this case in its favor. It reads those cases as holding that a beneficiary of an ERISA regulated defined-benefit plan has no injury *unless* the plan participants plead that they did not receive promised benefits, i.e., reimbursement of healthcare claims, or that there is a substantial likelihood that the plan will default, i.e., that insurance benefits will not be paid. According to MetLife, it makes no difference that *Thole* and *Perelman* were concerned with pension plans as opposed to health insurance plans because both, according to MetLife, are defined-benefit plans, under which the plan sponsor bears all of the risk of paying benefits. MetLife also argues that any increase, no matter how great, in participants' insurance costs is immaterial to the injury analysis so long as Plaintiffs receive their insurance benefits.

---

[59] *Id.*
[60] *Id.*
[61] *Id.* at 541.
[62] *Id.* at 542.
[63] *Id.* at 546.

Conversely, Plaintiffs argue that the dissimilarities between the pension plans in *Thole* and *Perelman* and the self-sponsored health plan here, makes all the difference. They point out that benefits in pension plans accrue over years, and once earned, the benefits, i.e., pension payments, are fixed and paid at regular intervals. In contrast, participants in a self-funded health plan pay for their benefits through payroll deductions in the form of premiums, and the plan sponsor can annually change both the amount of the premium (and other out-of-pocket costs) and the benefits to which a participant is entitled.

As a purely theoretical proposition, we agree with Plaintiffs. Thus, we decline to hold that *Thole* and *Perelman* require dismissal, under Article III, *whenever* a participant in a self-funded healthcare plan brings an ERISA suit alleging that mismanagement of plan assets increased his/her out-of-pocket expenses. While MetLife is correct that sponsors of self-funded health insurance plans, like pension plans, bear all the risk of distributing benefits to beneficiaries, we cannot ignore a more fundamental tenet of injury-in-fact: financial harm, "even if only a few pennies, . . . is a concrete, non-speculative injury."[64] A contrary conclusion, would mean that MetLife could charge Plan participants thousands of dollars more in premiums than is allowed under Plan documents, resulting in potential ERISA violations, and Plan participants would have no judicial recourse to seek return of their overpayments. *Thole* and *Perelman* command no such result, and in a different case, a plaintiff may well establish such a financial injury sufficient to satisfy Article III.[65]

---

[64] *Wallace v. ConAgra Foods, Inc.*, 747 F.3d 1025, 1029 (8th Cir. 2014); *accord Danvers Motor Co. v. Ford Motor Co.*, 432 F.3d 286, 293 (3d Cir. 2005) ("Monetary harm is a classic form of injury-in-fact." (citing *Adams v. Watson*, 10 F.3d 915, 920–25 & n.13 (1st Cir. 1993))).

[65] MetLife also makes much ado about injury-in-fact requiring a plaintiff to allege the invasion of a *legally protected interest* and argues that Plaintiffs have no legally protected interest in the Plan assets but only in the benefits they receive. This argument is largely duplicitous of MetLife's previously rejected *Thole* and *Perelman*-based

However, the allegations in Plaintiffs' Complaint fall short of alleging concrete financial harm. "[S]ometimes [courts] make standing law more complicated than it needs to be," but "[t]here is no ERISA exception to Article III."[66] Instead, we need only apply "ordinary Article III standing analysis" to determine whether ERISA plaintiffs have standing.[67]

Given the standing theory that Plaintiffs advance, their Complaint must include nonspeculative allegations, that if proven, would establish that they have or will pay more in premiums, or other out-of-pocket costs, as a result of MetLife not applying the $65 million in rebates to the Plan.[68] In other words, they need to allege economic harm. To do so, Plaintiffs' "pleadings must be something more than an ingenious academic exercise in the conceivable."[69] And while we "presum[e] that general allegations embrace those specific facts that are necessary to support the claim,"[70] "allegations that stand on nothing more than supposition" cannot establish financial harm.[71]

Several of our precedents are instructive. In *Finkelman v. Nat'l Football League* ("*Finkelman I*"), the plaintiffs alleged that the NFL violated New Jersey's Ticket Law because its method of selling tickets to Super Bowl XLVIII inflated ticket

---

argument but with a slightly different doctrinal gloss. In *Cottrell*, we explained that "financial . . . interests are 'legally protected interests' for purposes of the standing doctrine" and identifying such an interest in a complaint is not dependent on whether the alleged conduct violates a statute or breaches a contract. 874 F.3d at 164. MetLife's argument that Plan documents do not entitle Plaintiffs to pay any certain amount in insurance premiums is more befit a Rule 12(b)(6) motion, not 12(b)(1). *See id*.

[66] *Thole*, 590 U.S. at 547.

[67] *Id*.

[68] *Cottrell*, 874 F.3d at 168.

[69] *United States v. Students Challenging Regul. Agency Procs.*, 412 U.S. 669, 688 (1973).

[70] *Lujan*, 504 U.S. at 561 (internal quotation marks omitted).

[71] *Finkelman I*, 810 F.3d at 201.

prices in the resale market.[72]  The NFL sold 99% of tickets to NFL insiders and the rest in a public lottery.[73]  Finkelman purchased two resale tickets for $800 over face value.[74]  We held that Finkelman lacked standing.[75]

Finkelman's complaint did not adequately establish his price inflation theory  because it did not allege whether the NFL's conduct of selling only 1% of tickets to the public, and distributing 99% of tickets to insiders, effectively "increase[ed] or decreas[ed] prices on the secondary market."[76] Instead, the complaint relied on "pure conjecture about what the ticket resale market might have looked like if the NFL had sold its tickets differently."[77]  Put differently, the allegations were equally susceptible to an inference of financial harm and no harm.[78]

In *Finkelman v. Nat'l Football League* ("*Finkelman II*"), we concluded that Finkelman remedied his standing problem in his amended complaint.[79]  Unlike the first complaint, the amended complaint:

> did not just allege that prices would be lower on the secondary market were it not for the NFL's withholding.  Instead, Finkelman alleged a causal chain justifying *why* the NFL's withholding set into motion a series of events that ultimately raised prices on the secondary market.  Specifically, Finkelman alleged that the insiders to whom the NFL presently provides tickets are more likely to resell those tickets through third-party brokers to keep those sales anonymous, and those brokers in turn are more likely to charge higher prices.  But if more tickets were made available to fans initially, fans would be more

---

[72] *Id*. at 199–200.

[73] *Id*. at 190.

[74] *Id*.

[75] *Id*. at 189.

[76] *Id*. at 200.

[77] *Id*. at 201.

[78] *Id*. at 200.

[79] 877 F.3d 504, 512 (3d Cir. 2017).

15

likely than the NFL insiders are to sell through
direct fan-to-fan sales, and the prices would
likely be lower.[80]

Those allegations constituted "economic facts that are specific,
plausible, and susceptible to proof at trial."[81]

In *Cottrell v. Alcon Laboratories*, consumers sued
medicated eye drops manufacturers and distributors, alleging
that the design of the eye drop bottles required the plaintiffs to
administer larger drops than necessary when using the
medication, causing the plaintiffs' economic injury.[82] These
plaintiffs advanced a "pricing theory" of injury-in-fact based
on the cost differential of what they would have paid if the
bottles were better designed.[83] As compared to *Finkelman I*,
the *Cottrell* plaintiffs' pricing theory satisfied injury-in-fact
because it did not rest on a series of "presumption[s] essential
to the[] allegations of financial harm" and was instead
anchored by well-pleaded, non-speculative allegations.[84] The
allegations were supported by numerous scientific studies
identifying cost savings absent the defendant's challenged
conduct.[85]

Here, the allegations are more akin to those we
encountered in *Finkelman I* than in *Finkelman II* or *Cottrell*.
Plaintiffs generally allege that their out-of-pocket costs (co-
pays, co-insurance, premiums) increased, but they do not
allege which out-of-pocket costs increased, in what years, or
by how much. Any increase in costs was determined by
MetLife, but it is incumbent upon Plaintiffs to allege concrete
facts establishing that MetLife's challenged conduct caused
increased costs.[86] The purportedly violative conduct is the
retention of $65 million in PBM drug rebates. But the
Complaint does not include well-pleaded allegations that drug
rebates (or even the total value of plan assets) are, under the

---

[80] *Id*. at 512.

[81] *Id*. at 513.

[82] 874 F.3d at 159–60.

[83] *Id*. at 168.

[84] *Id*. at 169.

[85] *Id*. at 168–69.

[86] *See Finkelman I*, 810 F.3d at 201–03.

Plan documents, used to calculate Plan participants' out-of-pocket costs and that the effect of these inputs would decrease costs. Allegations of this sort are necessary because Plaintiffs must show that the purported violative conduct was the but-for-cause of their injury in fact, namely, an increase in their out-of-pocket costs above what they would have been if MetLife had deposited the rebate monies into the Plan trust.[87] In other words, Plaintiffs must show that they have an "individual right" to the withheld rebate monies, such that, MetLife's purportedly unlawful retention of the monies harmed Plaintiffs.[88] On these allegations, it is speculative that MetLife's alleged misappropriation of drug rebate money resulted in Plaintiffs paying more for their health insurance or had any effect at all.

Plaintiffs argue that we should fill in the necessary inferential gaps because general allegations are permitted at the pleading stage, but any attempt to do so is undermined by Plaintiffs' own speculative allegations. According to Plaintiffs, they would have "received" "multiple benefits" if MetLife had not misallocated drug rebates:[89]

> *First*, it may have been consistent with its fiduciary duties for [MetLife] to reduce ongoing contributions on account of the rebates collected by the Plan. *Second*, [MetLife] may have . . . reduced co-pays and co-insurance for pharmaceutical benefits. *Third*, [MetLife] may have distributed rebates to participants in proportion to their contributions to the Plan.[90]

These allegations readily permit an inference that even if MetLife had not committed ERISA violations, it *may not* have taken any of these listed actions and Plaintiffs' out-of-pocket

---

[87] *See Edmonson*, 725 F. 3d at 418.

[88] *Id*. at 417.

[89] Compl. ¶ 36, JA 123.

[90] *Id*.

costs would have still increased. Such pleadings are not sufficient to support Article III standing.[91]

Plaintiffs have simply failed to allege financial harm that is "actual or imminent," as opposed to theoretical, conjectural or hypothetical.[92] We end where we began; Plaintiffs lack Article III standing.[93]

**IV.**

For the foregoing reasons, we will affirm the District Court's dismissal without prejudice. As always, the District Court may exercise its discretion on remand in responding to any request to amend the Complaint.[94]

---

[91] *See Finkelman I*, 810 F.3d at 201–03; *see also Winsor v. Sequoia Benefits & Ins. Servs., LLC*, 62 F.4th 517, 524 (9th Cir. 2023) (dismissing health care plan beneficiaries' ERISA suit for failure to allege injury-in-fact where plaintiffs did "not plead[] facts tending to show that [defendant's] alleged breach of fiduciary duty led to plaintiffs paying higher contributions").

[92] *Cottrell*, 874 F.3d at 163 (quoting *Spokeo*, 578 U.S. at 339).

[93] Additionally, Plaintiffs argue that the District Court conflated statutory and constitutional standing and inappropriately dismissed the Complaint under Rule 12(b)(1) for reasons more befitting a Rule 12(b)(6) dismissal for lack of statutory standing. Given that we have independently concluded that Plaintiffs lack Article III standing, we do not reach this argument.

[94] *See Finkelman I*, 810 F.3d at 203.