Michael Eisenkraft
COHEN MILSTEIN SELLERS & TOLL, PLLC
88 Pine Street, 14th Floor
New York, New York 10005
(212) 838-7797
meisenkraft@cohenmilstein.com

Michelle Yau (*pro hac vice*)
Daniel Sutter (*pro hac vice*)
1100 New York Ave. NW, Eighth Floor
Washington, D.C. 20005
(202) 408-4600
myau@cohenmilstein.com
dsutter@cohenmilstein.com

Kai Richter (*pro hac vice*)
400 South 4th Street #401-27
Minneapolis, MN 55415
(612) 807-1575
krichter@cohenmilstein.com

Jamie Crooks (*pro hac vice*)
Michael Lieberman (*pro hac vice*)
FAIRMARK PARTNERS, LLP
1001 G Street NW
Suite 400 East
Washington, DC 20001
(619) 507-4182
jamie@fairmarklaw.com
michael@fairmarklaw.com

Michael Casper
WHEELER, DIULIO & BARNABEI P.C
1650 Arch Street, Suite 2200
Philadelphia, PA 19103
(215) 971-1000
mcasper@wdblegal.com

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| ANN LEWANDOWSKI and ROBERT GREGORY, on their own behalf, on behalf of all others similarly situated, and on behalf of the Johnson & Johnson Group Health Plan and its component plans,<br><br>Plaintiffs,<br><br>v.<br><br>JOHNSON AND JOHNSON AND THE PENSION & BENEFITS COMMITTEE OF JOHNSON AND JOHNSON,<br><br>Defendants. | Civil Action No. 3:24-cv-00671-ZNQ-RLS |

~~FIRST~~

**SECOND AMENDED CLASS ACTION COMPLAINT**

~~Plaintiff~~

Plaintiffs Ann Lewandowski and Robert Gregory, individually, on behalf of all others similarly situated, and on behalf of the Johnson & Johnson Group Health Plan and its component plans, ~~brings~~bring this action under 29 U.S.C. § 1132 against Defendants Johnson and Johnson and The Pension & Benefits Committee of Johnson and Johnson, for breaches of fiduciary duties and other violations of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001-1461, and ~~states~~state and ~~alleges~~allege as follows:

1.      Congress enacted ERISA in the wake of several high-profile scandals involving employers that mismanaged their employee benefits programs.  This mismanagement had inflicted millions of dollars of harm on employees and their dependents.  ERISA was designed to put an end to this mismanagement and to protect the interests of employee benefit plan participants.  It does so by "establishing standards of conduct, responsibility, and obligation for fiduciaries of employee benefit plans," and by providing plan participants and beneficiaries with "appropriate remedies, sanctions, and ready access to the Federal courts" when plan fiduciaries mismanage ERISA plans.  29 U.S.C. § 1001(b).  Courts have referred to ERISA's fiduciary duties as "the highest known to the law."

2.      ERISA subjects anyone with discretionary authority over an employee-benefits plan to fiduciary duties derived from the law of trusts.  Relevant here, ERISA's "duty of prudence" requires fiduciaries to act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B).  Among other things, ERISA's duty of prudence requires plan fiduciaries to make a diligent effort to compare alternative service providers in the marketplace, seek to minimize the expenses paid for the services to be provided, and continuously monitor plan expenses to ensure

that they remain reasonable and appropriate under the circumstances. In addition, ERISA's "duty of loyalty" requires fiduciaries to discharge their duties for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying *reasonable* expenses of administering the plan.

3.     This case principally involves mismanagement of prescription-drug benefits. Over the past several years, Defendants breached their fiduciary duties and mismanaged Johnson and Johnson's prescription-drug benefits program, costing their ERISA plans and their employees millions of dollars in the form of higher payments for prescription drugs, higher premiums, higher out-of-pocket costs, higher deductibles, higher coinsurance, higher copays, and lower wages or limited wage growth. Defendants' mismanagement is most evident in (but not limited to) the prices it agreed to pay one of its vendors—its Pharmacy Benefits Manager ("PBM")—for generic drugs that are widely available at drastically lower prices. For example, someone with a 90-pill prescription for the generic drug teriflunomide (the generic form of Aubagio, used to treat multiple sclerosis) could fill that prescription, *without even using their insurance*, at Wegmans for $40.55, ShopRite for $41.05, Walmart for $76.41, Rite Aid for $77.41, or from Cost Plus Drugs online pharmacy for $28.40. Defendants, however, agreed to make their ERISA plans and their participants/beneficiaries pay *$10,239.69*—not a typo—for each 90-pill teriflunomide prescription. The burden for that massive overpayment falls on Johnson and Johnson's ERISA plans, which pay most of the agreed amount from plan assets, and on participants/beneficiaries of the plans, who generally pay out-of-pocket for a portion of that inflated price. No prudent fiduciary would agree to make its plan and participants/beneficiaries pay a price that is *two-hundred-and-fifty times* higher than the price available to any individual who just walks into a pharmacy and pays out-of-pocket.

- 3 -

Cash Price Using No Insurance



Price Using J&J Plans



4.      The roughly $10,000 (per-prescription) difference between what pharmacies pay to acquire teriflunomide and what Defendants agreed to make Johnson and Johnson's ERISA plans and participants/beneficiaries pay for the exact same drug goes largely into the pockets of the PBM, at the expense of the ERISA plans and their participants/beneficiaries.

5.     Discrepancies like this exist for dozens of drugs under Johnson and Johnson's ERISA plans.  For example, as explained in greater detail below, certain generic and branded drugs are designated as "specialty" drugs based on the conditions they treat or other factors.  While Plaintiff'sPlaintiff Lewandowski's plan with Johnson and Johnson declined to provide her with access the plan's drug formulary upon request, an analysis of Defendants' prices for the generic drugs designated as specialty on a publicly available formulary managed by the same PBM reveals a pattern of unreasonable markups.  Across all generic-specialty drugs on the formulary for which there is publicly available data on average acquisition costs, Defendants agreed to make the plans and their beneficiaries pay, on average, a markup of ***498%*** above what it costs pharmacies to acquire those drugs.  In other words, Defendants agreed to make Johnson and Johnson's ERISA plans and their participants/beneficiaries pay, on average, roughly ***6 times*** as much as the PBM (or a PBM-owned pharmacy) paid for those very same drugs.  Not incidentally, Johnson and Johnson is a leading drug maker that earns billions of dollars a month selling drugs.

6.     This has also been Plaintiff'sPlaintiffs' personal experience with the generic, non-specialty drugs that she hasthey have been prescribed.  For example, across 14 prescriptions for generic drugs that shePlaintiff Lewandowski has obtained since August 2022, Defendants agreed to make the plans and PlaintiffLewandowski pay, on average, a markup of ***230.05%*** above pharmacy acquisition cost.  Put another way, the average pharmacy acquisition cost for these prescriptions was $182.60, but Defendants agreed to prices that required the plans and PlaintiffLewandowski to pay *more than three times as much*, or $602.68.  Similarly, Plaintiff Gregory was forced to pay over two times pharmacy acquisition cost for prescriptions through the Plans.  No prudent fiduciary would agree to such outrageous markups for generic drugs.

7.     Defendants also agreed to terms under which plan participants/beneficiaries are financially incentivized to obtain their prescriptions from the PBM's own mail-order pharmacy, even though that pharmacy's prices are routinely higher than the prices at other pharmacies.  For example, a plan participant/beneficiary seeking to fill a 90-day prescription of the generic drug bexarotene (used to treat a form of lymphoma) would pay a lower out-of-pocket percentage by using the PBM's pharmacy instead of going to Walgreens, but Defendants' ERISA plans would pay thousands of dollars more due to the high prices at the PBM's pharmacy.  In short, Defendants are steering participants/beneficiaries toward an option that, for many drugs, wastes thousands of dollars in plan assets while enriching the Plans' PBM by that same amount.

8.     Defendants failed to satisfy their fiduciary obligations at multiple steps in the process of administering prescription-drug benefits.  Defendants failed to exercise prudence and failed to act in the interest of participants and beneficiaries in selecting a PBM, in agreeing to allow Johnson & Johnson's ERISA plans and beneficiaries to pay unreasonable prices for prescription drugs based on unreasonable methodologies, in agreeing to contract terms with the PBM that needlessly allow the PBM to enrich itself at the expense of the company's ERISA plans and their participants and beneficiaries, in failing to monitor the PBM and the prices charged for prescription drugs, in failing to address conflicts of interest, in failing to actively manage and take reasonable measures oversee key aspects of the company's prescription-drug program, and failing to take available steps to rein in the PBM's profiteering, protect plan assets, and avoid unnecessary costs to participants and beneficiaries and protect their interests.

9.     The price discrepancies noted herein are illustrative of a pervasive and systematic problem of unreasonable prescription drug charges, despite well-known alternatives available to Defendants. Among other things, Defendants should have: used their bargaining power to obtain

better rates from their own PBM or another traditional PBM; taken steps to steer participants/beneficiaries toward the most cost-effective option instead of to the PBM's own pharmacy; moved all or parts of their prescription-drug plan to a "pass-through" PBM that bases its prices on actual pharmacy acquisition costs rather than inflated and manipulable benchmarks; directed substantial portions of their prescription-drug program to a well-known online pharmacy that charges only a modest markup above acquisition cost; and/or taken other steps detailed below. Yet the Pension and Benefits Committee of Johnson and Johnson—a major drug maker that itself profits from high drug prices—has instead chosen to force its benefits plans and covered employees and retirees to acquire drugs via some of the most expensive methods conceivable.

10.     ERISA required Defendants to make a diligent and thorough comparison of alternative service providers in the marketplace, to seek to minimize the costs for the services to be provided, and to continuously monitor plan expenses and ensure that they remain reasonable under the circumstances. Defendants did not do those things, and certainly not to the extent ERISA requires. Defendants breached their fiduciary duties by failing to engage in a prudent and reasoned decision-making process. If Defendants had engaged in a prudent and reasoned decision-making process, they would have known of, and adopted, any of numerous options that would have drastically lowered the cost of prescription drugs, and would have resulted in other cost savings for the plans and their participants and beneficiaries. Implementing those available options would have saved the plans and their participants and beneficiaries millions of dollars over the proposed class period.

11.     To remedy these fiduciary breaches, ~~Plaintiff~~Plaintiffs, individually and on behalf of the Plans and all others similarly situated, ~~brings~~bring this action under 29 U.S.C. § 1132 to enforce Defendants' liability under 29 U.S.C. § 1109, to enjoin Defendants from breaching their

fiduciary duties, to make good to the plans and their participants and beneficiaries all losses resulting from each fiduciary breach, and for other equitable relief specified below.

## I.    PARTIES AND OTHER RELEVANT ENTITIES

12.    Plaintiff Ann Lewandowski ("Lewandowski") is a "participant" in the ERISA plans at issue here, within the meaning of ERISA § 3(7), 29 U.S.C. § 1002(7). ~~Plaintiff~~Lewandowski began employment with Johnson and Johnson in November 29, 2021 as a healthcare policy and advocacy director for Wisconsin and Minnesota. Shortly after she filed this lawsuit, Johnson and Johnson purported to terminate ~~Plaintiff's~~Lewandowski's employment. However, her coverage under the Plans ~~remains~~remained in place and she ~~is continuing~~continued such coverage at her own cost. for several months. In particular, pursuant to the Consolidated Omnibus Budget Reconciliation Act (COBRA), ~~Plaintiff is continuing~~Lewandowski continued her coverage by paying premiums equivalent to 102% of the combined employer and employee contributions for similarly situated individuals under the Plans. ~~Plaintiff~~Lewandowski opted into COBRA coverage on May 7, 2024, continued such coverage until on or about October 1, 2024, and ~~intends to make~~made all required health plan payments. ~~Plaintiff~~Lewandowski brings this lawsuit on behalf of herself, on behalf of all others similarly situated, and on behalf of the Johnson & Johnson Group Health Plan and its component plans, serving as an affected plan participant and whistleblower to remedy Defendants' mismanagement of the ERISA Plans at issue here and to obtain appropriate relief under ERISA.

13.    Plaintiff Robert Gregory ("Gregory") is a "participant" in the ERISA plans at issue here, within the meaning of ERISA § 3(7), 29 U.S.C. § 1002(7). Gregory was employed by Johnson and Johnson from approximately June 1999 to September 2020. Gregory is currently retired from Johnson and Johnson, and remains enrolled in the company's Group Health Plan as a retiree. Gregory has paid and continues to pay premiums for his coverage under the Plans, and he

is also subject to out-of-pocket costs for purchases made for prescription drugs for himself and his family through the Plans.  Gregory brings this lawsuit on behalf of himself and all others similarly situated, serving as an affected plan participant to remedy Defendants' mismanagement of the ERISA Plans at issue here and to obtain appropriate relief under ERISA.

13.14.  Defendant Johnson and Johnson ("JnJJ&J" or "Johnson and Johnson") is a medical technologies and pharmaceutical company headquartered in New Brunswick, New Jersey. JnJJ&J earned approximately $95 billion in revenue in the 2022-23 fiscal year, placing it 40th on the 2023 Fortune 500.  It employs approximately 55,000 people in the United States and 130,000 people worldwide, and provides many of its U.S. employees with healthcare benefits, including prescription-drug benefits. It also provides healthcare benefits, including prescription-drug benefits, to certain of its retirees.

14.15.  JnJJ&J sponsors the Salaried Medical Plan and Salaried Retiree Medical Plan for its current and former employees, and both of those plans are part of the Group Health Plan of Johnson and Johnson and Affiliated Cos. (collectively, the "Plans" or the "J&J Plans").  The Plans are employee welfare benefit plans as defined at 29 U.S.C. § 1002(2)(A).  The purpose of the Plans is to provide medical benefits to employees and retirees of JnJJ&J and its affiliated companies, as well as to those employees'/retirees' family members.  The Plans' prescription-drug benefits are administered by a third-party service provider called Express Scripts.  The Plans pay Express Scripts about $2 million annually in administrative and ancillary fees, plus many millions more in fees that Express Scripts collects from the Plans through its spread pricing and retention of rebates, as described below.

15.16.  All or most of the Plans' expensesThe J&J Plans are self-funded health plans, and as such, the Plans' expenses are shared by J&J and the participants/beneficiaries of the Plans

instead of being paid by a third-party insurance company. For example, the Salaried Medical Plan's expenses (excluding out-of-pocket expenses billed directly to participants/beneficiaries pursuant to deductibles, copays, etc.) are paid from the Johnson and Johnson Salary Medical VEBA (the "VEBA Trust"), which is an employer-sponsored trust established under I.R.C. 501(c)(9) for the payment of medical benefits under the Plans. The VEBA Trust's IRS Form 990 submission states: "The VEBA has been established and maintained as a means of funding and paying benefits and administrative expenses for eligible salaried employees (and their eligible and enrolled dependents) who are participants in certain medical plans maintained by J&JJJ and its affiliated companies." The VEBA Trust is funded by a combination of employer and employee contributions, along with investment income. In a self-funded plan, like J&J's, the trust is responsible for 100% of the expenses of the plan; they do not share the actuarial risk with a third-party insurance carrier. In the most recent year of reporting, participants made approximately $148.28149.2 million in contributions to the VEBA Trust. The funds held by the VEBA Trust are assets of the Plans, and must be used "for the exclusive benefit of the Plans' participants and their beneficiaries." No portion of the VEBA Trust may revert to JnJJ&J or be used for or diverted to any purpose other than for the exclusive benefit of participants in the Plans and their beneficiaries.

16.17.  The Pension & Benefits Committee of Johnson and Johnson (the "Pension & Benefits Committee" or "Committee") is the administrator of the Plans and a fiduciary of the Plans with general authority for the management and administration of the Plans.  The members of the Committee are high-level JnJJ&J employees appointed to the Committee by JnJJ&J.

17.18.  Defendant Johnson & Johnson is the sponsor of the Plans and a fiduciary of the Plans.  Johnson & Johnson is responsible for appointing and removing Committee members, and on information and belief, retains decision-making authority with respect to the Plans.  Johnson &

Johnson also has a fiduciary duty to monitor its appointed fiduciaries, and it failed to adopt or follow sufficient procedures to review and evaluate the performance of the Committee and to remove fiduciaries whose performance was inadequate and/or who failed to satisfy ERISA's fiduciary duties and statutory requirements.  Johnson & Johnson is also liable for the fiduciary breaches and other ERISA violations of the Committee and its members as an appointing and monitoring fiduciary, and as a co-fiduciary under 29 U.S.C. § 1105.  In addition, Johnson & Johnson is liable for the fiduciary breaches and other ERISA violations of the Committee and its members because the Committee members were acting within the course and scope of their employment when they committed the fiduciary breaches and violations at issue and because Johnson & Johnson did not make reasonable efforts under the circumstances to remedy the breaches and violations.  For purposes of this litigation, Johnson & Johnson has stipulated that "it will be responsible for any judgment entered in this action based upon the actions or omissions of … any current or former members of the Committee or any other J&J committee or group with responsibilities relating to the Plans (either separately or as a whole); or the actions or omissions of J&J or the Committee."  ECF 43.

## II.    JURISDICTION AND VENUE

18.19.  This Court has exclusive subject-matter jurisdiction under 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331 because this is an action under 29 U.S.C. § 1132.  Plaintiff hasPlaintiffs have been injured by the unlawful conduct alleged herein and hashave standing to bring this action.

19.20.  Venue is proper in this district under 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391(b) because it is the district in which the Plans are administered, where at least one alleged breach or unlawful act took place, and where Defendants reside or may be found.

20.21.  This Court has general personal jurisdiction over defendant Johnson & Johnson because it is incorporated and headquartered in this State, and over the Committee because it

operates from and is headquartered in this State.  This Court has specific personal jurisdiction over all Defendants because they took the actions described herein in this district through the management of the Plans, all of which were administered from this State.

## III.    FACTUAL AND LEGAL BACKGROUND

### A.    Prescription-Drug Plans and Fiduciary Duties Under ERISA

~~21.~~ 22.  Employers are the principal source of health benefits for working-age Americans in the United States.  To provide those benefits, many employers sponsor employee benefit plans. The vast majority of employee health plans include coverage for prescription drugs.  Broadly speaking, the prescription-drug portion of an employee health plan covers a portion of the costs of an employee's prescription drugs.   The employee is responsible for a portion of a monthly insurance premium (and in some cases, the full premium amount) and for the full cost of purchased prescriptions until they meet any applicable deductible. Once the employee meets the deductible, the plan begins to cover a portion of the cost, and the employee continues to pay either a co-pay (often a set cost) or co-insurance (often a percentage of the contracted amount) for each prescription. The employee's premium payments are directly based on the plan's ~~projected costs for the next year, which are heavily influenced by the plan's~~ actual costs in past years or an actuarial projection of future costs that is heavily influenced by past costs.  The employee's deductible, co-pay, and co-insurance amounts are set according to the plan documents. Costs are based on the plan's contractual arrangements with third-party service providers, typically a combination of insurers and PBMs, who work as intermediaries between the plan and the healthcare delivery system.

~~22.~~ 23.  Prescription-drug plans (or the broader health care plans of which they are often a part), like other employee welfare benefit plans established by private-sector employers, are governed by ERISA.  Congress enacted ERISA to address concerns that employee benefit plans

were being mismanaged. ERISA protects the interests of employee benefit plan participants and their beneficiaries by establishing standards of conduct, responsibilities, and obligations for fiduciaries of employee benefit plans. In ERISA terms, an employer who offers a welfare plan to its employees (and, typically, its employees' family members) is called a "plan sponsor."

23.24.  Anyone who exercises any discretionary authority or discretionary control over the management of an employee-benefit plan, and anyone who exercises any authority or control respecting management or disposition of the assets of an employee-benefit plan, is a fiduciary of the plan.

24.25.  ERISA imposes strict fiduciary duties of loyalty and prudence on the fiduciaries of employee-benefit plans, including healthcare plans and prescription-drug plans. The duty of loyalty requires fiduciaries to act "solely in the interest of the participants and beneficiaries … for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan." 29 U.S.C. § 1104(a)(1)(A). The duty of prudence requires fiduciaries to exercise the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope. 29 U.S.C. § 1104(a)(1)(B). A fiduciary's process must bear the marks of loyalty, skill, and diligence expected of an expert in the field. Courts have described these fiduciary duties as "the highest known to the law."

25.26.  Specifically, 29 U.S.C. § 1104(a) states, in relevant part, that:

(1) [A] fiduciary shall discharge his duties with respect to a plan
solely in the interest of the participants and beneficiaries and—

(A) for the exclusive purpose of:

(i) providing benefits to participants and their
beneficiaries; and
(ii) defraying reasonable expenses of administering
the plan;

> (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

26.27.  Under ERISA, fiduciaries must act prudently and for the exclusive benefit of participants and beneficiaries in the plan when they select service providers for the plan. Fiduciaries must conduct an independent investigation and consider alternatives when initially selecting service providers, and continue to monitor and critically review the performance and cost of such service providers after they are appointed. The common law of trusts, which informs ERISA's fiduciary duties, emphasizes the duty to avoid unwarranted costs.  The Restatement (Third) of Trusts explains, "[i]mplicit in a trustee's fiduciary duties is a duty to be cost-conscious."

27.28.  Fiduciaries must also ensure that their agreements with service providers and the amounts they pay to those service providers are reasonable.  Fiduciaries must seek to minimize the costs for the level of services to be provided, and continuously monitor plan expenses to ensure that they remain reasonable and appropriate under the circumstances.  Fiduciaries of large plans like the J&J Plans also cannot ignore the power their plans wield to obtain favorable rates.  Put simply, wasting beneficiaries' money is imprudent.

28.29.  Fiduciaries cannot discharge their fiduciary duties simply by relying on the advice of third-party service providers, consultants, or experts.  As the Restatement explains, "[a]fter obtaining advice or consultation, the trustee can properly take the information or suggestions into account but then … must exercise independent, prudent, and impartial fiduciary judgment on the matters involved."  Fiduciaries also cannot discharge their fiduciary duties simply by relying on the advice of third-party service providers, consultants, or experts who have conflicts of interest that may prevent them from providing advice solely for the benefit of the plan.

29.30.  A plan fiduciary who breaches his or her fiduciary duties is personally liable for the relief specified in 29 U.S.C. § 1109(a), which provides:

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

30.31.  In addition to the remedies expressly identified, a plan participant or beneficiary may also obtain injunctive relief, surcharge, and other remedies, as appropriate, from a plan fiduciary who breaches his or her fiduciary duties, as well as attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g).

## B. Management and Administration of Prescription-Drug Plans

31.32.  Prescription-drug transactions work as follows:  When a person with prescription-drug insurance goes to hertheir pharmacy to buy a prescription drug, that person makes a claim on hertheir prescription-drug plan. If the person has yet to meet an applicable deductible, they are responsible for the full cost of the drug at plan rates.[1] Once she hasthey have met hertheir annual deductible, the plan often  covers some or all of the drug's cost.  The pharmacist sends a query to the insured's prescription-drug plan, which more or less instantaneously (*i.e.* while the insured is at the pharmacy counter) determines whether the drug is covered under the insured's plan. The plan communicates to the pharmacy whether the claim was approved or denied, and the cost of the prescription when using the plan. If the claim is approved, the pharmacy is informed of the cost of

---

[1] The insured may also be responsible for the full cost of the drug for other reasons, for example if it is not covered by the insured's plan or if the drug is priced below a coverage trigger (e.g., under $20 for J&J employees, *see infra* at n.3).

the prescription including any co-pay or co-insurance amount required from the insured.  The pharmacy then collects the co-pay or co-insurance based on the information provided and dispenses the drug.  In a later transaction, the prescription-drug plan pays the remainder of the drug's cost to the pharmacy, at a rate negotiated between the plan and the pharmacy.

32.33.  To provide prescriptions for plan members, a prescription-drug plan's fiduciaries (either directly or through a designated representative) generally must negotiate rates with a network of pharmacies at which its participants and beneficiaries may obtain prescription drugs; maintain a list of prescription drugs (called a formulary) that will be covered by the plan; maintain a framework to determine how the cost of those drugs will be shared between the plan and its participants/beneficiaries; process prescription-drug claims when participants/beneficiaries are at the pharmacy counter; and reimburse pharmacies for the plan's portion of the negotiated rates.

33.34.  The list of prescription drugs that are covered by a prescription-drug plan is called a "formulary."  The formulary is analogous to a commercial health plan's list of covered procedures: just as a commercial health plan will provide different levels of coverage (or no coverage) depending on the specific medical procedure at issue, a prescription-drug plan will provide different levels of coverage (or no coverage) depending on the specific prescription drug at issue.  Formularies are typically divided into multiple tiers—for example, a typical formulary includes several tiers that impact the participant's cost according to the tier designation.  Lower tiers often have either a small fixed copay or a limited coinsurance progressing to the specialty tier, typically involving 20% or more in cost-sharing from plan participants.  Examples of tiers with applicable cost sharing include preferred generic, non-preferred generic, preferred brand, non-preferred brand, and specialty.

34.35.  A generic drug is a pharmaceutical drug that contains the same chemical substance as a drug that was originally protected by chemical patents and sold under a brand name.  Generics are identical to brand-name drugs, but tend to be significantly lower-cost because they are produced by multiple competing manufacturers.  As the Food and Drug Administration explains, "generic medicines work in the same way and provide the same clinical benefit and risks as their brand-name counterparts.  A generic medicine is required to be the same as a brand-name medicine in dosage, safety, effectiveness, strength, stability, and quality, as well as in the way it is taken.  Generic medicines also have the same risks and benefits as their brand-name counterparts."

35.36.  Formularies are powerful tools for plan fiduciaries to control the plan's prescription-drug costs.  For example, when a lower-priced generic version of a drug becomes available, a prudent fiduciary will add the generic to its formulary and either remove the brand-name drug or disincentivize its use., in order to reduce costs.  This will result in beneficiaries receiving the lower-priced generic instead of the expensive (but chemically identical) brand-name drug, which in turn will lower costs for the plan.

36.37.  Other aspects of administering a prescription-drug plan also offer cost-saving opportunities for prudent plan fiduciaries.  For example, a prudent fiduciary will negotiate favorable drug prices and will implement systems to process claims efficiently and cheaply.  A fiduciary of a sufficiently large plan like the JnJJ&J Plans is also in a position to be able to extract financial concessions from a drug manufacturer (often termed "rebates") in exchange for agreeing to include the manufacturer's drugs on its formulary and/or in a preferred tier on its formulary.

### C.    Pharmacy Benefit Managers and Brokers

#### 1.    General Background on PBMs

37.38.  Many plan fiduciaries contract with third parties to help manage and administer the prescription-drug portion of their health plans.  These third parties are called "pharmacy benefit

managers" or, for short, "PBMs."  PBMs offer various services to prescription-drug plans, including negotiating with pharmacies to establish pharmacy networks where plan participants and beneficiaries can obtain prescription drugs; helping manage plans' formularies; processing participants'/beneficiaries' claims in real-time; and contracting with drug manufacturers to secure price reductions or other financial considerations.

38.39.  As a general matter, the PBM handles the day-to-day management of its clients' prescription drug programs and serves as the middleman between a benefits plan and network pharmacies.  Accordingly, when a plan participant or beneficiary obtains a prescription drug from a pharmacy, the PBM pays the pharmacy for the cost of the drug (less the participant/beneficiary's out-of-pocket responsibility) and then collects payment from the plan.  As noted in more detail below, however, the PBM may attempt to collect more money from the plan than it paid to the pharmacy, pocketing the difference.

39.40.  PBMs are service providers to prescription-drug plans.  They are profit-driven entities that seek to profit from their intermediary role in the prescription-drug ecosystem.  The largest PBMs are owned by publicly-traded companies and accordingly owe fiduciary duties to their shareholders to maximize their own profits.  As discussed in more detail below, many PBMs are also part of vertically integrated companies that create obvious conflicts of interest and incentivize them to take actions that are not in the best interest of their plan clients.

40.41.  There are two dominant pricing models for PBMs.  "Traditional" PBMs typically make their money through a combination of spread pricing, rebates, and owning their own pharmacies, as described below.  "Pass-Through" PBMs, in contrast, typically make their money only through administrative fees.  They do not engage in spread pricing, they pass through the full amount of any negotiated rebates to their client plans, and they do not own pharmacies.

## 2.    Traditional PBM Model

41.42.  In the traditional PBM model, the prices that a prescription-drug plan pays for prescription drugs are determined in negotiations between plan fiduciaries and the PBM.  Those prices can be determined in any number of ways, limited by only the parties' willingness to transact.

42.43.  One way that some plan fiduciaries and PBMs structure their agreements is to set prices for groups of drugs by reference to a specific benchmark price, rather than negotiating a separate price for each drug.

43.44.  One historically prevalent benchmark is called the "Average Wholesale Price" or "AWP."  In theory, the AWP for a drug is a benchmark that describes the average price that pharmacies pay to acquire that drug from wholesalers.  In reality, as is widely understood by prudent plan fiduciaries, AWP is not a true representation of actual market prices for either generic or brand drug products, is highly manipulable by manufacturers and wholesalers, and often bears little to no relation to a pharmacy's actual acquisition costs.  (A common joke among insiders in the industry insiders, like J&J, is that AWP stands for "Ain't What's Paid.")."  The difference between the AWP and a pharmacy's actual acquisition costs can be substantial, and sometimes arbitrarily so.  Researchers have found several examples in which the AWP for a drug was 50, 70, or even 100 times higher than the drug's actual cost to pharmacies.

44.45.  Plan fiduciaries that decide to use a traditional PBM may negotiate a bundled price, relative to AWP, for all generic drugs; a bundled price, relative to AWP, for all brand-name drugs; and a bundled price, relative to AWP, for all "specialty" drugs.  For example, a plan may agree to pay its PBM "AWP minus 85%" for generic drugs, "AWP minus 20%" for brand drugs, and "AWP minus 15%" for "specialty" drugs.  These prices might vary further based on whether the prescription is for a 30-day supply or a 90-day supply or based on other factors, including whether

the prescription is filled at the PBM's own pharmacy. These prices are negotiable between the traditional PBM and the plan fiduciaries.

45.46. Critically, however, the prices the plan agrees to pay its traditional PBM for a prescription may not bear any relation to the price the PBM will pay the pharmacy for the same prescription. Any difference between those two amounts is known as the "spread."

46.47. The "spread" can be a major revenue stream for traditional PBMs. "Spread pricing" is when a PBM negotiates a price with pharmacies that is lower than the price it charges the prescription-drug plan, and then instead of passing those savings on to its client plans, pockets the difference. For example, a PBM may negotiate with a pharmacy for a price of $17 for each prescription of a certain drug, but then may try to separately negotiate with the plan fiduciaries for a price of $20 for that same drug. The $3 "spread" between these two negotiated rates represents profit for the PBM, at the expense of the plan and its participants and beneficiaries. As an example of how this works in practice, a participant or beneficiary filling this prescription would pay a $5 co-insurance amount to the pharmacy and the PBM would pay the pharmacy $12 more, satisfying the PBM's agreement to pay the pharmacy $17 for the prescription. The PBM would then bill the plan the remaining $15 (the $20 negotiated price minus the $5 patient co-insurance).



- 20 -

47.48.  For generic drugs, there is often even more of a disconnect between an AWP-based price paid by a plan (and its participants/beneficiaries) to the PBM and the price then paid by the PBM to a pharmacy.  This is because the prices that PBMs pay to pharmacies for generic drugs are generally not based on AWP.  Instead, PBMs pay pharmacies for generic drugs based on prices listed on the PBM's proprietary "Maximum Allowable Cost" or "MAC" list.  A "MAC" list is a PBM-generated list that includes the maximum amount the PBM will pay a pharmacy for generic drugs.  PBMs have essentially free reign to determine their own pricing methodologies for their MAC lists, so long as the prices are not so low that pharmacies will refuse to do business or refuse to stock a drug.  One recent study observed that "proprietary PBM prices (i.e., maximum allowable cost, or MAC) were … highly variable and disconnected from the manufacturer or pharmacy established price for the medication."  PBMs may also have different MAC lists corresponding to different pharmacies (*e.g.*, the MAC prices may be far higher at the pharmacies they own) and different payers.

48.49.  Traditional PBMs engaging in spread pricing try to exploit the disconnect between the prices they receive from plans and the prices they pay to pharmacies, pocketing the difference between the two prices.  Because of this dynamic (and also for other reasons), it is imperative that the plan fiduciaries actively monitor PBMs and their pricing, and minimize any excess costs or spread.

49.50.  Traditional PBMs benefit the most when plan participants and beneficiaries are prescribed drugs with the highest cost to the plan relative to the actual drug acquisition cost, as this maximizes the "spread" retained by the PBM: the higher the cost to the plan, the more the PBM receives as revenue; the lower the drug acquisition cost, the less the PBM must pay to the pharmacy.  PBMs in such an arrangement are financially motivated not to make formulary

decisions based on which drugs have the lowest cost to the plan and its participants and beneficiaries, but rather based on which drugs allow them to pocket the largest spread. Prudent fiduciaries therefore closely supervise their formularies and carefully negotiate their payment structures to ensure that PBMs are not acting based on considerations that run contrary to the interests of the plan and its participants and beneficiaries.

50.51.  Because of the pronounced disconnect between AWP and acquisition cost for generic drugs, many prudent fiduciaries negotiate generic pricing based on pharmacy acquisition costs instead of with reference to AWP. These fiduciaries negotiate either a fixed, pre-determined price for each medication derived from each medication's acquisition cost, or a formula based on actual pharmacy acquisition costs. Basing prices on pharmacy acquisition costs rather than AWP reduces overall spending on generic drugs, limits spread pricing, and eliminates the variability in pricing inherent in AWP-based pricing models. Instead of agreeing to pay prices based on a "discount" from a made-up benchmark (AWP) that does not correspond to the actual cost of prescription drugs, prudent fiduciaries agree to pay reasonable prices based on the actual acquisition cost of the drugs their members purchase.

51.52.  Another potential revenue stream for traditional PBMs is through "rebates" and other financial concessions from drug manufacturers. Drug manufacturers often pay "rebates" to the PBM in exchange for securing either formulary or tier placement for their drugs. These "rebates" are generally based on the quantity of drugs dispensed under the plans administered by the PBM, and the manufacturer typically pays the PBM quarterly. For example, a manufacturer may rebate a percentage of the total PBM volume for a specific drug.

52.53.  Plans and traditional PBMs negotiate over how much of any such rebate or price concession will be retained by the PBM and how much will be passed through to the plan

- 22 -

(represented either as a percentage or a flat amount per prescription). Traditional PBMs may attempt to denominate rebates by other names to obscure their nature, or hide these rebates by purchasing medications from a wholly owned group purchasing organization ("GPO") that sells drugs back to the PBM ("GPO") to try to reduce the amounts they are contractually obligated to pass on to their client plans. Any amount the PBM retains is revenue for the PBM.

53.54.  Prudent fiduciaries negotiate with their PBMs to minimize or eliminate any portion of rebates or other financial concessions from manufacturers that the PBM retains instead of passing through to the plan. Prudent fiduciaries likewise ensure that their PBM contract is written with sufficient precision that the PBM cannot hide or obscure these rebates to avoid passing them through to the plan. While such rebates are not per se unlawful, prudent fiduciaries have a responsibility to ensure that the PBM and its affiliated entities are not receiving unreasonable compensation via such revenue sharing arrangements at the expense of the plan and its participants and beneficiaries.

54.55. Some traditional PBMs also earn revenue through ownership of their own pharmacies. Express Scripts, for example, is a PBM that is vertically integrated with the specialty pharmacy Accredo.  When PBMs own their own pharmacies, they may attempt to steer beneficiaries of their clients' prescription-drug plans to those pharmacies, including by requiring beneficiaries to pay more out-of-pocket at competitors' pharmacies or by refusing to cover prescriptions obtained at competitors' pharmacies. In addition, traditional PBMs may "agree" to excessively high reimbursement rates with the pharmacies they own (*i.e.*, reimbursement rates that greatly exceed the pharmacy's actual acquisition costs)—rates that the PBM would never agree to pay in a truly market-based transaction.  Through this arrangement, PBMs can misleadingly represent to plans that they are not engaging in spread pricing (*i.e.*, they can promise that they are

charging the plan the same amount they are paying the pharmacy), even though that is technically true only because the PBM "agreed" to pay its own pharmacy excessive amounts.  In reality, the mechanism is the same as spread pricing—*i.e.*, the traditional PBM charges the plan far more than the drug actually costs, and then the PBM or its affiliated pharmacy pockets the difference.

55.56.  There are several traditional PBMs in the marketplace that are capable of providing a high level of service and that will vigorously compete to win a PBM contract from a Fortune 50 company like Johnson and Johnson.  To ensure that they are continuing to manage the plan's costs and incur only reasonable expenses, prudent fiduciaries conduct open RFP processes to obtain competitive bids for PBM services at regular intervals and ensure that the rates and terms to which they agree continue to reflect the best rates and terms available in light of the plan's size, bargaining power, and other characteristics.  At a minimum, it is necessary to regularly survey the market to ensure that the plan and its participants and beneficiaries are not paying excessive costs.

### 3.    The "Pass-Through" PBM Model

56.57.  One alternative to the traditional PBM model is the "pass through" model. The payment structure for the pass through model is more transparent and straightforward, and provides plan sponsors with a reasonable alternative to traditional PBMs that offers many advantages including reduced costs.[2] In the pass-through PBM model, the amount that the PBM bills the plan is equal to the amount the PBM pays the pharmacy.  In this model, the PBM does not engage in spread pricing and commits to passing through all discounts and rebates, however denominated, to the plan.  The pass-through PBM earns revenue based only on a flat administrative fee it charges to the plan, usually assessed on a per-member, per-month basis (similar to a per-head fee for recordkeeping services to a retirement plan). Pass-through PBMs typically base their

---

[2]    *See,    e.g.,*    https://www.cap-rx.com/insights/the-upside-of-a-single-ledger-model-tm-in-pharmacy-benefits (last visited May 10, 2024).

costs on actual pharmacy acquisition costs.  Pass-through PBMs still negotiate for rebates and discounts from manufacturers, and more effectively pass those rebates and discounts through to their clients instead of keeping them for themselves.  This keeps incentives aligned.  The rebates and discounts that many pass-through PBMs negotiate are comparable, and in some cases identical, to the rebates and discounts available to traditional PBMs.

57.58.  Because pass-through PBMs do not benefit from rebates or spread pricing, they have no incentive to favor drugs on any factor other than what is in the best interest of the plan and its participants and beneficiaries.  Whereas a traditional PBM is typically incentivized to select drugs with higher rebates and/or that allow for higher spreads—even if those drugs have higher net costs for the plan—pass-through PBMs have no such incentives or conflicts of interest.

58.59.  Using a pass-through PBM does not negatively affect the patient experience compared to a traditional PBM, and in many cases improves the experience.  Most pass-through PBMs have network agreements with many or all major pharmacies, allowing plan beneficiaries to obtain their prescriptions from a wide range of pharmacies, including most or all of the pharmacies that are in-network for traditional PBMs.  For example, the pass-through PBM Navitus has network agreements with CVS, Walgreens, Walmart, Rite Aid, Giant, Stop & Shop, Wegman's, Publix, Kroger, Costco, and many others.  Similarly, the pass-through PBM Capital Rx "maintains a national network of more than 65,000 pharmacies, including all national chains and most independent pharmacies."  Pass-through PBMs also partner with mail-order pharmacies, including for specialty drugs, that can provide plan participants and beneficiaries with the same (or greater) level of convenience as a traditional PBM's mail-order pharmacy.

59.60.  Pass-through PBMs are able to obtain the same drugs from manufacturers as traditional PBMs.  Any prescription-drug plan that wants to include or exclude any specific drug

on its formulary can do so with either a pass-through PBM or a traditional PBM.  Pass-through

PBMs also offer the same types of services—and, if anything, more personalized services—than

traditional PBMs.

60.61.  There are numerous pass-through PBMs in the marketplace that are capable of

providing a high level of service and will vigorously compete to win a PBM contract from a

Fortune 50 company like Johnson and Johnson.  To ensure that they are continuing to manage the

plan's costs and incur only reasonable expenses, prudent fiduciaries conduct open RFP processes

to obtain competitive bids for PBM services at regular intervals from both traditional PBMs and

pass-through PBMs, and ensure that the rates and terms to which they agree continue to reflect the

best rates and terms available in light of the plan's size, bargaining power, and other characteristics.

At a minimum, it is necessary to regularly survey the market, including pass-through PBMs, to

ensure that the plan and its participants and beneficiaries are not paying excessive costs.

61.62.  Prudent fiduciaries choose carefully among PBMs, analyzing multiple PBMs'

offerings to decide which PBM and which payment model will be most beneficial and most cost-

effective for the plan.  Prudent fiduciaries also negotiate favorable terms with PBMs and

continually supervise their PBM's actions to ensure that the plan is minimizing costs and

maximizing outcomes for beneficiaries.  Prudent fiduciaries retain sufficient control over their

plans' formularies to prevent the PBM from making formulary decisions that serve the PBM's

interests but not the plan's interests.  Prudent fiduciaries also periodically attempt to renegotiate

their PBM contracts, conduct marketplace surveys, and/or conduct an open RFP process to solicit

proposals from other PBMs and ensure that they have the best possible deal for the plan and plan

participants/beneficiaries.

4.      **Brokers**

62.63.  Many plan sponsors hire consultants and/or brokers to assist them with soliciting bids from, selecting, and negotiating with a PBM.  A plan sponsor's broker may serve as the broker for a range of the plan sponsor's vendor agreements but recommend that the plan sponsor hire a consultant (usually one affiliated with the brokerage) to assist specifically with the PBM selection process.  For simplicity, consultants and brokers together are referred to here as "employee benefit consultants" ("EBCs") or "PBM reseller coalitions."  EBCs are service providers to prescription-drug plans.  They are profit-driven entities that seek to profit from their intermediary role in the prescription-drug ecosystem.

63.64.  Some EBCs, while purporting to act in the interest of prescription-drug plans, are in fact being paid by PBMs in ways that incentivize them to act against the plan's interests.  For example, PBMs may promise to pay an EBC a commission on every prescription if the EBC recommends the PBM to its client plans.  As one media outlet reported, "[c]onsulting firms can collect at least $1 per prescription from the largest PBMs, according to more than a dozen independent drug benefits consultants, and attorneys involved with employers' PBM contracts. That can go as high as $5 per prescription in extreme cases, three of those people said. Consulting firms and brokerages may receive a certain dollar amount for each covered employee and member. Or they may share in the rebates that the PBMs pluck from pharmaceutical manufacturers — ***money that otherwise could be used by employers to lower premiums for their workers***." Bob Herman, *'It's beyond unethical': Opaque conflicts of interest permeate prescription drug benefits*, STAT+ (June 20, 2023) (emphasis added), https://www.statnews.com/2023/06/20/pbms-consulting-firms-investigation/.

64.65.  According to one report, an EBC managing an RFP process refused to allow a PBM to even enter a bid for a plan's contract unless the PBM agreed to pay the EBC $6.50 per

prescription.  In an apparent attempt to hide the payment, the EBC asked the PBM to mail the payments quarterly to a PO box in another state.

65.66.  Industry experts have warned that many EBCs or brokers "not only give[s] bad advice to the employer that's in the broker's self-interest, but the broker also allows the big PBM to write crazy terms into a contract."

66.67.  Some EBCs, while purporting to manage an open RFP process for their client plans, will refuse to solicit bids from PBMs that decline to offer the EBC kickbacks or other forms of indirect compensation.

67.68.  Prudent fiduciaries ensure that any EBC they hire to help them select and negotiate with a PBM does not have conflicts of interest that would prevent it from offering objective advice to the plan and operating a truly open RFP process.  Prudent fiduciaries would not hire an EBC who was receiving kickbacks or other forms of compensation from the PBM it was assisting in selecting or negotiating with, or who would refuse to solicit bids or accept offers from PBMs who were not paying kickbacks or providing other forms of compensation.  As one media outlet put it, "[e]mployers … may be neglecting their legal duty by not asking their consultants and brokers to disclose all the sources of their revenue."

68.69.  Prudent fiduciaries exercise—and are required to exercise—independent, prudent, and impartial fiduciary judgment even on matters for which they receive advice from EBCs.

69.70.  Section 202 of the 2021 Consolidated Appropriations Act prohibits covered plans from entering into a contract, renewal, or extension of services for the plan with "covered service providers," which includes EBCs, without first requiring the covered service provider to disclose, in writing, any and all direct and indirect compensation in excess of $1,000 it receives for providing services to the plan.  A covered plan's failure to obtain the required disclosures from a covered

service provider under Section 202 makes its contract with that service provider a prohibited transaction under ERISA.  Prudent fiduciaries obtain the required disclosures from their EBCs and ensure that the disclosures are sufficiently clear and unambiguous, and that no conflict of interest exists, before entering into, renewing, or extending their contract.

### 5.    Fiduciary responsibilities with respect to PBMs and EBCs

70.71.  The fiduciaries of a prescription-drug plan have control over the plan's expenses, formulary, and choice of third-party service providers (including PBMs and EBCs).  Their control over the formulary includes which drugs will be covered by the plan and which tier of the formulary any covered drug will be placed.  The fiduciaries are also responsible for hiring third-party service providers, for negotiating the terms of their agreements with those third-party service providers (including drug prices), and for exercising continued oversight over the service providers and any aspect of the plan for which a third-party service provider is contractually responsible.

71.72.  These fiduciary responsibilities (and how they are carried out) have the potential to dramatically affect the amount of money the plan pays for prescription drugs.  Accordingly, fiduciaries of prescription-drug plans must engage in a rigorous process to manage the plan's formulary, oversee any formulary management performed by a third-party vendor, and ensure that the plan pays no more than reasonable amounts for prescription drugs.  This is particularly true for Fortune 50 companies like Johnson and Johnson with tens of thousands of employees and former employees in their plans, which have the bargaining power to obtain the most favorable terms from third-party vendors.

72.73. When fiduciaries agree to overpay for prescription drugs, employees—and especially the sickest employees—bear much of the burden.

73.74.  First, employees are typically responsible for the entire cost of covered items until they meet their deductible.[3]. After meeting their deductible, employees remain responsible for a co-pay or co-insurance amount thereafter.  Accordingly, if plan fiduciaries agree to inflated prices for prescription drugs, the participating employees or beneficiaries receiving those drugs are required to pay some or all of those inflated prices out-of-pocket.  This is true for PlaintiffPlaintiffs and many other class members who purchase prescription drugs through the Plans.

74.75.  Second, a co-insurance amount is often calculated as a percentage of the *pre-rebate* (gross) price, so the participant/beneficiary's out-of-pocket responsibility ends up being a higher percentage of the net price than stated inthe published coinsurance percentage for which the participant/beneficiary is properly responsible under the plan documents..  This is true for likewise true for PlaintiffPlaintiffs and other class members who purchase prescription drugs through the Plans.

75.76.  Third, the amounts that a self-funded health plan spends on prescription drugs directly affect the premiumspremium contributions that all plan members must paymake to fund the plan. Self-funded health plans cover 100% of the cost of their claims through contributions from participants/beneficiaries and the sponsoring employer.  Although a third-party insurer may *administer* a self-funded plan, any such third-party administrator is not responsible for the any of the plan's expenses or actuarial risks, which are borne exclusively by the participants/beneficiaries and the sponsoring employer.  In this way, a self-funded group health plan functions much like an individual employee healthcare reimbursement account which is funded by employee salary deferrals and any deposits the employer may make as part of its overall benefits package. Claims

---

[3] Aside from the deductible, under the J&J plan, members remain responsible for "inexpensive" generics under $20.

costs are paid directly out of the monies deposited into the trust account by participants/beneficiaries and their employer, with no ability to shift costs to a third party. At least 85% of the premium cost for large plans like the Plans is attributable to prescription -drug ~~portion of their benefit plans.~~ outlays and other healthcare expenditures (with the remainder attributable to administrative costs, risk or pooling charges, and reserve set asides). Accordingly, if plan fiduciaries agree to inflated prices for prescription drugs, they pass those inflated prices on to all employees and plan members—even those who did not receive any such prescription drugs—through increased ~~premiums.~~ premium contributions. Indeed, the Federal Trade Commission has explicitly found that inflated drug costs "result in higher premiums." U.S. Fed. Trade Comm'n, *Pharmacy Benefit Managers: The Powerful Middlemen Inflating Drug Costs and Squeezing Main Street Pharmacies* (2024) ("FTC Report"), available at https://www.ftc.gov/system/files/ftc_gov/pdf/pharmacy-benefit-managers-staff-report.pdf; *see also infra* at ¶¶ 200-204 (citing other sources identifying same causal link). This is true for prescription-drug plans generally and ~~Plaintiff~~Plaintiffs and the Plans specifically.

~~76.~~77.  Fourth, employers often pass higher health care costs on to their employees in the form of depressed wages. and benefits.  In a recent report, the Congressional Budget Office noted that "[e]mployers' spending on health insurance represents a large part of their employees' nonwage compensation, so employers generally take actions to offset increases in health insurance spending in order to maintain their profits."  The CBO also cited a recent study finding that increased healthcare spending by employers was "associated with a rise in employees' out-of-pocket costs, an increase in the use of high-deductible health plans, and slower wage growth for employees."  UC Berkeley researchers summarized recent academic research on this topic: "Increases in health care costs are coming out of workers' pockets one way or another . . . . When

health care costs rise, employers can respond in a variety of ways, such as by increasing worker premium contributions, increasing deductibles or copayment amounts, reducing employment, or increasing their own premium contributions while reducing or limiting wage growth accordingly." This is true for employers generally and, on information and belief, ~~JnJ~~J&J specifically.

### D.     Specialty Drugs

~~77.~~78.  Some drugs, whether brand or generic, are classified as "specialty" drugs.  As originally envisioned, the "specialty" designation referred to expensive branded drugs used to treat complex or rare chronic conditions, required special handling or care, and historically were available only at hospitals, doctors' offices, or specialty pharmacy locations where the patient could receive specialized instruction from a medical professional.

~~78.~~79.  Today, however, the "specialty" designation is largely arbitrary.  There is no universal standard or agreement regarding what qualifies as a "specialty" drug.  Indeed, the three largest PBMs disagree about whether any particular drug is a "specialty" drug about half the time:



~~79.~~80.  However defined, there is no question that specialty drugs are a major driver of prescription-drug spending.  According to numerous industry experts, specialty drugs account for

more than half of all pharmacy spending, with total non-discounted spending in 2022 at approximately $324 billion (compared to $311 billion for non-specialty). This makes the cost of specialty drugs a significant driver of premiums for all plan participants, including participants in the J&J Plans, regardless of whether they themselves are prescribed specialty drugs and pay out-of-pocket costs for those drugs.

80.81.  The classification of a generic drug as a "specialty" drug can have a major impact on the price the plan will be required to pay for that drug because, as suggested in the pricing example above, many plans agree to pay to traditional PBMPBMs rates for "specialty" drugs that are higher (*i.e.*, have a lower discount from AWP) than the prices they pay for non-specialty drugs. Because there is no definitive set of objective factors to determine whether any given drug is a specialty drug, the classification of a drug as "specialty" can be the subject of negotiations between plan fiduciaries and PBMs, as well as the relative roles of the plan fiduciaries and the PBM in making those classification decisions.

81.82.  Many traditional PBMs own their own mail-order "specialty" pharmacies. For example, the PBM CVS Caremark owns CVS Specialty, the PBM Express Scripts owns Accredo, and the PBM OptumRx owns Optum Specialty Pharmacy. These PBM-owned "specialty" pharmacies are typically mail-order pharmacies that do not provide the kind of in-person support that a medical professional would offer at a traditional specialty pharmacy. Instead, the defining feature of these PBM-owned "specialty" pharmacies is merely (and circularly) that they dispense the drugs that the PBM itself deems "specialty."

82.83.  An arrangement in which a plan's members are incentivized or required to obtain "specialty" drugs only from the PBM's own "specialty" pharmacy provides powerful incentives for PBMs to designate generic drugs as "specialty" drugs and/or to inflate the prices of specialty

drugs.  The PBM's costs are limited to its pharmacy's actual acquisition cost of the drug from the wholesaler (which is typically even lower than the MAC price), and yet it can continue to charge the plan the high AWP-based price designated for "specialty" drugs.

83.84.  This model also incentivizes traditional PBMs to favor generic "specialty" drugs with higher AWPs relative to their actual acquisition costs.  If two similar generic "specialty" drugs cost roughly the same for the PBM's pharmacy to acquire, the PBM will be incentivized to favor the one with a higher AWP, as that will maximize the spread between the AWP-based price it receives from the plan and its actual acquisition cost.  The PBM thus might include only the drug with the higher AWP on its formulary, forcing the plan and its participants/beneficiaries to pay more but offering no benefit other than profit for the PBM.

84.85.  "Specialty" drugs can be a major driver of costs for a prescription-drug plan.  While specialty drugs make up a relatively small percentage of overall prescriptions, they typically account for more than 50% of a prescription-drug plan's overall spend.  Prudent fiduciaries will therefore be extra careful to negotiate favorable contract terms regarding specialty drugs to avoid paying excessive amounts for specialty drugs, closely manage their specialty drug expenditures, closely supervise their PBMs' treatment and designation of specialty drugs, and make changes to their prescription-drug plans as necessary to fulfill their fiduciary obligations.

85.86.  Some PBMs offer services focused specifically on specialty drugs.  In this kind of arrangement, a plan uses a traditional PBM for most of its prescription-drug needs, but carves out management of all specialty drugs to a specialty-focused PBM.  In the specialty PBM carve-out model, responsibility for the entire specialty benefit is carved out to a PBM with a focus on, and expertise in, management of specialty drugs. These specialty PBMs—who typically use the pass-through model—can incorporate all aspects of specialty drug management, including claims

processing, specialty formulary, and specialty pharmacy network management. Specialty carve-out PBMs do not need to own a specialty pharmacy and have no financial incentive to artificially promote greater or more expensive drug use—and, as a result, offer substantial savings to plans and their participants/beneficiaries. Many large companies use the specialty carve-out model for their prescription-drug plans. For example, DuPont carved out specialty drugs from its contract with CVS Caremark, and contracted with the pass-through PBM Archimedes to manage its specialty-drug program. Similarly, Signet Jewelers carved out specialty drugs from its contract with the traditional PBM OptumRx, and contracted with Archimedes to manage its specialty-drug program.

86.87.  Plan fiduciaries must be cognizant of PBMs' self-interest in maximizing their own profits, and not simply accede to PBMs' preferences without conducting an independent investigation or considering alternatives. For example, instead of accepting a PBM's request that participants/beneficiaries be steered to fill their "specialty" drug prescriptions at the PBM's own pharmacy, fiduciaries must consider whether participants/beneficiaries (and the plan writ large) would be better off if they were permitted or encouraged to fill their prescriptions at a broader range of pharmacies. Plan fiduciaries must also engage in a prudent decision-making process with respect to whether to carve out their specialty-drug program from their broader PBM contract.

### E.    Formulary Management - Brand vs. Generic

87.88.  When a pharmaceutical company discovers or designs a potential new drug, it incurs significant cost in doing research, development, and clinical trials. As part of the process, the pharmaceutical company obtains a patent for the drug. In the United States, patents for brand-name drugs generally last 20 years. When the brand-name drug is the only version available on the market, the price is often quite high because the pharmaceutical company seeks to cover the cost of the research, development, and clinical trials of the drug, and then turn a profit.

88.89.  Once the patent on the brand-name drug expires, other pharmaceutical companies may produce their own version of the drug. These versions are known as "generic" versions.  The companies that produce generic versions of a drug are able to sell them for much less than the brand-name drug, as they did not incur any costs for research or clinical trials.  There is no limit to the number of generic versions of a drug that can be produced, so there are often several pharmaceutical companies that will produce generic versions of a brand-name drug.  This creates competition in the market and drives prices lower.

89.90.  Prudent fiduciaries of prescription-drug plans will generally replace brand-name drugs on the formulary when lower-cost, FDA-approved generics become available. Alternatively, prudent fiduciaries will add the generics to the formulary at lower prices and then incentivize plan participants/beneficiaries to obtain these lower-cost generics instead of the more expensive brand-name drugs.  As CVS's chief medical officer has put it, "[i]n situations where the medications are equivalent, from a medical point of view it makes sense to do this in order to reduce cost."

90.91.  Prudent fiduciaries are aware of the conflicts of interest that PBMs have in making formulary decisions.  The manufacturers of brand-name drugs typically pay rebates or other financial concessions to PBMs when their drugs are included on formularies and dispensed by the PBM's prescription-drug plan clients.  PBMs may pass some of these rebates through to the plan, but any retained amounts represent revenue for the PBM.  From the PBM's perspective, an expensive brand-name drug from which the PBM is paid a rebate or other financial concession is more lucrative than a generic drug for which the manufacturer pays no rebate or a smaller rebate. The PBMs retaining these rebates therefore are incentivized to include higher-priced drugs on a plan's formulary to maximize their own profits, even when including a lower-priced drug (*e.g.*, a

generic) would be more cost-effective for the plan.  Prudent plan fiduciaries are aware of these dynamics and ensure that formulary decisions are being made in the interest of the plan and its participants and beneficiaries rather than third-party vendors with conflicts of interest.

## IV.    DEFENDANTS BREACHED THEIR FIDUCIARY DUTIES

### A.    Defendants Mismanaged the Plans' Generic-Drug Program

91.92.  Defendants imprudently managed the Plans' generic-drug program, and failed to act in the best interest of participants/beneficiaries and ensure that expenses were reasonable.

92.93.  Defendants' mismanagement has caused the Plans and their beneficiaries to vastly overpay for prescription drugs and has cost the Plans and their participants/beneficiaries (including PlaintiffPlaintiffs) millions of dollars over the Class Period.

93.94.  On one or more occasions during the class period, Defendants entered into and/or renewed a contract with Express Scripts, a traditional PBM, under which Express Scripts agreed to serve as the Plans' PBM and Defendants agreed (or caused the Plans to agree) to various terms regarding drug prices, formulary management, pharmacy networks, and administrative services.

94.95.  On information and belief, the process by which Defendants chose Express Scripts as the Plans' PBM was not an open RFP process, was not otherwise diligent or consistent with the applicable fiduciary standard of care, and did not consider the full range of available options for PBM services.

95.96.  The standard contract that Express Scripts uses with its clients—and, on information and belief, its contract with Defendants—makes clear that the plan sponsor and the plan fiduciaries retain "all … discretionary authority and control with respect to the management of the Plan and plan assets."  In other words, Defendants acknowledged in their contract with Express Scripts that they, and not Express Scripts, have final say over management of the Plans and plan assets.

96.97.   On information and belief, Defendants used Aon (previously known as Aon Hewitt) as their broker, or EBC.  According to public reporting, Aon receives indirect compensation from certain PBMs in connection with Aon's clients' use of those PBMs.  In its SEC filings, Aon acknowledges its receipt of indirect compensation from the companies to which it steers its clients—compensation it refers to as "market-derived income"—and warns investors that "this revenue may be subject to scrutiny by various regulators under conflict of interest, anti-trust, unfair competition, conduct and anti-bribery laws and regulations."  Accordingly, Defendants allowed their selection of a PBM for the Plans to be guided or managed by a broker with a conflict of interest—*i.e.*, a financial interest in steering Defendants toward certain PBMs or including certain provisions in the PBM contract, in ways not necessarily correlated with the financial and other interests of the Plans and their participants/beneficiaries.

97.98.   The contract between Defendants and Express Scripts is not public, and Defendants have refused to provide Plaintiff Lewandowski with a copy upon request.  However, an analysis of the prices that Defendants agreed to make the Plans and their participants/beneficiaries pay for generic drugs reveals a staggering markup from acquisition costs for those drugs, a staggering markup from the prices that would be charged by a "pass-through" PBM, and a staggering markup from prices charged to comparable plans by other traditional PBMs.  These prices greatly exceed the prices that any prudent fiduciary would agree to pay and are not reasonable.

98.99.   Defendants imprudently agreed to a pricing model in which the prices the Plans and their participants/beneficiaries pay for generic drugs, including generic-specialty drugs, are based on a discount from AWP rather than on a fixed unit-price schedule or with reference to actual pharmacy acquisition costs for those drugs.  Defendants' acceptance of this AWP-based pricing model for generic drugs resulted in the Plans and their participants/beneficiaries paying millions

of dollars more than they would have paid under a pricing model based on pharmacy acquisition costs. Those overpayments were retained by Defendants' PBM, which as a result received a fee for ~~its~~goods and services far in excess of a reasonable fee for pharmacy benefit management services.

~~99.~~100.        With respect to generic-specialty drugs in particular, Defendants also illogically agreed to a pricing model in which some or all generic-specialty drugs are treated the same as branded specialty drugs, instead of being priced as generic drugs. Defendants' agreement to these terms, among others, directly caused the Plans and their participants/beneficiaries to pay unreasonably high amounts for prescription drugs.

~~100.~~101.        As described in more detail below, Defendants agreed to make the Plans and their participants/beneficiaries pay unreasonable markups above what it costs for pharmacies to acquire those same drugs. Most of these markups represent profit for the PBM, with no corresponding benefit for the Plans or their participants/beneficiaries. The markups to which Defendants agreed are substantially higher than what a pass-through PBM would charge and substantially higher than what even traditional PBMs charge to their other plan clients. Indeed, Defendants squandered their bargaining power and, for many drugs, agreed to make the Plans and their participants/beneficiaries pay more than someone would pay if they just walked into a retail pharmacy and filled the same prescription *without* using insurance. Put another way, it would be more prudent for Defendants to tell employees *not* to use their insurance and instead to give them a company credit card that the Plans were responsible for paying. This despite Defendants having significant bargaining power as a Fortune 50 company with over 50,000 U.S. employees. Had Defendants prudently negotiated and continued to monitor the terms of their PBM contract with Express Scripts in light of market developments, or had Defendants conducted a prudent process

to inquire as to different PBMs (through an RFP process, market surveys, or otherwise), the Plans and their participants/beneficiaries would have saved millions of dollars.

101.102.    In an effort to measure the aggregate overcharges to which Defendants agreed for generic drugs, Plaintiff Lewandowski requested the formulary used by her prescription-drug benefits plan, administered by Express Scripts.  PlaintiffLewandowski was informed that she was not allowed access to her formulary.  Accordingly, a publicly available Express Scripts formulary was used.  That formulary listed a total of 95 generic drugs that were classified as specialty.

102.103.    The federal government's Centers for Medicare and Medicaid Services compiles the National Average Drug Acquisition Cost ("NADAC") database.  The NADAC database uses survey data to determine the average "acquisition cost" for many prescription drugs.  The "acquisition cost" is the amount that a pharmacy pays to acquire prescription drugs from its suppliers (typically wholesalers who purchase directly from manufacturers).  A prescription drug's NADAC is a widely-accepted benchmark that describes the average price that pharmacies pay to acquire that drug.  Accordingly, the difference between a prescription drug's NADAC and the price that a prescription-drug plan and its participants/beneficiaries pay for that prescription drug represents the markup to which the plan's fiduciaries have agreed.

104.    NADAC is commonly used by other plans as a benchmark for the prices they pay for prescription drugs. For example, the PBM Capital Rx uses NADAC prices as a benchmark for the prices it charges its plan clients and does not engage in any additional spread pricing. Its clients simply pay a small markup above NADAC prices. Similarly, even Express Scripts offers a "ClearNetwork" product with prices to plans based on the lowest of three benchmarks, one of which is NADAC. This shows that NADAC is not only a commonly-used benchmark, but a

conservative one, as the ClearNetwork product's prices are based on the *lower* of NADAC and two other benchmarks.

103.105.        CMS has published a recent NADAC for 42 of the 95 generic drugs that were classified as specialty on the above-mentioned Express Scripts formulary, providing a standardized benchmark against which to assess the prices that Defendants negotiated on behalf of the Plans and their participants/beneficiaries.  Across those 42 drugs, Defendants' negotiated prices reflect, on average, a markup of *498%* above pharmacy acquisition cost.  Put another way, the total acquisition cost for one 90-day prescription of each of the 42 drugs is $28,050.53, but Defendants agreed to prices that would result in one 90-day prescription of each of the 42 drugs costing the Plans and their beneficiaries nearly *six times as much*, or $167,604.88.  No prudent fiduciary would agree to pay their PBM an average 498% markup above pharmacy acquisition cost because such markups would cost participants/beneficiaries significantly and the additional expense would drive increased health plan costs.

104.106.        Abacavir-lamivudine is a generic HIV antiviral drug.  According to the NADAC database, the acquisition cost for pharmacies for abacavir-lamivudine is $2.01 per tablet, or $180.90 for a 90-unit prescription.  Defendants, however, agreed to make the Plans and their participants/beneficiaries pay Express Scripts *$1,629.40* for each 90-unit abacavir-lamivudine prescription.  This price reflects an *800.72%* markup.

105.107.        Abacavir-lamivudine is widely available at retail (non-specialty) pharmacies, including Rite Aid, Walmart, ShopRite, Wegmans, Costco, Walgreens, Duane Reade, CVS, Target, and others.  The cash price (*i.e.*, the price a person would pay if shethey did not use insurance) for an abacavir-lamivudine prescription at *every one* of these pharmacies is lower than the price Defendants agreed to make the Plans and their participants/beneficiaries pay.  While

Defendants agreed to a price of ***$1,629.40*** for each 90-day abacavir-lamivudine prescription, the same prescription is available from Rite Aid for $123.82, Walmart for $127.32, ShopRite for $154.70, Wegmans for $175.47, or from Cost Plus Drugs online pharmacy for $210. No prudent fiduciary would agree to make its plan and participants/beneficiaries pay a price that is up to thirteen times higher than the price at which the drug is widely available.



106.108.          Abiraterone acetate is a generic drug used to treat prostate cancer. According to the NADAC database, the average acquisition cost for pharmacies for abiraterone acetate is $0.92 per 250mg tablet, or $82.80 for a 90-unit prescription.  Defendants, however, agreed to make the Plans and their participants/beneficiaries pay Express Scripts **$5,375.26** for each 90-unit abiraterone acetate prescription.  This price reflects a **6,391.86%** markup**.**

107.109.          Abiraterone acetate is widely available at retail (non-specialty) pharmacies, including Rite Aid, Walmart, ShopRite, Wegmans, Costco, Walgreens, Duane Reade, CVS, Target, and other pharmacies.  The cash price for an abiraterone acetate prescription at *every one* of these pharmacies is lower than the price Defendants agreed to make the Plans and their participants/beneficiaries pay to Express Scripts.  While Defendants agreed to a price of **$5,375.26** for each 90-unit abiraterone acetate prescription, the same prescription is available from Rite Aid for $105.87, Walmart for $111.19, Wegmans for $115.30, or from Cost Plus Drugs online pharmacy for $90.50.   No prudent fiduciary would agree to make its plan and participants/beneficiaries pay a price that is up to almost sixty times higher than the price at which the drug is widely available.



Price Using J&J Plans

**Abiraterone Acetate 250 Mg Tablet**

Pharmacy: Delivery
Days supply: 90
Quantity: 90

| | |
|---|---|
| Total medication cost: | $ 5,375.26 |
| Plan pays*: | $ 3,650.26 |
| You pay: | $ 1,725.00 |
| | |
| Applied to your deductible: | $ 1,600.00 |
| Applied to your out-of-pocket: | $ 1,725.00 |
| | |
| Cost per day: | $ 19.17 |

Your plan pays about 68% of the cost for this medicine.

*The cost to your plan does not include any rebates or other incentives your plan may receive from your use of this medication. Express Scripts may retain or share some rebates with your plan. The cost your plan pays is an approximation and is subject to change.

~~108.~~110.      Imatinib is a generic oral therapy medication used to treat certain types of leukemia and bone marrow disorders.  According to the NADAC database, the average acquisition cost for pharmacies for imatinib is $1.88 per 400mg tablet, or $169.20 for a standard 30-unit prescription.  Defendants, however, agreed to make the Plans and their participants/beneficiaries pay Express Scripts *$16,398.17* for each 90-unit imatinib prescription.  This price reflects an *9,591.59%* markup.

~~109.~~111.      Imatinib is widely available at retail (non-specialty) pharmacies, including Rite Aid, ShopRite, Wegmans, Acme, Costco, Walgreens, Duane Reade, CVS, Target, and other pharmacies.  The cash price for an imatinib prescription at *every one* of these pharmacies is lower than the price Defendants agreed to make the Plans and their participants/beneficiaries pay to Express Scripts.  While Defendants agreed to a price of *$16,398.17* for each 90-unit imatinib prescription, the same prescription is available from Rite Aid for $155.42, ShopRite for $249.83, Wegmans for $249.83, Acme for $261.08, or from Cost Plus Drugs online pharmacy for $94.10.

No prudent fiduciary would agree to make its plan and participants/beneficiaries pay a price that is one-hundred times higher or more than the price at which the drug is widely available.



110.112.    Fingolimod is a generic medication used to treat multiple sclerosis. According to the NADAC database, the average acquisition cost for pharmacies for fingolimod is $9.74 per 0.5mg capsule, or $876.60 for a 90-unit prescription.  Defendants, however, agreed to

make the Plans and their participants/beneficiaries pay Express Scripts ***$13,325.83*** for each 90-unit Fingolimod prescription.  This price reflects an ***1,420.7%*** markup.

111.113.    Fingolimod is widely available at retail (non-specialty) pharmacies, including Wegmans, ShopRite, Rite Aid, Walmart, Costco, Acme, Walgreens, Duane Reade, CVS, Target, and other pharmacies.  The cash price for a fingolimod prescription at *every one* of these pharmacies is lower than the price Defendants agreed to make the Plans and their participants/beneficiaries pay to Express Scripts.   While Defendants agreed to a price of ***$13,325.83*** for each 90-unit fingolimod prescription, the same prescription is available from Wegmans for $648, ShopRite for $677.68, Rite Aid for $891.63, Walmart for $895.63, or from Cost Plus Drugs online pharmacy for $875.09.  No prudent fiduciary would agree to make its plan and participants/beneficiaries pay a price that is up to twenty times higher than the price at which the drug is widely available.

Cash Price Using No Insurance



Price Using J&J Plans

**Fingolimod 0.5 Mg Capsule**

Pharmacy: Delivery
Days supply: 90
Quantity: 90

| | |
|---|---|
| Total medication cost: | $ 13,325.83 |
| Plan pays*: | $ 11,600.83 |
| You pay: | $ 1,725.00 |
| Applied to your deductible: | $ 1,600.00 |
| Applied to your out-of-pocket: | $ 1,725.00 |
| Cost per day: | $ 19.17 |

Your plan pays about 87% of the cost for this medicine.

*The cost to your plan does not include any rebates or other incentives your plan may receive from your use of this medication. Express Scripts may retain or share some rebates with your plan. The cost your plan pays is an approximation and is subject to change.

112.114.    Temozolomide is a generic cancer drug.  According to the NADAC database, the average acquisition cost for pharmacies for temozolomide is $13.84 per 140mg capsule, or $1,245.60 for a 90-unit prescription.  Defendants, however, agreed to make the Plans and their participants/beneficiaries pay Express Scripts *$15,332.32* for each 90-unit temozolomide prescription.  This price reflects an *1,130.92%* markup.

113.115.    Temozolomide is widely available at retail (non-specialty) pharmacies, including Wegmans, ShopRite, Rite Aid, Costco, Acme, Walgreens, Duane Reade, CVS, Target, and other pharmacies.  The cash price for a temozolomide prescription at *every one* of these pharmacies is lower than the price Defendants agreed to make the Plans and their participants/beneficiaries pay to Express Scripts.  While Defendants agreed to a price of *$15,332.32* for each 90-unit temozolomide prescription, the same prescription is available from ShopRite for $1,085, Wegmans for $1,086, Costco for $1,348, Rite Aid for $2,543, or from Cost Plus Drugs online pharmacy for $371.30.  No prudent fiduciary would agree to make its plan and

participants/beneficiaries pay a price that is up to forty times higher than the price at which the drug is widely available.

Cash Price Using No Insurance



Price Using J&J Plans



~~114.~~116.     Teriflunomide is a generic drug used to treat certain forms of multiple sclerosis.  According to the NADAC database, the average acquisition cost for pharmacies for generic teriflunomide is $0.91 per 14mg tablet, or $81.90 for a 90-unit prescription. Defendants,

however, agreed to make the Plans and their participants/beneficiaries pay Express Scripts **$10,239.69** for each 90-unit teriflunomide prescription. This price reflects an **12,403%** markup.

115.117.    Teriflunomide is widely available at retail (non-specialty) pharmacies, including Wegmans, ShopRite, Walmart, Rite Aid, Costco, Acme, Walgreens, Duane Reade, CVS, Target, and other pharmacies. The cash price for a teriflunomide prescription at *every one* of these pharmacies is lower than the price Defendants agreed to make the Plans and their participants/beneficiaries pay to Express Scripts. While Defendants agreed to a price of **$10,239.69** for each 90-unit teriflunomide prescription, the same prescription is available from Wegmans for $40.55, ShopRite for $41.05, Walmart for $76.41, Rite Aid for $77.41, or from Cost Plus Drugs online pharmacy for $28.40. No prudent fiduciary would agree to make its plan and participants/beneficiaries pay a price that is up to 360 times higher than the price at which the drug is widely available.



Cash Price Using No Insurance

| Price Using J&J Plans |
| --- |

**Teriflunomide 14 Mg Tablet**

Pharmacy: Delivery
Days supply: 90
Quantity: 90

| | |
| --- | --- |
| Total medication cost: | $ 10,239.69 |
| Plan pays*: | $ 8,514.69 |
| You pay: | $ 1,725.00 |
| | |
| Applied to your deductible: | $ 1,600.00 |
| Applied to your out-of-pocket: | $ 1,725.00 |
| | |
| Cost per day: | $ 19.17 |

Your plan pays about 83% of the cost for this medicine.

*The cost to your plan does not include any rebates or other incentives your plan may receive from your use of this medication. Express Scripts may retain or share some rebates with your plan. The cost your plan pays is an approximation and is subject to change.

116.118.    The examples above are among the worst instances of Defendants' mismanagement, but they are illustrative of Defendants' failure to negotiate with Express Scripts for prices that are anywhere close to pharmacy acquisition cost.  The following table lists the 42 above-mentioned drugs for which NADAC information is publicly available, and then shows the prices Defendants agreed to make the Plans and their participants/beneficiaries pay for a 90-day supply as compared to the acquisition cost of the same drug, quantity, and dosage for the average pharmacy. And as shown above, these drugs are available from many pharmacies at amounts below NADAC averages, such that the markup shown in the chart below actually understates the extent to which the Plans paid inflated prices.

| **Generic Drug Name** | **Quantity** | **Pharmacy Acquisition Cost** | **Price J&J Agreed To Pay** | **Markup %** |
| --- | --- | --- | --- | --- |
| abacavir | 180 | $111.60 | $322.36 | **188.85%** |
| abacavir-lamivudine | 90 | $180.90 | $1,629.40 | **800.72%** |
| abiraterone acetate | 90 | $82.80 | $5,375.26 | **6,391.86%** |
| atazanavir sulfate | 90 | $313.20 | $613.10 | **95.56%** |
| azathioprine | 90 | $16.20 | $27.42 | **69.26%** |
| capecitabine | 90 | $47.70 | $2,099.91 | **4,302.33%** |
| cyclosporine | 90 | $774.90 | $732.39 | **-5.49%** |
| dalfampridine | 90 | $45.90 | $2,197.71 | **4,688.04%** |
| deferasirox | 90 | $177.30 | $8,199.75 | **4,524.79%** |

| | | | |
|---|---|---|---|
| dimethyl fumarate DR capsule | 180 | $120.60 | $16,070.94 | 13,225.82% |
| droxidopa | 90 | $230.40 | $5,340.66 | 2,217.99% |
| efavirenz | 90 | $277.20 | $2,016.99 | 627.63% |
| efavirenz-emtricitabine-tenofovir disoproxil fumarate | 90 | $115.20 | $7,097.43 | 6,060.96% |
| emtricitabine-tenofovir | 90 | $49.50 | $1,260.12 | 2,445.70% |
| enoxaparin sodium | 1 | $13.72 | $18.71 | 36.37% |
| etravirine | 180 | $2,889.00 | $2,172.29 | -24.81% |
| everolimus | 90 | $545.40 | $1,351.43 | 147.79% |
| fingolimod | 90 | $876.60 | $13,325.83 | 1395.60% |
| fondaparinux sodium | 72 | $3,854.88 | $8,796.92 | 128.20% |
| glatiramir | 36 | $4,738.68 | $13,778.52 | 190.77% |
| ibandronate | 3 | $11.34 | $32.56 | 187.13% |
| imatinib mesylate | 90 | $160.20 | $16,398.17 | 10,136.06% |
| lamivudine | 90 | $76.50 | $114.80 | 50.07% |
| lamivudine-zidovudine | 90 | $72.00 | $223.52 | 210.44% |
| mycophenolate mofetil tablet | 90 | $25.20 | $18.00 | -28.57% |
| mycophenolate sodium tablet | 90 | $16.20 | $145.06 | 795.43% |
| nevirapine | 90 | $12.60 | $8.50 | -32.54% |
| nevirapine XR tablet | 90 | $386.10 | $530.63 | 37.44% |
| octreotide acetate | 15 | $138 | $178.21 | 29.14% |
| ribavirin tablet | 90 | $61.20 | $78.57 | 28.38% |
| ritonavir tablet | 90 | $89.10 | $465.62 | 422.59% |
| sildenafil citrate | 18 | $3.78 | $20.96 | 454.50% |
| sirolimus | 90 | $209.70 | $704.56 | 235.98% |
| sofosbuvir/velpatasvir | 28 | $7,793.52 | $8,160.00 | 4.70% |
| tacrolimus | 90 | $13.50 | $17.77 | 31.63% |
| tadalafil tablet | 18 | $2.88 | $64.11 | 2,126.04% |
| temozolomide | 90 | $1,242.00 | $15,332.32 | 1,134.49% |
| tenofovir disoproxil fumarate | 90 | $42.30 | $79.67 | 88.35% |
| teriflunomide | 90 | $81.90 | $10,239.69 | 12,402.67% |
| tetrabenazine tablet | 90 | $292.19 | $5,526.56 | 1,791.46% |
| tobramycin inhalation solution | 840 | $1,520.40 | $16,822.26 | 1,006.44% |
| zidovudine | 90 | $45.00 | $136.30 | 202.89% |
| **TOTAL** | | $28,050.53 | $167,604.88 | 497.51% |

117.119.    The Plans' prices for the 53 drugs designated as specialty on the Express

Scripts formulary for which CMS *does not* publish a NADAC (i.e., those not in the table above)

are just as unreasonable.  While NADAC information showing average pharmacy acquisition costs

is not available as a benchmark, many of those drugs are available at retail or online pharmacies

for prices far lower than Defendants agreed to make the Plans and their participants/beneficiaries

pay, indicating that the acquisition costs are far lower as well, and that Defendants agreed to unreasonable markups for those drugs.  Four examples follow:

118.120.    A 90-day supply of bexarotene gel (generic for Targretin) is available for a cash price (*i.e.*, without using insurance) of $11,241 at Rite Aid, $12,378 at Wegmans, $21,708 at Walgreens, and $30,920.21 at Cost Plus Drugs.  Defendants agreed to make the Plans and their participants/beneficiaries pay $80,028.50.

119.121.    A 90-day prescription of fosamprenavir (generic for Lexiva) is available for a cash price of $457.14 at Rite Aid, $476.94 at Wegmans, $840.12 at Walgreens, and $1,217.80 at Cost Plus Drugs.  Defendants agreed to make the Plans and their participants/beneficiaries pay $2,304.97.

120.122.    A 90-day supply of betaine powder (generic for Cystadane) is available for a cash price of $742.04 at Wegmans, $1,315 at Walgreens, $1,517 at Rite Aid, and $1,784 at CVS. Defendants agreed to make the Plans and their participants/beneficiaries pay $4,438.24.

121.123.    A 300-tablet prescription of tiopronin (generic for Thiola) is available for a cash price of $1,208 at Wegmans, $2,142 at Walgreens, $2,260 at CVS, and $2,469 at Rite Aid. Defendants agreed to make the Plans and their participants/beneficiaries pay $7,910.99 if they obtain the prescription at Accredo, and $7,165.24 if they obtain it at Walgreens.  To repeat: if a beneficiary of the Plans fills a prescription for tiopronin at Walgreens and *does not use* ~~her~~*their* *insurance*, Walgreens will charge only $2,142.  But if ~~she fills~~they fill the exact same prescription at the exact same Walgreens and *uses* ~~her~~*their* *Johnson and Johnson health insurance*, Defendants agreed to make ~~her~~them and the Plans pay a combined $7,165.

122.124.    For many or most of the generic-specialty drugs on the Plans' formulary, there is no medical necessity for that designation.  As demonstrated above, most of these drugs are

available at traditional retail pharmacies, do not require handling that traditional retail pharmacies are unable to provide, and do not require the kinds of medical services traditionally provided by specialty pharmacies.  For many or most of the generic-specialty drugs on the Plans' formulary, no special handling is provided by the pharmacies at which Plan beneficiaries obtain generic-specialty drugs, including at Accredo, which is owned by Express Scripts.  The "specialty" designation serves little purpose other than to enrich the Plans' PBM at the expense of the Plans and their participants/beneficiaries.

123.125.    Defendants' mismanagement has also caused the Plans and their participants/beneficiaries to overpay for generic drugs that are not designated as "specialty" on the above-described Express Scripts formulary.  Generic, non-specialty drugs typically account for approximately 15-20% of overall prescription-drug spending, and are also a driver of premiums for all plan participants, including participants in the JnJJ&J Plans, regardless of whether they themselves are prescribed such drugs and pay out-of-pocket costs for those drugs.

124.126.    Since August 2022, Plaintiff Lewandowski has been prescribed and filled prescriptions for the following generic, non-specialty drugs: trazodone, baclofen, zaleplon, azithromycin, tizanidine, doxycycline, valacyclovisir, promethazine, methylprednisolone, eszopiclone, ondansetron, hydroxychloroquine, alprazolam, and two others.  The following table compares the price that Defendants agreed to make the Plans and their participants/beneficiaries pay for these prescriptions with the NADAC for the same drug, quantity, and dosage at the time of the prescription:

| Generic Drug Name | Quantity | Pharmacy Acquisition Cost | Price J&J Agreed To Pay | Markup % |
|---|---|---|---|---|
| baclofen | 270 | $15.93 | $25.79 | 61.90% |
| zaleplon | 28 | $5.66 | $8.31 | 46.92% |
| tizanidine | 90 | $5.04 | $18.72 | 271.43% |
| trazodone | 270 | $9.45 | $40.64 | 330.05% |
| doxycycline | 14 | $1.86 | $4.87 | 161.55% |

| | | | | |
|---|---|---|---|---|
| valacyclovir | 180 | $82.80 | $303.68 | **266.80%** |
| promethazine | 30 | $1.50 | $2.58 | **72.00%** |
| methylprednisolone | 21 | $3.17 | $3.85 | **21.41%** |
| eszopiclone | 10 | $0.98 | $3.07 | **213.27%** |
| ondansetron | 9 | $1.97 | $3.00 | **52.21%** |
| hydroxychloroquine | 180 | $39.06 | $135.77 | **247.59%** |
| alprazolam | 30 | $0.69 | $1.50 | **117.39%** |
| [Other Drug 1] | 90 | $3.78 | $13.71 | **262.70%** |
| [Other Drug 2] | 90 | $10.71 | $37.19 | **247.25%** |
| **TOTAL** | | $182.60 | $602.68 | **230.05%** |

125.127.    Across Plaintiff's Lewandowski's 14 prescriptions, Defendants' negotiated prices reflect, on average, a markup of ***230.05%*** above pharmacy acquisition cost.  Put another way, the total pharmacy acquisition cost for these prescriptions was $182.60, but Defendants agreed to prices that cost the Plans and Plaintiff Lewandowski *more than three times as much*, or $602.68.  No prudent fiduciary would agree to pay their PBM an average 230.05% markup above pharmacy acquisition cost for generic, non-specialty drugs.

126.128.    The markups for the generic medications that Plaintiff Lewandowski was prescribed are illustrative of, and consistent with, the markups for other generic medications available under the Plans.

127.129.    The Plans' extraordinarily high prices for generic drugs are not offset by special discounts from Express Scripts for other kinds of drugs.  For the 50 most common high-cost *branded* drugs (including Humira, Ozempic, Trulicity, and many more), Defendants agreed to a roughly 2% markup over pharmacy acquisition cost for those drugs.  These prices are generally consistent with market pricing, and do not reflect special discounts that would offset or justify the atypical and extraordinary overcharges for generic specialty drugs under the Plans.  On information and belief, Defendants' failure to act prudently in negotiating the prices of generic drugs has cost the Plans and their participants/beneficiaries millions of dollars each year, which has not been offset by any corresponding discounts on other drugs.

- 54 -

### B.    Defendants Mismanaged Other Aspects of Their Prescription-Drug Program

~~128.~~131.    Defendants have also mismanaged other aspects of their prescription-drug program, to the detriment of the Plans and their participants/beneficiaries.

#### 1.    Steering Toward Higher Prices

~~129.~~131.    One way in which Defendants have further mismanaged the Plans is by agreeing to steer beneficiaries toward Express Scripts' mail-order pharmacy, Accredo, even though Accredo's prices are routinely higher than the prices retail pharmacies charge for the same drugs.  On information and belief, this resulted from Defendants' lack of oversight of Express Scripts and lack of attention to the ways in which it would attempt to enrich itself and its own pharmacy at the Plans' expense.  A prudently-administered plan would steer beneficiaries toward the option with a lower overall price, or at least would not allow a plan vendor (*i.e.*, Express Scripts) to self-interestedly steer participants/beneficiaries toward the option with a higher overall price.

~~130.~~132.    For example, when a participant/beneficiary searches the Plans' online portal for bexarotene, ~~she is~~they are told that ~~her~~their out-of-pocket responsibility for one 90-day

| Bexarotene 75 Mg Capsule | | Bexarotene 75 Mg Capsule | |
|---|---|---|---|
| Pharmacy: Walgreens #03291 | | Pharmacy: Delivery | |
| Days supply: 90 | | Days supply: 90 | |
| Quantity: 90 | | Quantity: 90 | |
| Total medication cost: | $13,716.14 | Total medication cost: | $19,381.37 |
| Plan pays*: | $11,741.14 | Plan pays*: | $17,656.37 |
| You pay: | $1,975.00 | You pay: | $1,725.00 |
| Applied to your deductible: | $1,600.00 | Applied to your deductible: | $1,600.00 |
| Applied to your out-of-pocket: | $1,975.00 | Applied to your out-of-pocket: | $1,725.00 |
| Cost per day: | $21.94 | Cost per day: | $19.17 |
| Your plan pays about 86% of the cost for this medicine. | | Your plan pays about 91% of the cost for this medicine. | |
| *The cost to your plan does not include any rebates or other incentives your plan may receive from your use of this medication. Express Scripts may retain or share some rebates with your plan. The cost your plan pays is an approximation and is subject to change. | | *The cost to your plan does not include any rebates or other incentives your plan may receive from your use of this medication. Express Scripts may retain or share some rebates with your plan. The cost your plan pays is an approximation and is subject to change. | |

prescription would be $1,975 if ~~she fills~~they fill the prescription at Walgreens, but $250 cheaper if ~~she~~they instead ~~fills~~fill the prescription through Accredo—which incentivizes ~~her~~them to use Accredo.  The cost to the Plans, however, is more than $5,000 higher through Accredo.  Even setting aside that the prices Defendants agreed to pay to Walgreens and Accredo are both excessive for a generic drug, Defendants imprudently steer beneficiaries toward an option that costs the Plans over $5,000 more per prescription while enriching the Plans' PBM by roughly that same amount:



131.133.       This discrepancy is even more pronounced for bexarotene in gel form, where beneficiaries are disincentivized to order through Walgreens at a total cost of $23,587.56 and instead incentivized to order from Accredo at a total cost of $80,028.50 for one 90-day prescription:

<table>
<tr><td>

Bexarotene 1% Gel (60 g)

Pharmacy: Walgreens #03291
Days supply: 90
Quantity: 180

| Total medication cost: | $ 23,587.56 |
| Plan pays*: | $ 21,612.56 |
| You pay: | $ 1,975.00 |
| Applied to your *deductible*: | $ 1,600.00 |
| Applied to your *out-of-pocket*: | $ 1,975.00 |
| Cost per day: | $ 21.94 |

Your plan pays about 92% of the cost for this medicine.

*The cost to your plan does not include any rebates or other incentives your plan may receive from your use of this medication. Express Scripts may retain or share some rebates with your plan. The cost your plan pays is an approximation and is subject to change.

</td><td>

Bexarotene 1% Gel (60 g)

Pharmacy: Delivery
Days supply: 90
Quantity: 180

| Total medication cost: | $ 80,028.50 |
| Plan pays*: | $ 78,303.50 |
| You pay: | $ 1,725.00 |
| Applied to your *deductible*: | $ 1,600.00 |
| Applied to your *out-of-pocket*: | $ 1,725.00 |
| Cost per day: | $ 19.17 |

Your plan pays about 98% of the cost for this medicine.

*The cost to your plan does not include any rebates or other incentives your plan may receive from your use of this medication. Express Scripts may retain or share some rebates with your plan. The cost your plan pays is an approximation and is subject to change.

</td></tr>
</table>

~~132.~~134.    Put differently, Defendants encourage an employee who is prescribed this form of bexarotene to select an option that would cost the Plan an additional $56,440.94 *per quarter*—most if not all of which will Express Scripts will simply pocket as revenue—with no cognizable benefit to the Plans or their participants/beneficiaries.

~~133.~~135.    The same is true for tiopronin, a generic drug used to help prevent kidney stones.  Defendants steer beneficiaries toward Accredo, even though a 90-day prescription through Accredo is more expensive.  Defendants imprudently steer beneficiaries toward an option that costs the Plans almost $750 more per prescription while enriching the Plans' PBM by that same amount.

<table>
<tr><td>

Tiopronin 100 Mg Tablet (100 each)

Pharmacy: Walgreens #03291
Days supply: 90
Quantity: 300

| Total medication cost: | $ 7,165.24 |
| Plan pays*: | $ 5,190.24 |
| You pay: | $ 1,975.00 |
| Applied to your *deductible*: | $ 1,600.00 |
| Applied to your *out-of-pocket*: | $ 1,975.00 |
| Cost per day: | $ 21.94 |

Your plan pays about 72% of the cost for this medicine.

</td><td>

Tiopronin 100 Mg Tablet (100 each)

Pharmacy: Delivery
Days supply: 90
Quantity: 300

| Total medication cost: | $ 7,910.99 |
| Plan pays*: | $ 6,185.99 |
| You pay: | $ 1,725.00 |
| Applied to your *deductible*: | $ 1,600.00 |
| Applied to your *out-of-pocket*: | $ 1,725.00 |
| Cost per day: | $ 19.17 |

Your plan pays about 78% of the cost for this medicine.

</td></tr>
</table>

~~134.~~136.    The same holds true even for lower-priced drugs.    After a participant/beneficiary of the Plans meets ~~her~~their annual deductible, ~~she remains~~they remain

responsible for a co-insurance percentage that differs based on where ~~she fills~~they fill the prescription.  Plan documents ~~notify her~~state that if ~~she fills~~they fill the prescription from Accredo, ~~her~~their co-insurance will amount to 15% of the drug's cost, while if ~~she fills~~they fill the prescription from a retail pharmacy, ~~her~~their co-insurance will increase to 20%.  Defendants thus steer participants/beneficiaries to Accredo by advertising that their coinsurance responsibility will be lower.  For many drugs, however, this is a bad deal for both the Plans and the participants/beneficiaries, because Accredo's prices are often substantially higher than retail pharmacies.  For example, if ~~Plaintiff~~Plaintiffs filled a 90-day prescription of Zidovudine (100mg) from Accredo, the Plans would pay about $116 (after accounting for the participant/beneficiary share of just over $20), but if ~~she~~they filled it at ~~her~~their local Hometown Pharmacy, the Plans would pay only $70.52 and ~~she~~they would only pay $17.63 for ~~her~~their share.

## 2.    Failure To Promote Generics

~~135.~~137.     Another way in which Defendants have mismanaged the plan is by failing to disincentivize the use of high-priced branded drugs on the Plans' formulary in favor of lower-priced generics.  On information and belief, Defendants made these decisions based in whole or in part on their PBM's conflicted recommendations—which were often based on which drugs would be most profitable for the PBM rather than which drugs would be most cost-effective for the Plans—and not based on their own independent and ongoing assessment of the formulary.  As a result, the Plans and participants/beneficiaries were forced to overpay compared to prudent alternatives.

~~136.~~138.    Teriflunomide is the generic form of the branded drug Aubagio.  As noted above, the acquisition cost for pharmacies for generic teriflunomide is $0.91 per 14mg tablet, or $81.90 for a 90-unit prescription. Defendants, however, agreed to make the Plans and their participants/beneficiaries pay Express Scripts ***$10,239.69*** for each 90-unit generic teriflunomide prescription.  Defendants agreed to make the Plans and their participants/beneficiaries pay even higher amounts for branded Aubagio, which is chemically identical:  The Plans and their participants/beneficiaries must pay $27,672.82 for a 90-day prescription of Aubagio.  Even setting aside that neither price is particularly good, a prudent fiduciary would steer participants/beneficiaries toward the lower-priced generic by, *e.g.*, offering a lower out-of-pocket responsibility for the generic or replacing Aubagio on the formulary.  Instead, however, both drugs are covered on the formulary for no good reason.

| Teriflunomide 14 Mg Tablet | |
| --- | --- |
| Pharmacy: Delivery | |
| Days supply: 90 | |
| Quantity: 90 | |
| Total medication cost: | $ 10,239.69 |
| Plan pays*: | $ 8,514.69 |
| You pay: | $ 1,725.00 |
| Applied to your deductible: | $ 1,600.00 |
| Applied to your out-of-pocket: | $ 1,725.00 |
| Cost per day: | $ 19.17 |
| Your plan pays about 83% of the cost for this medicine. | |

*The cost to your plan does not include any rebates or other incentives your plan may receive from your use of this medication. Express Scripts may retain or share some rebates with your plan. The cost your plan pays is an approximation and is subject to change.

| Aubagio 14 Mg Tablet | |
| --- | --- |
| Pharmacy: Delivery | |
| Days supply: 90 | |
| Quantity: 90 | |
| Total medication cost: | $ 27,672.82 |
| Plan pays*: | $ 25,947.82 |
| You pay: | $ 1,725.00 |
| Applied to your deductible: | $ 1,600.00 |
| Applied to your out-of-pocket: | $ 1,725.00 |
| Cost per day: | $ 19.17 |
| Your plan pays about 94% of the cost for this medicine. | |

*The cost to your plan does not include any rebates or other incentives your plan may receive from your use of this medication. Express Scripts may retain or share some rebates with your plan. The cost your plan pays is an approximation and is subject to change.

| Teriflunomide 14 Mg Tablet | |
|---|---|
| Pharmacy: Delivery | |
| Days supply: 90 | |
| Quantity: 90 | |
| Total medication cost: | $ 10,239.69 |
| Plan pays*: | $ 8,514.69 |
| You pay: | $ 1,725.00 |
| Applied to your deductible: | $ 1,600.00 |
| Applied to your out-of-pocket: | $ 1,725.00 |
| Cost per day: | $ 19.17 |
| Your plan pays about 83% of the cost for this medicine. | |

*The cost to your plan does not include any rebates or other incentives your plan may receive from your use of this medication. Express Scripts may retain or share some rebates with your plan. The cost your plan pays is an approximation and is subject to change.

| Aubagio 14 Mg Tablet | |
|---|---|
| Pharmacy: Delivery | |
| Days supply: 90 | |
| Quantity: 90 | |
| Total medication cost: | $ 27,672.82 |
| Plan pays*: | $ 25,947.82 |
| You pay: | $ 1,725.00 |
| Applied to your deductible: | $ 1,600.00 |
| Applied to your out-of-pocket: | $ 1,725.00 |
| Cost per day: | $ 19.17 |
| Your plan pays about 94% of the cost for this medicine. | |

*The cost to your plan does not include any rebates or other incentives your plan may receive from your use of this medication. Express Scripts may retain or share some rebates with your plan. The cost your plan pays is an approximation and is subject to change.

137.139.    The same is true for the drug dimethyl fumarate, which is the generic form of the branded drug Tecfidera. Dimethyl fumarate is inexpensive.  According to the NADAC database, the average acquisition cost for pharmacies for generic dimethyl fumarate is $0.67 per 240mg tablet, or $120.60 for a 180-unit prescription. Defendants, however, agreed to make the Plans and their participants/beneficiaries pay Express Scripts $89.28 per 240mg tablet, or **$16,070.94** for each 180-unit prescription.  This price reflects an **13,225%** markup.  Defendants agreed to make the Plans and their participants/beneficiaries pay even higher amounts for branded Tecfidera, which is chemically identical: The Plans and their participants/beneficiaries must pay $27,626.21 for a 180-unit prescription of Tecfidera.  Even setting aside that neither price is particularly good, a prudent fiduciary would steer participants/beneficiaries toward the lower-priced generic by, *e.g.*, offering a lower out-of-pocket responsibility for the generic or replacing Tecfidera on the formulary.  Instead, however, both drugs are covered on the formulary for no good reason.

| Dimethyl Fumarate 240 Mg Capsule,Delayed Release (enteric coated) | |
| --- | --- |
| Pharmacy: Delivery | |
| Days supply: 90 | |
| Quantity: 180 | |
| Total medication cost: | $16,070.94 |
| Plan pays*: | $14,345.94 |
| You pay: | $1,725.00 |
| Applied to your deductible: | $1,600.00 |
| Applied to your out-of-pocket: | $1,725.00 |
| Cost per day: | $19.17 |
| Your plan pays about 89% of the cost for this medicine. | |

| Tecfidera Dr 240 Mg Capsule (60 each) | |
| --- | --- |
| Pharmacy: Delivery | |
| Days supply: 90 | |
| Quantity: 180 | |
| Total medication cost: | $27,626.21 |
| Plan pays*: | $25,901.21 |
| You pay: | $1,725.00 |
| Applied to your deductible: | $1,600.00 |
| Applied to your out-of-pocket: | $1,725.00 |
| Cost per day: | $19.17 |
| Your plan pays about 94% of the cost for this medicine. | |

138.140.    The same is true for the drug ambrisentan, which is the generic form of the branded drug Letairis, which is used to treat pulmonary arterial hypertension.  Defendants agreed to make the Plans and their participants/beneficiaries pay Express Scripts $22,989.78 for each 90-unit ambrisentan prescription but even more—$37,968.16—for a 90-unit prescription of Letairis, which is chemically identical.  Even setting aside that neither price is particularly good, a prudent fiduciary would steer participants/beneficiaries toward the lower-priced generic by, *e.g.*, offering a lower out-of-pocket responsibility for the generic or replacing Letairis on the formulary.  Instead, however, both drugs are covered on the formulary for no good reason.

| Ambrisentan 10 Mg Tablet | |
| --- | --- |
| Pharmacy: Delivery | |
| Days supply: 90 | |
| Quantity: 90 | |
| Total medication cost: | $22,989.78 |
| Plan pays*: | $21,264.78 |
| You pay: | $1,725.00 |
| Applied to your deductible: | $1,600.00 |
| Applied to your out-of-pocket: | $1,725.00 |
| Cost per day: | $19.17 |
| Your plan pays about 92% of the cost for this medicine. | |
| *The cost to your plan does not include any rebates or other incentives your plan may receive from your use of this medication. Express Scripts may retain or share some rebates with your plan. The cost your plan pays is an approximation and is subject to change. | |

| Letairis 10 Mg Tablet | |
| --- | --- |
| Pharmacy: Delivery | |
| Days supply: 90 | |
| Quantity: 90 | |
| Total medication cost: | $37,968.16 |
| Plan pays*: | $36,243.16 |
| You pay: | $1,725.00 |
| Applied to your deductible: | $1,600.00 |
| Applied to your out-of-pocket: | $1,725.00 |
| Cost per day: | $19.17 |
| Your plan pays about 95% of the cost for this medicine. | |
| *The cost to your plan does not include any rebates or other incentives your plan may receive from your use of this medication. Express Scripts may retain or share some rebates with your plan. The cost your plan pays is an approximation and is subject to change. | |

## C. Defendants' Fiduciary Processes Were Fundamentally Flawed

139.141.     Defendants failed to engage in a prudent and reasoned decision-making process before agreeing to a PBM contract (and extending/renewing a contract) that requires the Plans and their participants/beneficiaries to pay Express Scripts the above-described prices. Prudent plan fiduciaries would have taken readily-available steps to reduce the Plans' costs, which Defendants failed to take. Because of the extraordinarily high prices to which Defendants agreed, the Plans paid substantially more for prescription drugs than they would have absent the conduct described herein. Likewise, participants and beneficiaries of the Plans paid more in premiums and out-of-pocket costs than they would have absent the conduct described herein.

140.142.     *First*, even setting aside whether prudent fiduciaries would have contracted with Express Scripts for all of their prescription-drug benefits, Defendants failed to adequately negotiate (or re-negotiate) the Plans' contract with Express Scripts and failed to prudently exercise their rights under that contract. As a Fortune 50 employer with tens of thousands of employees, JnJJ&J has substantial bargaining power with vendors, including PBMs. Prudent fiduciaries would have—and other similarly sized companies' plan fiduciaries have—used that bargaining power to demand and obtain substantially better contractual terms, including terms relating to prices and the way in which prices are determined. Defendants could have taken these steps and obtained savings while retaining their Plans' prescription drug features and level of PBM services.

141.143.     For example, prudent fiduciaries would have—and Defendants could have—ensured that the Plans' prices for generic drugs are set forth in a fixed unit-cost schedule or NADAC-based price instead of with reference to AWP. By taking this one step, Defendants would have reduced their spending on generic drugs by 30% or more. Fiduciaries of comparable plans have done exactly that in their negotiations with Express Scripts and have reduced their prescription-drug spending by 30% or more as a result. This option was available to Defendants

and would have saved the Plans and their participants/beneficiaries millions of dollars across the prescription-drug program as a whole. Put another way, Defendants' fiduciary breaches caused the Plans and their participants/beneficiaries to overpay by millions of dollars each year on prescription-drug costs compared to available alternatives.

142.144.    Prudent fiduciaries also would have—and Defendants could have—ensured that generic specialty drugs are priced as generic drugs and not placed in the specialty drug category with branded specialty drugs. Prudent fiduciaries also would have—and Defendants could have—more closely supervised Express Scripts' formulary management and more effectively exercised their own rights to make decisions about formulary inclusion and placement. Had Defendants adequately negotiated with Express Scripts and exercised their rights under the Plans' contracts, the Plans and their participants/beneficiaries would have saved millions of dollars.

143.145.    *Second*, Defendants failed to adequately consider contracting with a pass-through PBM, instead of Express Scripts, for all of the Plans' prescription-drug needs. Fiduciaries of similar plans across the country have conducted comprehensive plan reviews and concluded that their plans' interests were best served by switching from a traditional PBM to a pass-through PBM. This option was equally available to Defendants. Given the extremely high prices that Defendants agreed to pay, the Plans and their participants/beneficiaries would have been better served by switching from a traditional PBM to a pass-through PBM, and those benefits would have been clear at the time of contracting. Defendants failed to adequately solicit bids from pass-through PBMs, or alternatively, did solicit such bids but failed to act in the best interests of the Plans and their beneficiaries when choosing among competing bids. A prudent process would have made clear that the Plans would save a substantial amount of money by contracting with one

or more pass-through PBMs instead of entering into and/or renewing their contract with Express Scripts, without meaningfully (or at all) sacrificing availability of drugs, scope of pharmacy network, quality of service, convenience, or any other factor related to plan features or services. Had Defendants adequately considered alternative PBMs and made the prudent choice, the Plans and their participants/beneficiaries would have saved millions of dollars.

144.146.    SmithRx is a pass-through PBM that services a wide range of healthcare plans. SmithRx is capable of providing a high level of service comparable or superior to that provided by Express Scripts, and it currently services multiple clients who formerly used Express Scripts as their PBM. Defendants could have, but did not, include SmithRx in their procurement process. If Defendants had contracted with SmithRx instead of agreeing to its contract with Express Scripts, Defendants would have saved the Plans and their participants/beneficiaries substantial amounts of money while retaining the Plans' prescription-drug features and level of PBM services.

145.147.      The following table lists the generic drugs highlighted in paragraphs 116-121118-123 of this FirstSecond Amended Complaint, with a comparison between the prices that Defendants agreed to make the Plans and their participants/beneficiaries pay Express Scripts and the prices that SmithRx charges its plan clients with its pass-through model:

| Generic Drug Name | Quantity | Johnson & Johnson Plan | SmithRx Cost | Cost Differential to J&J Plan |
|---|---|---|---|---|
| Abacavir | 180 | $322.36 | $35.20 | -89.08% |
| Abacavir-Lamivudine | 90 | $1,629.40 | $109.90 | -93.26% |
| Abiraterone Acetate | 90 | $5,375.26 | $95.50 | -98.22% |
| Atazanavir Sulfate | 90 | $613.10 | $75.82 | -87.63% |
| Azathioprine | 90 | $27.42 | $25.30 | -7.73% |
| Bexarotene Gel** | 60 | $80,028.50 | $10,310.07 | -87.12% |
| Bexarotene Capsules | 300 | $1,975.00 | $1,146.16 | -41.97% |
| Capecitabine | 90 | $2,099.91 | $33.40 | -98.41% |
| Cyclosporine | 90 | $732.39 | $28.90 | -96.05% |
| Dalfampridine | 90 | $2,197.71 | $28.00 | -98.73% |
| Deferasirox | 90 | $8,199.75 | $82.90 | -98.99% |
| Dimethyl Fumarate DR Capsule | 180 | $16,070.94 | $113.50 | -99.95% |
| Droxidopa | 90 | $5,340.66 | $55.90 | -98.95% |
| Efavirenz | 90 | $2,016.99 | $76.09 | -96.23% |
| Efavirenz-Emtricitabine Tenofovir Disoproxil Fumarate | 90 | $7,097.43 | $75.65 | -98.93% |
| Emtricitabine-Tenofovir | 90 | $1,260.12 | $43.30 | -96.56% |
| Etravirine | 180 | $2,172.29 | $1,021.60 | -52.97% |
| Fingolimod | 90 | $13,325.83 | $880.09 | -93.40% |
| Fosamprenavir | 90 | $13,325.83 | $880.09 | -93.40% |
| Fingolimod | 90 | $13,325.83 | $880.09 | -93.40% |
| Etravirine | 90 | $13,325.83 | $880.09 | -93.40% |
| Fingolimod | 90 | $13,325.83 | $880.09 | -93.40% |
| Etravirine | 90 | $13,325.83 | $880.09 | -93.40% |
| Fingolimod | 90 | $13,325.83 | $880.09 | -93.40% |
| Etravirine | 90 | $13,325.83 | $880.09 | -93.40% |

*Includes shipping fee

| Generic Drug Name | Quantity | Johnson & Johnson Plan | SmithRx Cost | Cost Differential to J&J Plan |
|---|---|---|---|---|
| Fingolimod | 90 | $13,325.83 | $880.09 | -93.40% |
| Etravirine | 90 | $13,325.83 | $880.09 | -93.40% |
| Fingolimod | 90 | $13,325.83 | $880.09 | -93.40% |
| Fosamprenavir | 90 | $2,304.97 | $613.90 | -73.37% |
| Ibandronate | 3 | $32.56 | $15.29 | -53.04% |
| Imatinib | 90 | $16,398.17 | $99.10 | -99.40% |
| Lamivudine | 90 | $114.80 | $34.30 | -70.12% |
| Ibandronate | 90 | $13,325.83 | $880.09 | -93.40% |
| Lamivudine-Zidovudine | 90 | $223.52 | $38.80 | -82.64% |
| Mycophenolate Mofetil Tablet | 90 | $18.00 | $28.00 | 55.56% |
| Mycophenolate Sodium Tablet | 90 | $145.06 | $29.80 | -79.46% |
| Nevirapine | 90 | $8.50 | $19.00 | 123.53% |
| Nevirapine XR Tablet | 90 | $530.63 | $89.20 | -83.19% |
| Ribavirin Tablet | 90 | $78.57 | $76.60 | -2.5% |
| Sildenafil Citrate | 18 | $20.96 | $12.40 | -40.84% |
| Sirolimus | 90 | $704.56 | $129.70 | -81.59% |
| Tacrolimus | 90 | $17.77 | $21.70 | 22.12% |
| Tadalafil Tablet | 18 | $64.11 | $15.10 | -76.45% |
| Temozolomide | 90 | $15,332.32 | $376.30 | -97.55% |
| Tenofovir Disoproxil Fumarate | 90 | $79.67 | $40.60 | -49.04% |
| Teriflunomide | 90 | $10,239.69 | $33.40 | -99.67% |
| Tetrabenazine Tablet | 90 | $5,526.56 | $70.30 | -98.73% |
| Tobramycin Inhalation Solution | 840 | $16,822.26 | $962.15 | -94.28% |
| Zidovudine | 90 | $136.30 | $34.30 | -74.83% |
| Total | | $221,101.09 | $17,420.22 | -92.21% |

🞰 SmithRx

146.148.      As these comparisons make clear, the prices that Defendants agreed to make the Plans and their participants/beneficiaries pay Express Scripts are excessive not only in comparison to the NADAC, but also in comparison to the actual prices charged by another PBM

in the marketplace that is fully capable of providing the J&J Plans the same level of service they receive from Express Scripts. In light of these specific price discrepancies and the broader methodological differences between SmithRx and PBMs using the traditional PBM model, if Defendants had contracted with SmithRx instead of agreeing to their Express Scripts deal, they would have saved the Plans several millions of dollars per year on prescription drug costs across the Plans as a whole, after accounting for all charges for all drugs, fees, and rebates. Put another way, Defendants' fiduciary breaches caused the Plans and their participants/beneficiaries to overpay by millions of dollars each year on prescription-drug costs compared to available alternatives.

147.149.    Comparable savings were available to Defendants by contracting with other pass-through PBMs as well. For example, Navitus is a pass-through PBM that services a wide range of healthcare plans covering millions of persons. It is capable of providing a high level of service comparable or superior to that provided by Express Scripts. For 2022, Navitus's commercial clients paid an average of $89.73 in net total costs per-member, per-month. On information and belief, the Plans in 2022 paid substantially more in net total costs per-member, per-month under the terms of the contract Defendants negotiated with Express Scripts. Put another way, Defendants' fiduciary breaches caused the Plans to overpay by millions of dollars each year on prescription-drug costs compared to available alternatives.

148.150.    ***Third***, Defendants failed to adequately consider carving out their specialty-drug program from their broader contract with Express Scripts. As described below, fiduciaries of similar plans across the country have conducted comprehensive plan reviews and concluded that their plans' interests were best served by carving out specialty pharmacy benefits from their overall PBM contract. This option was equally available to Defendants. A prudent process would

have revealed that the Plans would save money by carving out the specialty-drug program from the Plans' contract with Express Scripts. Had Defendants adequately considered this option and made the prudent choice, the Plans and their participants/beneficiaries would have saved millions of dollars.

### D.    An Attentive Fiduciary Would Have Recognized and Avoided the Flaws in Defendants' Approach.

#### 1.    Published Warnings and Guidance

~~149.~~151.    Prominent media outlets, industry publications, governmental entities, and research organizations have long reported on the PBM tactics and conflicts of interest detailed above, and have warned plan administrators about the financial harms that result when they fail to act prudently and instead allow PBMs to enrich themselves at the expense of plans and their participants/beneficiaries. Prudent fiduciaries would heed this advice—and many prominent companies' fiduciaries have heeded this advice—by taking steps to protect their plans from these widely-reported tactics. Defendants knew or should have known that their PBM arrangements unreasonably failed to heed these warnings and failed to protect the Plans and their participants/beneficiaries from these widely reported tactics, despite having ample bargaining power. Defendants' failure to act prudently and their decision to enter into unreasonable arrangements with their PBM cost the Plans and their participants/beneficiaries millions of dollars during the class period.

~~150.~~152.    As early as 2010, the International Foundation of Employee Benefit Plans was reporting on the ways in which PBMs use specialty drugs to extract profits from plans. One notable article written by a PBM expert warned that "most PBMs increase their profit margins by buying specialty drugs at low prices and selling them at far higher prices, rather than using their marketplace leverage to decrease their clients' costs." The article advised plans to "require your

PBM to provide pass-through pricing for every specialty drug dispensed" and to "invoice your plan based on the PBM's actual acquisition cost."  The article also recommended that plans "can—and should—position [themselves] contractually to carve out specialty drugs after the contract begins, ensuring that you can consistently obtain the best minimum guaranteed discount available, throughout the life of the contract."  The article advised plans that they should "make sure to eliminate … exclusivity provisions and replace them with provisions that allow you to carve out specified services, including the provision of some or all specialty drugs, and the right to negotiate contracts with alternative specialty drug pharmacies."

151.153.    A 2013 article in Fortune Magazine reported that traditional PBMs "effectively pad bills by $8 to $10 a prescription" and, quoting a consultant who had audited more than 100 PBM contracts, that "[t]he nation's employers are being taken for a ride" by traditional PBMs.

152.154.    A 2017 article reported that "[c]ontrolling the formulary gives PBMs a crucial point of leverage over the system" and warned that "PBMs place drugs on their formularies based on how high a rebate they obtain, rather than the lowest cost or what is most effective for the patient."  The same article warned that "[t]he MAC list that goes to the pharmacy does not necessarily match the one for the health plan. By charging the plan sponsor more than they pay the pharmacy in a reimbursement, PBMs can make anywhere from $5 to $200 per prescription."

153.155.    A 2017 article from Bloomberg titled "Drug Costs Too High?  Fire the Middleman" reported that PBMs "keep about 10 percent of the rebates from manufacturers vying to get their medicines covered; they sometimes charge health-plan clients more for generics than they reimburse the pharmacies dispensing them; and they channel clients to their own specialty or mail-order pharmacies."  The article recounted numerous success stories of companies that had

moved away from the traditional PBM model and delivered millions of dollars in savings to their plans and their employees.

154.156.        A 2018 article from Axios reported that PBM contracts are often "written with the PBM's financial interests in mind" and that "those kinds of provisions can result in lost savings for everyone, especially for small companies and their employees."  The article warned that "[e]ven some of the largest companies think they are protected because they have in-house and outside attorneys vetting contracts, yet that's not necessarily the case."  The article warns that "a major tactic to maximize profits" by PBMs is controlling how different drugs are designated on the formulary.

155.157.        A 2018 article from Axios quoted a prominent consultant who warned that "One of the key components of the system is that transition of brand-name drug to generic drug … [a]nd if you would allow a PBM or any third-party vendor to over-inflate that amount ... you are being set up to lose every time."

156.158.        A 2018 report by drug price nonprofit 46Brooklyn Research detailed PBMs' use of spread pricing to reap massive profits, at the expense of payers, on generic imatinib mesylate.    As that report explained, payers who agree to pay prices that are determined independently of what PBMs pay to pharmacies "lose all visibility into what their underlying drugs actually cost, handing the keys over to the PBM," while "the PBM can effectively just sit back as generic prices plummet, knowing that it is under no requirement whatsoever to pass the full extent of those savings back" to the payer.

157.159.        An extensive probe by the Columbus Dispatch, reporting on which began in 2018, revealed "that CVS Caremark routinely billed the state [of Ohio] for drugs at a far higher amount than it paid pharmacies to fill the prescriptions," retaining "tens of millions of dollars" in

spread pricing. Among many other things, the Dispatch reported that the traditional PBM "system has a built-in incentive for CVS Caremark and other PBMs to maximize the price spreads: They get to keep the money" and that "the largest spreads occurred among generic drugs." The Dispatch's reporting was picked up and widely reported by national outlets.

158.160.    A 2018 USA Today article about PBMs quoted a prominent consultant describing a supposedly new pricing model by CVS Caremark as follows: "CVS Caremark is using different language only to make it appear that it is being more transparent. And the new pricing approach also doesn't eliminate rebates on brand-name drugs or spread pricing. When negotiating contracts with manufacturers, CVS Caremark can label manufacturers' payments with whatever labels Caremark wants: rebates, manufacturer fees, health management fees, etc. Therefore, the question is what percentage of total manufacturer payments Caremark passes through."

159.161.    A 2019 article quoted a prominent consultant who identified "[a] lack of clear definitions of types of drugs" as an important issue, and explained that "PBMs often play with the definitions of [specialty] drugs in ways that promote the health of their own bottom line." The consultant advised that a payer "should make its own list of specialty drugs" and "set minimum guaranteed discounts off public prices for each." The same consultant stated: "If you write a better contract, you can eliminate a lot of this stuff."

160.162.    A 2020 report commissioned by The Florida Pharmacy Association and American Pharmacy Cooperative, Inc. warned that "as more brand name specialty drugs … lose patent exclusivity in the coming years, there is growing risk that the extreme pricing manipulation and steering we have identified on imatinib mesylate could become more commonplace," and recommended moving "to an acquisition cost-based model to mitigate the risk of a dramatic rise in price exploitation on specialty generic drugs."

161.163.    A 2020 report on pharmacy benefits advised that traditional PBMs have "misaligned incentives which can lead to price increases without providing equivalent value for the purchasers of benefits" and advised that "Employers need to: • Think differently about how to manage the pharmacy benefit. • Take action on addressing waste, low-value drugs and excess costs often caused by PBMs and other pharmacy benefit middlemen. • Make ethical and logical decisions over what a drug is worth and the employer's ability to pay – as plan sponsor and fiduciary, it's critical that dollars are used efficiently for plan beneficiaries. • Focus on innovative approaches to specialty drug management."

162.164.    A 2021 report prepared by the House Committee on Oversight and Reform Minority Staff warned that "PBMs engage in a number of questionable practices, one of which is spread pricing, in which PBMs pay a pharmacy a lower amount than they report to a health plan sponsor."  The report further stated that PBMs use their control of formularies to "drive patients to more expensive drugs."

163.165.    A 2022 BenefitsPro article directed at human resources officers advised that "plan sponsors have more power than they may realize when evaluating a PBM," that "your PBM contract must be free of any ambiguities regarding the PBM's obligation to act in your best interests at all times," that plan fiduciaries should "prohibit the PBM from using any internal 'proprietary' algorithm that determines whether a drug will be priced as a brand or generic drug," that plan fiduciaries should "prohibit the MAC Game by requiring the PBM to use the same MAC List to pay the pharmacy and to bill you for generic drugs," that plan fiduciaries should "make it clear that … the PBM must pass through and not retain any rebates" and "define the term 'rebate' to include any and all renumeration that the PBM receives from drug manufacturers based on your plan's utilization," that plan fiduciaries should "require the PBM to … place drugs on your

formulary based on efficacy, safety and the true net cost of the drugs," and that plan fiduciaries should "audit your PBM to confirm that the PBM has delivered the contracted pricing and has implemented your plan designs correctly."

164.166.    A February 2022 white paper on specialty drug management reported that "the savings with Specialty PBM Carve-Out can be quite substantial, with savings ranging from 25-50%. Sources of savings go beyond the supply chain elements of rebates and drug discounts to incorporate benefits of the clinical and coverage model, including a more cost-effective formulary, health economics-based coverage, more rigorous [prior authorization], and more robust copay assistance programs."

165.167.    A 2022 white paper from the University of Southern California (USC) reported that "U.S. consumers and employers and the government often overpay for generics as pharmacy benefit managers (PBMs) and their affiliated insurer companies game opaque and arcane pricing practices to pad profits."  The paper continues: "Commercial tactics such as spread pricing, copay clawbacks and formularies that advantage branded drugs over less expensive generics have funneled the savings from low-cost generics into intermediaries' pockets, rather than the pockets of patients."

166.168.    A 2023 report documented that PBMs regularly decline to replace expensive brand-name drugs on formularies with newly released generics, stating that "PBMs are persistently excluding generic competition from the market, resulting in higher prices and less choice for patients and the healthcare system."  The report explained that "PBMs prefer the high-list price, high-rebate drugs because they benefit from it."

167.169.    A 2023 guide to PBM contracting for employers identified "[t]he lack of unit cost pricing for ALL generics" as the "most substantial cost excess seen in PBM contracting,"

and informed employers that "[a]n objective ($/unit) price for EVERY generic entity must be presented in the proposal and integrated into the executed PBM contract." The same guide warns that "[i]f a plan sponsor (fiduciary) allows generics to be priced at AWP-X%, ALL cost modeling and projections are not credible."

168.170. A 2023 article reported on the "flow of money between major consulting conglomerates and PBMs," and quoted an industry attorney's statement that "[t]he broker not only gives bad advice to the employer that's in the broker's self-interest, but the broker also allows the big PBM to write crazy terms into a contract." The article further warned employers that "PBMs … favor brand-name drugs over generic equivalents, delay coverage of new generics and biosimilars, mark up prices of generic drugs, and require employers to use the PBM's mail-order pharmacy," all to "boost the PBM's bottom line."

169.171. The federal government has long recognized the cost savings that result from basing prices on actual pharmacy acquisition costs rather than an AWP-based model. The United States Office of Personnel Management ("OPM"), which manages the civil service of the federal government, regularly issues guidelines and standards applicable to insurance carriers that provide health care coverage to federal employees. Since at least 2011, those standards have required that carriers' contracts with PBMs "base Carrier costs on negotiated price with network pharmacies or the actual acquisition cost for PBM-owned or affiliated pharmacies." According to the latest guidelines, carriers must ensure that the price of drugs filled by pharmacies not affiliated with the PBM are based on the negotiated price in each pharmacy agreement plus a dispensing fee, without spread pricing. Likewise, carriers must ensure that the price of drugs filled by PBM-owned or affiliated pharmacies are based on the actual acquisition cost, plus a dispensing fee,

without spread pricing.  PBMs must also disclose to carriers the MAC lists used for carriers'
pricing.

170.172.        OPM also requires carriers to negotiate for full audit rights to all PBM
network pharmacy contracts, claims data, manufacturer payments (including all rebates, however
denominated), invoices, and clinical services coverage criteria.  OPM further requires carries to
include in their PBM contracts terms related to having access to information at each claim and
aggregate level between PBMs and pharmacies (including PBMs and PBM-owned or affiliated
pharmacies).

### 2.    Defendants' Own Business Experience

171.173.        JnJJ&J has itself made numerous public statements that reveal its
knowledge regarding PBM practices and the pharmaceutical industry.  In a 2022 court filing,
JnJJ&J explained that PBMs "serve as middlemen with an aim towards increasing insurers' and
their own profits by determining which drugs a plan will cover and to what extent they will be
covered."

172.174.        JnJJ&J publishes an annual "Transparency Report" that discusses the
challenges that PBMs pose to patient access, including the percentage of each dollar that they pay
to PBMs as a drug manufacturer. According to the 2022 report, JNJJ&J pays 58% of each
pharmaceutical dollar to commercial insurers. The Health Policy and Advocacy team frequently
presents the Transparency Report to "inform" patients, advocacy groups, doctors, nurses, office
managers, pharmacists, and other allied professionals on the costs associated with PBMs and the
resulting patient access challenges created by the increased costs. In fact, JnJJ&J has a written
policy supporting pass-through rebates in its Transparency Report and frequently lobbies at

Federal and State legislatures that passing through rebates would lower prices for consumers and employers.

173.175.    In 2019,  a JnJJ&J executive testified to the U.S. Senate that one reason patient out-of-pocket spending on medicines had grown by 54% from 2006 to 2016 was "due to changes in how health insurance is designed and, specifically, how pharmaceutical benefits are managed."  She continued: "[T]oo often these rebates and discounts are not shared with patients, leaving the sickest patients paying higher out-of-pocket costs. We anticipate eliminating rebates could result in lower list prices, provided these rebates and discounts are not replaced with equally high fees or other payments demanded by middlemen. We also strongly advocate that beneficiary copays be based on net price."

174.176.    In 2023, JnJJ&J wrote to the Pennsylvania Department of Insurance about a practice through which PBMs and health plans alter specialty drug classifications to avoid regulatory caps on patient out-of-pocket expenses. The letter explained that "PBMs carve out a list of specialty drugs for third-party companies to manage. These third party companies can increase the patient's copay for the given drug to an artificially high amount—often thousands of dollars per dose."

        **3.**      ~~3.~~    **Practices of Other Plans**

175.177.    Throughout the class period, the fiduciaries of other prescription-drug plans took one or more of the steps detailed above and saved their plans and their beneficiaries millions of dollars, with savings that far outweighed any costs (financial or otherwise) of implementation. These options were equally available to Defendants, who could have retained the J&J Plans' prescription -drug features and the level of PBM services while obtaining substantial savings for the Plans (in the form of lower payments for prescription drugs) and their participants/beneficiaries

(in the form of lower premiums, lower deductibles, lower coinsurance, lower copays, and higher wages or greater wage growth).

176.178.    The following examples are illustrative and taken from public reporting. Many other companies have taken similar steps and achieved similar results.

177.179.    PepsiCo, Inc. is a multinational food, snack, and beverage corporation that provides prescription-drug benefits for thousands of employees and their dependents.  In 2018, PepsiCo joined the National Drug Purchasing Coalition, which reports described as a "group of the nation's largest, most forward-thinking employers that use their collective purchasing power to negotiate high quality, cost-effective and innovative solutions for managing pharmacy benefits." PepsiCo continues to use Express Scripts as its PBM, but it has used its bargaining power to secure prices for generic drugs that are far lower than Defendants' prices.  For the generic drugs in the table at paragraph 116118 above, Defendants agreed to make the Plans and their participants/beneficiaries pay, on average, *2.3 times as much* as PepsiCo's plan and participants/beneficiaries pay for the same drugs.  For the generic drugs in the table at paragraph 124126 above, Defendants agreed to make the Plans and their participants/beneficiaries pay, on average, *four times* as much as PepsiCo's plan and participants/beneficiaries pay for the same drugs.

178.180.    Caterpillar Inc. is an equipment manufacturer that provides prescription-drug benefits for approximately 100,000 employees and their dependents.  In 2010, Caterpillar began exercising full control over its formulary instead of deferring to the formulary recommendations of its traditional PBM, and used that control to ensure that decisions about formulary inclusion and placement were being made in the interests of its plan rather than its PBM. Since making these changes, Caterpillar has saved millions of dollars per year on its prescription-

drug costs, with far lower per-patient and per-prescription costs.  Bloomberg News reported on Caterpillar's success in exercising formulary control, reporting that "Caterpillar has saved tens of millions of dollars a year" and quoting the company's global benefits manager stating that Caterpillar's "model is as successful today as it's ever been."

179.181.    Wayne Farms is a poultry producer that provides prescription-drug benefits for approximately 12,000 employees and their dependents.  In August 2020, Wayne Farms carved out specialty drugs from its traditional PBM contract and implemented a pass-through PBM model for its specialty drugs through Archimedes, a pass-through PBM.  This change resulted in substantial savings for Wayne Farms: When comparing the first six months of the specialty carve-out program to the same time period in the year prior, Wayne Farms' expenditures on specialty drugs decreased from $26.75 to $16.03 in per-member per-month costs ("PMPM," a common cost metric for prescription-drug plans), representing a 40% decrease in plan spend.  Net of fees, Wayne Farms experienced a 31% decrease in plan spend for the first six months compared to the same period the prior year.  This change in plans was implemented with negligible member disruption. Wayne Farms's Director of Compensation and Benefits stated: "Implementing this program was one of the best decisions our team has made. The savings are exceeding projections and our members are extremely happy."

180.182.    American Casino & Entertainment Properties LLC ("ACEP") was a gaming company (which has since been acquired by a larger gaming company) that provided prescription-drug benefits for thousands of employees and their dependents.  In 2012, ACEP dropped its traditional PBM and switched to Navitus, a pass-through PBM.  Its prescription-drug costs decreased by 28 percent as a result of the switch.  ACEP's Corporate Vice President of Human

Resources stated that the company was able to "maintain excellent coverage while providing substantial savings to our employees."

181.183.    Dean Foods was a food and beverage company (which has since been acquired by another company) that provided prescription-drug benefits for approximately 15,000 employees and their dependents.  In 2019, Dean Foods carved out all specialty drugs from its traditional PBM contract, and Vivio, a pass-through PBM, began managing all specialty drug benefits under Dean Foods' prescription-drug plan.  Prior to carving out specialty drugs, Dean Foods was projected to spend approximately $8.798 million on specialty drugs in 2019.  But after carving out specialty drugs, Dean Foods spent only $5.569 million in specialty drugs in 2019, for a savings of $4.35 million in a single year.

182.184.    Self-Insured Schools of California (SISC) is a public school Joint Powers Authority that provides health care benefits to staff and their families at over 400 school districts in California, covering approximately 330,000 total members.  In 2014, SISC engaged in a comprehensive review of its prescription-drug benefit and concluded that it could save money by no longer deferring to its traditional PBM's formulary management decisions (which SISC recognized were favoring more expensive drugs with large rebates over cheaper drugs without rebates) and by identifying a PBM that was not focused on driving usage of its own mail-order pharmacy.  SISC conducted a prudent process, hired a non-conflicted consultant, and eventually contracted a pass-through PBM.  By working with its pass-through PBM to design a custom formulary, and through the more favorable pricing model of pass-through PBMs, SISC achieved substantial savings with minimal member disruption.  SISC's Deputy Executive Officer stated: "We were very surprised with what we were uncovering and confident that we weren't cutting into effectiveness, just trimming waste. Clinical effectiveness and safety always came first."

183.185.        The University of Southern California (USC) is a private research university that provides prescription-drug benefits for more than 20,000 employees and their dependents.  By refusing to accept the formularies offered by its PBM and designing its own higher-value formulary, USC reduced its drug spend by 40 percent in one year.

184.186.        Golden Entertainment, Inc. is a gaming company that provides prescription-drug benefits for more than 5,000 employees and their dependents.  In or around 2019, Golden Entertainment switched from a traditional PBM to a pass-through PBM.  Just four months after implementation of its new approach, Golden Entertainment achieved overall plan and member savings of 33.5%, including a 24% decrease in member cost and a 29% decrease in PMPM costs.

185.187.        The city of Kenosha, Wisconsin provides prescription-drug benefits for approximately 2,400 employees and their dependents.  In 2018, Kenosha replaced its traditional PBM with a pass-through PBM.  In its first three years with the pass-through PBM, Kenosha saved $2.3 million in pharmacy costs, achieved a 38% decrease in net plan PMPM costs, and achieved a 318% increase in rebates received.  Kenosha's Director of Human Resources referred to the move to a pass-through PBM as "a rousing success" with "complete transparency and significant cost savings," and reported that "the City's pharmacy costs have dropped 38 percent, resulting in more than $2.3 million in cumulative savings."

186.188.        The Montana Credit Union League (MCUL) Group Benefit Trust provides health and life insurance benefits to nearly half of the 45 credit unions in the state of Montana.  In 2021, MCUL issued an RFP for a new pharmacy benefits manager and contracted with a pass-through PBM.  By making the change, MCUL achieved significant reductions in PMPM costs, from $143 in 2021 to $88 in 2022.

187.189.    Foot Locker is a sportswear and footwear retailer that provides prescription-drug benefits for approximately 8,500 employees and their dependents.  In 2021, Foot Locker switched from a traditional PBM to Navitus, a pass-through PBM.  During the first year after the switch, spending on drugs dropped 5%.

188.190.    Phifer Incorporated is a fabrics company that provides prescription-drug benefits for approximately 1,000 employees and their dependents.  At the end of 2022, Phifer dropped its traditional PBM in favor of MedOne Pharmacy Benefit Solutions.  According to Phifer's vice president of human resources, Phifer was able to hold its premiums for 2024 flat because of the money it saved on drug spending.

189.191.    The Teamsters Health and Welfare Trust Fund of Philadelphia and Vicinity, a union fund that provides prescription-drug benefits for approximately 16,000 employees and their dependents, replaced their traditional PBM with Capital Rx in 2019.  The fund saved 17% on drug spending in its first year away from its traditional PBM, and has saved more on drug spending each year than it projected.  The executive director of the fund referred to the fund's decision to move away from a traditional PBM as the "best decision ever."

## V.    ADDITIONAL FACTS REGARDING NAMED ~~PLAINTIFF~~PLAINTIFFS AND HARM TO THEM

### A.    ~~Plaintiff is~~Defendants' Conduct Caused Plaintiffs to Pay More in Premiums as Employees

190.192.    As employees, Plaintiffs were both enrolled in the ~~Salaried Medical Plan component of the Group Health Plan~~Plans and ~~has~~ paid ~~co-pays, co-insurance amounts, and deductibles attributable to her use of prescription drugs.  She has also paid~~monthly premiums for ~~her~~their health insurance coverage~~, part of~~ through the Plans, which ~~is for~~includes prescription -drug coverage. As a result of Defendants' fiduciary breaches ~~and other ERISA violations, Plaintiff~~

~~has,~~ Plaintiffs paid more in premiums (and also had higher out-of-pocket costs) than ~~she~~they would have ~~paid~~had absent the fiduciary breaches ~~and other ERISA violations~~.

193.    Johnson and Johnson's employees (including both current and former employees enrolled in the Plans) share in the cost of healthcare coverage with Johnson and Johnson. ~~In particular,~~ The Plans' expenses are paid from the VEBA Trust, ~~and the VEBA Trust~~which is funded ~~by a combination of~~through employer and employee contributions, along with investment income. ~~Employee~~Employees make their contributions ~~are made in the form of~~through monthly ~~premiums.~~ premium payments.

~~191.~~194.    Defendants set the amount of the required employee contributions ~~in~~ each calendar year ~~is set by~~. Defendants~~, who~~ set that amount based on the Plans' expected spending in that year—i.e., ~~the more that~~when Defendants expect ~~the Plans to spend on~~higher healthcare costs (including on prescription drugs), ~~the more~~ they require ~~employees to pay into~~higher employee contributions to the VEBA Trust ~~to cover a portion of those expected costs~~. Accordingly, when the Plans' healthcare expenses (including for prescription drugs) increase in ~~one~~a given year, employees ~~are required to pay more in~~face higher premiums in ~~future~~subsequent years. ~~In this way~~Consequently, the Plans' overpayments for prescription drugs lead directly to increases in premiums for the Plans' participants.

195.    In each year during the class period, Defendants set ~~the required employee contributions each year as a percentage of expected spending by the Plans. Over the past ten years for which data is available (from 2013 to 2022), Defendants regularly set~~ employee contributions at ~~the level necessary~~amounts they projected would result in employees contributing premiums equal to 17-18% of overall Plan healthcare costs, with J&J contributing the remaining 82-83%. Throughout this period, it was Defendants goal to maintain a consistent ~~and stable~~ ratio of

employer contributions ~~and employee~~ to employee contributions, and any minor variation was due to forecasting error. If the Plan's costs were higher or lower in any given year, Defendants would have maintained the same static split of employee and employer contributions. ~~Specifically, In~~ this way, the amount employees are required to pay in premiums is tied directly to—and increases and decreases with—the Plan's actual and projected spending.

~~192.~~196.    As the Plans' annual healthcare spending steadily increased from $617.2 million to $949.4 million (over this period (shown by the blue line below), ~~the required~~ employee contributions ~~increased at essentially the same rate and held remarkably~~ rose proportionally, thus maintaining a steady ~~in~~ percentage ~~terms~~ (of total costs (as shown by the orange line below~~):~~) at about 17-18% of the total premium contributions:



~~193.~~197.    This ~~stability in~~consistent employee contribution percentage ~~is the result of~~reflects Defendants' intentional efforts to maintain a consistent ratio between employer and employee contributions.  In light of these efforts, ~~if~~any reduction in overall healthcare spending ~~were lower in any given year~~ —e.g., if Defendants stopped causing the Plans to overspend on prescription drugs by millions of dollars each year—would result in proportionally lower

employee contributions ~~would be lower as well, in order to maintain~~, in accordance with the ~~same split between employer~~established contribution ratio that Defendants have steadfastly maintained. And similarly, because Defendants caused the Plan to overspend on prescription drugs, overall healthcare spending increased, and employee contributions ~~to which Defendants have demonstrated their commitment.~~in the form of premiums increased in tandem.

198.    The fact that employee contributions in the form of premiums will increase when plans overspend on prescription drugs is also supported by numerous independent and/or government studies.

199.    In 2024, the Federal Trade Commission ("FTC") issued a report on PBMs. The FTC's Report found that, in addition to directly affecting patients' out-of-pocket costs, "inflated drug costs over time also result in higher premiums" for patients who utilize commercial health insurance such as employer-provided insurance. FTC Report at 47.

200.    A 2023 report by the Center for American Progress, an independent nonpartisan policy institute, similarly found that inflated drug prices "ultimately raise[] costs for consumers through higher cost sharing and premiums."  The Center for American Progress, *Following the Money: Untangling U.S. Prescription Drug Financing* (Oct. 12, 2023), https://www.americanprogress.org/article/following-the-money-untangling-u-s-prescription-drug-financing/~~If Defendants had~~.  The report found that "misaligned incentives throughout the drug pricing system sustain high prices ultimately borne by patients. Patients absorb these high prices through cost sharing or directly out of their pockets if they have not met their deductibles or are uninsured.  These unnecessary price increases also burden patients through higher health plan premiums." *Id.*

201.    According to a 2023 report by Families USA, a nonpartisan organization that examines health care policy, "almost 20% of health insurance premiums are driven by the rising cost of prescription drugs." Families USA, *Paying the Price: How Drug Manufacturers' Greed Is Making Health Care Less Affordable for All of Us* 5 (November 14, 2023).

202.    A 2023 article about PBMs also notes the connection between premiums and the higher costs of drugs, explaining that when drug costs increase, premium costs increase as well, because "[i]nsurance premiums and copayments are based on list prices." Arthur Gale, *If Pharmacy Benefit Managers Raise Drug Prices, Then Why Are They Needed?*, Mo. Med., July/August 2023, at 244.

203.    An article from Peterson Center on Healthcare and KFF's Health System Tracker states, "Prescription drugs are one of the leading contributors to health spending growth, and insurers frequently cite these higher drug costs as a reason for raising premiums." Gary Claxton et al., *Examining High Prescription Drug Spending for People with Employer Sponsored Health Insurance* (Oct. 27, 2016), https://www.healthsystemtracker.org/brief/examining-high-prescription-drug-spending-for-people-with-employer-sponsored-health-insurance/. The article further notes that retail prescription drug spending represents a larger share of total employer insurance benefits than retail drugs represent as a share of total national health spending, and therefore "growth in prescription drug spending may have a relatively large effect on employer-sponsored health insurance premiums." *Id.*

204.    In a 2024 report commissioned by the Employee Benefits Security Administration, RAND Corporation (a nonprofit, nonpartisan research organization) found that "drug spending is conceptually related to premiums." Andrew W. Mulcahy et al., *Prescription Drug Prices, Rebates, and Insurance Premiums* 4, RAND (Dec. 5, 2024), https://www.rand.org/pubs/

research_reports/RRA1820-3.html.  The RAND report observed "a general trend of increasing health care and prescription drug costs to enrollees, *including premiums*," since 2014, *id.* at 30 (emphasis added), and stated that "[h]igher drug spending will, holding all else constant, lead to higher premiums."  *Id.* at 52.  The report further explain[ed] that "[i]nsurers set health insurance premiums based on actuarial projections of spending in the year," and that "actuaries project aggregate drug spending forward to estimate next-year spending." *Id.* at 18, 54.  RAND also found that, for employer-sponsored health insurance coverage, "[t]he employer share of the premium remained steady at 82-83 percent per year across 2014-2023." *Id.* at 19.  In other words, as drug costs rose between 2014 and 2023, they were borne by both plan participants and their employer proportionally relative to the percentage that each contributed to the total insurance premium, which remained stable over time.

205.    The RAND report's findings—that the employer's share of the premium remains steady at close to 82 to 83 percent even when healthcare costs go up—align perfectly with Defendants' practice of maintaining employee contributions at approximately 17-18 percent of the total insurance premium.  *See supra* ¶ 196.  This further supports Plaintiffs' allegation that Defendants follow standard industry practices by passing along rising drug costs to Plan participants in proportion to the percentage of the premiums borne by such participants.

~~194.~~206.    Had Defendants not committed the fiduciary breaches alleged here, the Plans' annual spending would have been substantially lower, which in turn would have reduced the ~~amount of the~~ required employee premium contributions each year, including ~~the contributions~~those made by ~~Plaintiff. She has~~Plaintiffs. They paid more in premiums than ~~she~~they would have paid absent Defendants' fiduciary breaches.

207.    In the most recent year of reporting, the Plans' participants madecontributed approximately $148.28149.2 million in contributions to the VEBA Trust. Plaintiff in the form of premiums. Plaintiffs, as an employee of Johnson & Johnson and a participantparticipants in the Salaried Medical Plan, has beenPlans, were required to pay, and has paiddid pay, monthly healthcare premiums into the VEBA Trust. While she was employed by JnJ, PlaintiffJ&J, Plaintiffs paid the amount of employee contributions required by Defendants each month., and were injured by increases in those premiums. Those premium increases were attributable to rising Plan expenses, including expenses associated with excessive prescription drug costs.

**B.    Defendants' Conduct Caused Plaintiffs to Pay More in Premiums for Continuing Coverage After** ~~JnJ~~**Separating from J&J**

195.208.    After J&J purported to terminate her employment, shePlaintiff Lewandowski enrolled in COBRA and will paypaid the combined amount of employee and employer contributions, plus a 2% fee, consistent with the terms of COBRA.

196.    Until the fiduciary breaches alleged herein are remedied, Plaintiff will be required in the future to pay more in premiums than she would be required to pay absent Defendants' fiduciary breaches.

209.    In addition, if Defendants had not agreed to terms that forced the PlansCOBRA premiums for self-insured plans, including the J&J Plans, must be calculated on either an "actuarial basis" or "past cost" basis. *See* 29 U.S.C. § 1164(2). The actuarial basis requires an actuary to predict anticipated claims costs based on past costs, plan design, census changes, and other factors. By far the largest factor among these actuarial criteria is past costs/claims experience. Alternatively, under the "past cost" method (which J&J on information and belief utilized), the plan looks simply at previous costs for prior plan years and uses a statutory formula as a basis for setting COBRA premiums. Under either method, it is accepted and understood that the resulting

COBRA premiums should be based (in whole or in part) on total plan cost.  Thus, under either method, higher drug costs contribute to higher COBRA premium costs because they drive up the costs of paid claims.  Accordingly, Defendants' fiduciary breaches, which drove up drug costs, also drove up the cost of Lewandowski's COBRA premiums for coverage through the Plans. Moreover, there is no dispute that Lewandowski paid 100% of all premiums for COBRA coverage (plus a 2% administrative fee), without any employer cost-sharing.

210.    In summary, Lewandowski was required to pay more in both employee premium contributions and COBRA premiums than she would have been required to pay absent Defendants' fiduciary breaches.

211.    After Plaintiff Gregory retired from J&J, he enrolled in the retiree plan within the Group Health Plan, and has continued such coverage to the present date. As a covered retiree, Plaintiff Gregory continues to make substantial premium contributions. Indeed, Gregory's premium contributions are even greater than the amount he paid as an employee, and currently exceed $1,300 per month.  As a result, Gregory continues suffer ongoing injury from increased premiums.

212.    Defendants' fiduciary breaches, which drove up drug costs, also drove up the cost of Gregory's premiums for retiree coverage through the Plans.  Gregory was required to pay more in both employee premium contributions and retiree premiums than he would have been required to pay absent Defendants' fiduciary breaches.

**C.    Defendants' Conduct Caused Plaintiff Lewandowski To Pay More in Out-Of-Pocket Costs, and Also to Pay Her Out-Out of Pocket Costs Sooner**

213.    In 2023, Defendants' unlawful conduct caused Plaintiff Lewandowski to pay more out-of-pocket for prescription drugs than she otherwise would have paid. This is true even though she nominally hit her "out-of-pocket maximum" for 2023.  Specifically, Lewandowski actually

paid $979.57 in out-of-pocket expenses in 2023, but absent Defendants' unlawful conduct, she would have paid approximately $210.00 less, or approximately $769.57. This $210 loss is concrete financial harm to Lewandowski that resulted directly from Defendants' unlawful conduct. The factual support for this allegation of harm is detailed in the rest of this subsection.

214. The term "out-of-pocket" refers to payments other than monthly premiums that a plan participant pays for medical services and prescription drugs—*i.e.*, amounts that are not covered by the health plan. For example, plan participants may be required to pay a $25 co-pay for a doctor visit, with the health plan covering the rest of the cost. The $25 co-pay is an "out of pocket" cost. Similarly, plan participants may be required to pay 20% co-insurance for a hospital visit, meaning that the health plan pays 80% of the overall charge and the employee pays the other 20% herself. That 20% co-insurance payment is an "out of pocket" cost.

215. The term "deductible" refers to the amount of money a plan participant must pay out-of-pocket at the start of a plan year before her health insurance starts sharing costs. While some medical services are exempt from the deductible, as a general matter, a plan participant must pay the full price for medical services herself until she has "met" her deductible. After she meets her deductible, her health plan will start paying for its share of covered medical expenses.

216. An "out-of-pocket maximum" is the maximum amount that a plan participant will be required to pay out-of-pocket toward covered medical services during a plan year. Amounts paid during the deductible phase, co-pays, and co-insurance payments all count as "out-of-pocket" payments and generally count toward a participant's "out of pocket maximum." After the plan participant hits her out-of-pocket maximum for the year, she generally will no longer be charged co-pays or co-insurance; the health plan will pay for *all* covered services in full.

217.    In 2023, Lewandowski's deductible under the Plan was $1,500 and her out-of-pocket maximum was $3,500.  In between the $1,500 deductible and the $3,500 out-of-pocket maximum, she was responsible for 20% coinsurance.

218.    Lewandowski purchased several prescription drugs in the first four months of 2023. Because she was still in her deductible phase, she paid the full charge for these drugs, at the prices negotiated by Defendants for the Plans and their participants/beneficiaries.  Lewandowski also obtained medical services for which she paid out of pocket, because she was still in her deductible phase. Between January 1, 2023, and April 16, 2023, Lewandowski paid a total of $916.74 in out-of-pocket costs, $339.75 of which was for prescription drugs.

219.    Because of Defendants' unlawful conduct, Lewandowski paid excessive amounts for at least two of those prescription drugs.

220.    First, in January 2023, Lewandowski was prescribed a 90-tablet prescription of the generic drug tizanidine (2mg).  As noted above, Defendants agreed to a price of $18.72 for that prescription.  Lewandowski was required to pay, and did pay, that entire amount out-of-pocket. At the time, the acquisition cost of tizanidine (2mg) was $0.056/tablet, or $5.04 for a 90-tablet prescription.  Defendants thus imprudently caused Lewandowski to pay a 271% markup over acquisition costs for tizanidine (2mg), and Lewandowski was required to pay this entire amount out-of-pocket.  The acquisition cost of tizanidine (2mg) is roughly the same today as it was in January 2023, and a 90-tablet prescription of tizanidine (2mg) is currently available from Walgreens for $9.04, Walmart for $9.00, Costco for $11.89, and Cost Plus Drugs online pharmacy for $8.31.  In other words, Defendants—despite all their bargaining power—negotiated a price for this drug that was higher than the price available to any person with no insurance and no bargaining power, and Lewandowski was required to pay that inflated amount out-of-pocket.

221.    Second, in February 2023, Lewandowski was prescribed a 180-tablet prescription of the generic drug valacyclovir (1000mg).  As noted above, Defendants agreed to a price of $303.68 for that prescription.  Lewandowski was required to pay, and did pay, that entire amount out-of-pocket.  At the time, the acquisition cost of valacyclovir (1000mg) was $0.46/tablet, or $82.80 for a 180-tablet prescription.  Defendants thus imprudently caused Lewandowski to pay a 267% markup over acquisition costs for valacyclovir (1000 mg), and Lewandowski was required to pay this entire amount out-of-pocket.  The acquisition cost of valacyclovir (1000mg) is roughly the same today as it was in February 2023, and a 180-tablet prescription of valacyclovir (1000mg) is currently available from CVS for $72.76, Walmart for $119.34, Walgreens for $105.81, and Cost Plus Drugs online pharmacy for $70.26.  In other words, Defendants—despite all their bargaining power—negotiated a price for this drug that was higher than the price available to any person with no insurance and no bargaining power, and Lewandowski was required to pay that inflated amount out-of-pocket.

222.    At this point, Lewandowski had paid a total of $916.74 in out-of-pocket costs. She would hit her deductible with another $583.26 in out-of-pocket spending and would hit her out-of-pocket maximum with another $2,583.26 in  out-of-pocket spending.

223.    In April 2023, Lewandowski received an infusion of the prescription drug Ocrevus (ocrelizumab) at a medical facility to treat a complex chronic health condition. The total cost of the procedure was $79,212.00. To satisfy her $1,500 deductible, Lewandowski was responsible for the first $583.26 of the drug ($1,500 minus the $916.74 of previous out-of-pocket costs).  After she met her deductible, Lewandowski's coinsurance responsibility under the Plan was 20%. Because 20% of the remaining $78,628.74 is far more than the $2,000 still remaining before hitting her out-of-pocket maximum, Lewandowski's additional responsibility was limited to $2,000.

224.    Lewandowski's total out-of-pocket responsibility for the infusion was thus $2,583.26. However, Lewandowski paid only $62.83, because the remainder of the charge was covered by a co-pay assistance card. A co-pay assistance card is essentially a coupon offered by the manufacturer of a drug. In this case, the terms of the co-pay assistance card were that Lewandowski would be required to pay the first $62.83 of any amount charged, with the drug manufacturer paying the entirety of any remaining charge, up to a limit not relevant here. Thus, had Lewandowski's responsibility been more than $2,583.26, she still would have paid only $62.83, with the manufacturer covering the rest.

225.    Critically, even though Lewandowski did not herself pay the full $2,583.26, that amount was still counted towards her deductible and her out-of-pocket maximum. This is because the Plans apply amounts covered by co-pay assistance cards toward participants'/beneficiaries' deductibles and out-of-pocket maximums, pursuant to federal law. Accordingly, even though Lewandowski paid only $62.83 with her own money, the full $2,583.26 was applied toward her out-of-pocket maximum, bringing her to the cap of $3,500.

226.    After the infusion, Lewandowski was at her out-of-pocket maximum of $3,500 for 2023 for Plan purposes, even though the total amount *she* paid out-of-pocket in 2023 was $979.57.

227.    Absent Defendants' unlawful conduct, Lewandowski would have paid less than $979.57 out-of-pocket in 2023. As noted above, Defendants' unlawful conduct caused Lewandowski to overpay for valacyclovir by approximately $200 and for tizanidine by approximately $10. Had Defendants satisfied their fiduciary duties and negotiated a reasonable price for these drugs, Lewandowski would have paid only approximately $769.57 in out-of-pocket expenses in 2023.

228.    While paying less for these drugs in January and February would have meant that she had an additional $210.00 of room before hitting her out-of-pocket maximum in April, that entire $210.00 would have been added to her bill for the infusion and then covered by the co-pay assistance card.  So, instead of being responsible for $2,583.26, she would have been responsible for $2,793.26.  Importantly, this *would not have increased* the amount she actually paid out-of-pocket for the infusion because the extra $210 would have been covered by the co-pay assistance card.  Said differently, while that full $210 would have still counted toward her deductible and out-of-pocket maximum, Lewandowski would not have had to pay that cost. Instead, the co-pay assistance card, rather than Lewandowski, would have covered that additional $210.

229.    The following two tables compare Lewandowski's actual out-of-pocket spending for 2023 with what her spending would have been absent Defendants' unlawful conduct, demonstrating the approximately $210 of harm.

| Actual Spending, 2023 | | | | |
|---|---|---|---|---|
| **Expense** | **Charged to Plaintiff** | **Paid OOP by Plaintiff** | **Paid by Copay Card** | **Counted as OOP by Plan** |
| Valacyclovir | $303.68 | $303.68 | $0 | $303.68 |
| Tizanidine | $18.72 | $18.72 | $0 | $18.72 |
| Other drugs and medical services | $594.34 | $594.34 | $0 | $594.34 |
| Infusion | $2,583.26 | $62.83 | $2,520.43 | $2,583.26 |
| **TOTAL for Year** | **$3,500.00** | **$979.57** | **$2,520.43** | **$3,500.00** |

| **Spending Absent Defendants' Unlawful Conduct, 2023** | | | | |
| **Expense** | **Charged to Plaintiff** | **Paid OOP by Plaintiff** | **Paid by Copay Card** | **Counted as OOP by Plan** |
|---|---|---|---|---|
| Valacyclovir | $103.68 | $103.68 | $0 | $103.68 |
| Tizanidine | $8.72 | $8.72 | $0 | $8.72 |
| Other drugs and medical services | $594.34 | $594.34 | $0 | $594.34 |
| Infusion | $2,793.26 | $62.83 | $2,730.43 | $2,793.26 |
| **TOTAL for Year** | **$3,500.00** | **$769.57** | **$2,730.43** | **$3,500.00** |

230.    The year 2023 was not an outlier.  Lewandowski also paid higher overall out-of-pocket costs in other years as a result of the Plans' unreasonable and excessive prescription drug prices, notwithstanding any out-of-pocket maximums that applied to her.

231.    In addition to paying *higher* out-of-pocket costs overall, Lewandowski also was harmed because she was forced to pay those costs *sooner* than she otherwise would have.

232.    Specifically, because Lewandowski was forced to pay higher-than-reasonable amounts for her prescriptions in January 2023 and February 2023, and paid those amounts out-of-pocket, she suffered an immediate corresponding reduction in her cash position and lost the ability to purchase other necessities of life with the monies already spent on those prescriptions.  The fact that her out-of-pocket maximum was limited to a certain amount, or that the Plans began to pay 100% of her covered expenses after her expensive infusion in April 2023, does not alter the fact that Lewandowski had less money than she otherwise would have in the first quarter of 2023 (and at least a portion of April 2023 as well).

233.    It is well recognized that money paid now is worth more on a present value basis than money paid later.  Likewise, a detriment to one's cash flow is also an independent form of financial injury.  For example, if an individual incurs $1,000 in expenses in a year, but those expenses are incurred in mid-January of instead of mid-April, the only way to maintain the same cash position between January and April is to borrow those funds in the interim.  At a simple 10% interest rate for one quarter (out of four quarters in a year), the cost of that lost access to capital is $25 ($1,000 x 10% x ¼).  This is effectively what happened to Ms. Lewandowski, and constitutes an injury separate and apart from the fact that she actually wound up paying higher total expenses overall. The time value of money is well recognized in the law and financial literature. A typical person like Ms. Lewandowski who does not have unlimited financial resources can ill-afford to overpay expenses in any given month.

**D.    Defendants' Conduct Also Caused Plaintiff Gregory To Pay More in Out-Of-Pocket Costs**

234.    Defendants' unlawful conduct also caused Plaintiff Gregory to pay more out-of-pocket for prescription drugs than he otherwise would have paid.

235.    For example, Gregory paid a $20 copay for a 90-day supply of the generic drug enalapril (20 mg tablets) through the Plans in or around October 2024. This copay amount alone (Gregory's invoice from Express Scripts does not indicate what the Plans additionally paid) represents more than twice the NADAC amount of $9.98 for a 90-day supply, and exceeds a reasonable charge.

236.    Consistent with the NADAC benchmark, other vendors charge approximately $10 (half Gregory's copay amount) for a 90-day supply of enalapril.  For example, ShopRite charges $10.80 and Wegmans charges $9.30 for the same prescription.

237.    Had Gregory been charged a reasonable amount for his enalapril prescription, he would have paid less than $20 for that prescription in October 2024, and he also would have paid less than he did in other months when he had the same prescription filled.

238.    Plaintiff Gregory has repeatedly filled prescriptions for enalapril through the Plans, and he has repeatedly been overcharged for those prescriptions while enrolled in the Plans.

239.    Plaintiff Gregory did not hit his out-of-pocket maximum under the Plans in 2024, and does not recall hitting his out-of-pocket maximum in other years.

240.    If Plaintiff Gregory had been charged a reasonable amount for enalapril (and other prescription drugs) through the Plans, his overall out-of-pocket expenses would have been reduced in 2024 and other years.

**E.    Defendants' Conduct Resulted in Reduced Benefits for Plan Participants and Beneficiaries**

~~197.~~241.        In addition, if Defendants had not agreed to terms that forced the Plans (and participants/beneficiaries) to overpay for prescription drugs, the Plans would have used plan assets to deliver additional healthcare benefits to ~~Plaintiff~~Plaintiffs and other participants/beneficiaries. In the most recent year of reporting, for example, the VEBA Trust received $~~968,686,502~~1,040,441,688.00 in additional plan assets, from a combination of employee contributions, employer contributions, and investment income. Pursuant to ERISA, those $~~968,686,502 in~~ plan assets were required to be spent for the exclusive purpose of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan. In the same year, the VEBA Trust used $~~962,050,340~~1,026,979,305 of plan assets on claims payments and plan expenses. A significant portion of that $~~962,050,340~~amount was spent on overpayments for prescription drugs. If Defendants had not forced the Plans to waste that money by paying excessive prices for prescription drugs, the Plans

would have been required by ERISA to use—and would have used—that money to deliver additional benefits to participants/beneficiaries, including ~~Plaintiff~~Plaintiffs.

198.    Defendants' unlawful conduct also caused Plaintiff to pay more out-of-pocket for prescription drugs than she otherwise would have paid.  In February 2023, Plaintiff was prescribed a 180-tablet prescription of the generic drug valacyclovir (1000mg).  As noted above, Defendants agreed to a price of $303.68 for that prescription.  Plaintiff was required to pay, and did pay, that entire amount out-of-pocket.  At the time, the acquisition cost of valacyclovir (1000mg) was $0.46/tablet, or $82.80 for a 180-tablet prescription.  Defendants thus imprudently agreed to make the Plans and their participants/beneficiaries pay a 267% markup over acquisition costs for valacyclovir (1000 mg), and Plaintiff was required to pay that entire amount out-of-pocket.  The acquisition cost of valacyclovir (1000mg) is roughly the same today as it was in February 2023, and a 180-tablet prescription of valacyclovir (1000mg) is currently available from Rite Aid for $90.45, Wegmans for $90.50, Safeway for $108.13, and Cost Plus Drugs online pharmacy for $103.60.  In other words, Defendants—despite all their bargaining power—negotiated a price for this drug that was higher than the price available to any person with no insurance and no bargaining power, and Plaintiff was required to pay that inflated amount out-of-pocket.

199.    In January 2023, Plaintiff was prescribed a 90-tablet prescription of the generic drug tizanidine (2mg).  As noted above, Defendants agreed to a price of $18.72 for that prescription.  Plaintiff was required to pay, and did pay, that entire amount out-of-pocket.  At the time, the acquisition cost of tizanidine (2mg) was $0.056/tablet, or $5.04 for a 90-tablet prescription.  Defendants thus imprudently agreed to make the Plans and their participants/beneficiaries pay a 271% markup over acquisition costs for tizanidine (2mg), and Plaintiff was required to pay that entire amount out-of-pocket.  The acquisition cost of tizanidine

(2mg) is roughly the same today as it was in January 2023, and a 90-tablet prescription of tizanidine (2mg) is currently available from Safeway for $6.38, Wegmans for $12.28, Rite Aid for $12.81, and Cost Plus Drugs online pharmacy for $6.80. In other words, Defendants—despite all their bargaining power—negotiated a price for this drug that was higher than the price available to any person with no insurance and no bargaining power, and Plaintiff was required to pay that inflated amount out-of-pocket.

200.   In March 2024, Plaintiff was prescribed a 90-tablet prescription of another generic drug (Other Drug 2). As noted above, Defendants agreed to a price of $37.19 for that prescription. Plaintiff was required to pay, and did pay, $20 out-of-pocket for that prescription. At the time, the acquisition cost of the drug was $0.119/tablet, or $10.71 for a 90-tablet prescription. Defendants thus imprudently agreed to make the Plans and their participants/beneficiaries pay a 247.25% markup over acquisition costs for this drug, and Plaintiff was required to pay 86% more than the acquisition cost out-of-pocket. The acquisition cost of the drug is roughly the same today as it was in March 2024, and a 90-tablet prescription of this drug is currently available from Rite Aid for $14.28, Safeway for $16.19, Wegmans for $17.78, and Cost Plus Drugs online pharmacy for $10.40. In other words, Defendants—despite all their bargaining power—negotiated a price for this drug that required Plaintiff to pay more out-of-pocket than she would have paid if she told the pharmacy *not* to process the claim through her insurance.

201.   Until the unlawful conduct alleged herein is remedied, Plaintiff will be required in the future to pay more out-of-pocket for prescription drugs than she would be required to pay absent Defendants' unlawful conduct.

242.   In a 2023 "total rewards survey," J&J admitted a need to increase employee premiums and cut benefits under the Plans to cover costs, and asked for feedback from employees

regarding these measures. Unsurprisingly, these measures were not popular because they detrimentally impacted Plan participants like Plaintiffs. Had the Plans not overspent for prescription drug coverage, these adverse measures could have been mitigated or avoided.

### F.    Plaintiff Lewandowski's Request for Plan Documents

202.243.    Plan documents state that the Summary Plan Description for the Salaried Medical Plan consists of several separate documents, including a "General/Administrative Information Plan Details" document.

203.244.    Plan documents state that the "General/Administrative Information Plan Details" document is available on Johnson & Johnson's "For Your Benefit (FYB) Website." However, the "General/Administrative Information Plan Details" document is not accessible to PlaintiffPlaintiffs at that website or, to hertheir knowledge, at any other website.

204.245.    On December 20, 2023, Plaintiff Lewandowski sent a typewritten request through the Alight online portal messaging system established by Defendants, asking that all plan documents, including the "General/Administrative Information Plan Details" document, be mailed to her.

205.246.    Defendants received and accepted Plaintiff'sLewandowski's request.

206.247.    On January 8, 2024, PlaintiffLewandowski received in the mail a document for a different health plan in which she is not enrolled, titled "Local 809 Depuy, Inc. Other Important Information Summary Plan Description."

207.248.    On February 19, 2024 – after this lawsuit was filed – counsel for Defendants belatedly sent Plaintiff'sLewandowski's counsel the "General/Administrative Information Plan Details" document, but no other documents.

208.249.    On February 20, 2024, PlaintiffLewandowski, through counsel, sent a written letter to counsel for Defendants. The letter requested "all instruments under which the

Salaried Medical Plan is established or operated, including the formal plan document(s), all documents constituting the summary plan description, the latest annual report, and any other document falling within the terms of § 1024(b)(4)." The letter also requested "all instruments under which the Johnson & Johnson Group Health Plan is established or operated, including the master plan document, all documents constituting the full summary plan description, the latest annual report, and any other document falling within the terms of § 1024(b)(4)."

209.250.    On March 4, 2024, PlaintiffLewandowski, through counsel, sent another written letter to counsel for Defendants. The letter provided additional detail about the documents included within the scope of Plaintiff'sLewandowski's earlier request. Among other things, the letter made clear that Plaintiff'sLewandowski's request included "All contracts and agreements under which the Plans' prescription drug benefit is operated, including but not limited to all contracts and agreements with Express Scripts or Accredo (and any attachments, appendices, or exhibits thereto)."

210.251.    Defendants    provided    some    documents    in    response    to    Plaintiff'sLewandowski's request, but have refused to provide their agreement with Express Scripts.

**G.    Plaintiff Lewandowski's Other Experiences With the Plan**

211.252.    Lewandowski has had multiple other experiences with her employer-sponsored health care that suggest broader failures in Defendants' overall health plan administration.

212.253.    PlaintiffLewandowski has two complex chronic health conditions. One requires regular infusions of the prescription drug Ocrevus (ocrelizumab) at a medical facility. Before switching from her spouse's health insurance to the Salaried Medical Plan, PlaintiffLewandowski received this treatment at an outpatient hospital location. When she joined

the Salaried Medical Plan, representatives from Johnson & Johnson's health plan assured her that she could continue to receive treatment there upon starting her employment and would owe only $300 out-of-pocket for the treatment.

213.254.    Neither of these things were true.  In May 2022, just 3 days before a scheduled infusion at the outpatient hospital location, Plaintiff'sLewandowski's health plan redirected her to a different administration site, at a community cancer center owned by an academic center, and tried to delay the infusion by several days.

214.255.    According to the documentation PlaintiffLewandowski received, her health plan paid approximately $78,331.82 for the treatment from the cancer center, even though the average sales price ("ASP," a measure used for drugs covered by Medicare Part B) reported by CMS for the infused drug was only approximately $35,000.  When PlaintiffLewandowski asked if the health plan had reviewed cost prior to disrupting her care and directing her to the cancer center, they declined to provide any evidence that the cancer center was lower-priced than her original treatment site, and on information and belief, it was not.

215.256.    PlaintiffLewandowski searched for a less expensive site to receive the same treatment, and found an out-of-network site that offered to provide the treatment for approximately $40,000—about half the price of the center to which her plan previously directed her.

216.257.    PlaintiffLewandowski delivered this good news to her health plan and requested in-network parity—*i.e.*, that her out-of-pocket responsibility be the same as it would be at an in-network facility.  Approving the request would have saved the health plan tens of thousands of dollars on every infusion.  Nevertheless, the plan denied her request, acknowledging that "it would make sense to receive your injections at a facility that is significantly lower in cost," but stating that "there is no network deficiency and therefore a non-par provider cannot be

approved." ~~Plaintiff~~Lewandowski continues to receive her infusions at the more expensive site of care, with the Johnson & Johnson health plan wasting tens of thousands of dollars of plan assets on each of her visits.

~~217.~~258.    In other instances, ~~Plaintiff~~Lewandowski has taken on additional financial burdens to save money for the health plan in ways that the health plan could have adopted for itself. For example, ~~Plaintiff~~Lewandowski independently contracted with direct primary care, which is an arrangement in which the patient pays a flat membership fee to a healthcare provider in exchange for unlimited and direct access to the provider without separate fee-for-service charges. ~~Plaintiff's~~Lewandowski's health plan does not cover this membership fee or otherwise encourage the use of direct primary care. The health plan's negotiated rates for its current fee-for-service contracts are so high that just four visits to an in-network provider (or a single emergency room trip) would cost the plan more than if it had just covered the membership fee that provides ~~Plaintiff~~Lewandowski with unlimited appointments and 24/7 provider access.

~~218.~~259.    ~~Plaintiff~~Lewandowski has also experienced instances in which providers refuse to appeal claim denials. With respect to one claim denial, her health plan told her that even though she was appealing, she would have to pay the hospital the disputed amount pending appeal, wait until her appeal was granted, and wait until her health plan *also* paid the disputed amount—and only then could she seek reimbursement from the now twice-paid hospital. The health plan's decision to agree to this appeal structure with providers puts participants at significant financial risk for undisclosed costs and surprise medical bills, and it removes any incentive for the provider to seek prior authorization to confirm services are covered because they can just immediately bill the patient.

**PLAN-WIDE RELIEF**

219.260.        29 U.S.C. § 1132(a)(2) authorizes any participant or beneficiary of an ERISA plan to bring an action on behalf of such plan and to obtain the plan-wide remedies provided by 29 U.S.C. § 1109(a). ~~Plaintiff seeks~~Plaintiffs seek relief on behalf of the Plans pursuant to this statutory provision for purposes of ~~her~~their Cause of Action in Count One.

220.261.        ~~Plaintiff seeks~~Plaintiffs seek recovery for injuries to the Plans sustained as a result of the breaches of fiduciary duties referenced in Count One and throughout this ~~First~~Second Amended Complaint from the beginning of the statute of limitations period through judgment in this matter.

221.262.        ~~Plaintiff is~~Plaintiffs are adequate to bring this derivative action on behalf of the Plans, and ~~her~~their interests are aligned with the Plans' participants and beneficiaries. ~~Plaintiff does~~Plaintiffs do not have any conflicts of interest with any participants or beneficiaries that would impair or impede ~~her~~their ability to pursue this action. ~~Plaintiff has~~Plaintiffs have retained counsel experienced in ERISA litigation, and ~~intends~~intend to pursue this action vigorously on behalf of the Plans.

**CLASS ACTION ALLEGATIONS**

222.263.        For purposes of Counts One and Two, ~~Plaintiff brings~~Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23 on behalf of the following proposed class:[4]

> All persons who were participants in or beneficiaries of any of the Plans from the beginning of the statute of limitations period through judgment in this matter (the "Class Period").

---

[4] Plaintiffs reserve the right to propose other or additional classes or subclasses in their motion for class certification or subsequent pleadings in this action.

223.264.    The members of the putative class are so numerous that joinder of all potential class members is impracticable. Plaintiff doesPlaintiffs do not know the exact size of the class but isare informed and believesbelieve that the proposed class includes tens of thousands of persons residing across the United States.

224.265.    Plaintiff'sPlaintiffs' claims are typical of the claims of other members of the proposed class. Like other class members, PlaintiffPlaintiffs participated in one or more of the Plans and has suffered injuries as a result of Defendants' mismanagement of the Plans. Defendants treated PlaintiffPlaintiffs consistently with other class members with respect to hertheir prescription drug coverage and payment obligations as a JnJ employee. Plaintiff's. Plaintiffs' claims and the claims of all class members arise out of the same conduct, policies, and practices of Defendants as alleged herein, and all members of the class have been similarly affected by Defendants' wrongful conduct.

225.266.    There are questions of law and fact common to the class that predominate over any individual issues that might exist. Common questions include, but are not limited to, whether the Defendants are fiduciaries of the Plans; whether Defendants breached their fiduciary duties by engaging in the conduct described in this FirstSecond Amended Complaint; whether the breaches caused the Plans to overpay for prescription drugs and class members to share in that financial burden; and whether the Plans and the class member participants and beneficiaries are entitled to monetary, injunctive, and other equitable relief.

226.267.    PlaintiffPlaintiffs will fairly and adequately protect the interests of the class members. Plaintiff hasPlaintiffs have no interests antagonistic to those of other members of the class, and isare committed to the vigorous prosecution of this action. In addition, Plaintiff

~~has~~Plaintiffs have retained counsel competent and experienced in class-action litigation, including ERISA class actions.

~~227.~~268.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy because numerous identical lawsuits alleging similar or identical causes of action would not serve the interests of judicial economy and would create a risk of inconsistent or varying adjudications with respect to individual potential class members that would establish incompatible standards of conduct.   A class action would save time, effort, and expense and assure uniformity of decision for persons similarly situated without sacrificing procedural unfairness or any undesirable result.

~~228.~~269.     ~~Plaintiff is~~Plaintiffs are unaware of any members of the putative class who are interested in presenting their claims in a separate action, nor would it be economically feasible for them to do so.

~~229.~~270.     This class action will not be difficult to manage due to the uniformity of claims among the class members and the susceptibility of the claims to class litigation.   The proposed class has a high degree of cohesion.

## CAUSES OF ACTION

### COUNT ONE
### Breach of Fiduciary Duties – 29 U.S.C. §§ 1104(a), 1132(a)(2)
### (on behalf of ~~Plaintiff~~Plaintiffs, the Class, and the Plans against All Defendants)

~~230.~~271.     ~~Plaintiff~~Plaintiffs, on behalf of all others similarly situated, and on behalf of the Johnson & Johnson Group Health Plan and its component plans, ~~incorporates~~incorporate by reference all previous paragraphs of this ~~First~~Second Amended Complaint as if fully re-written herein.

~~231.~~272.     Defendants were required to discharge their duties with respect to the Plans solely in the interest of the Plans' participants and beneficiaries, and for the exclusive purpose of

providing benefits to participants and beneficiaries and defraying reasonable expenses of administering the Plans.  In addition, Defendants were required to act with the care, skill, prudence, and diligence required by ERISA.

232.273.    These duties required Defendants to (among other things) prudently manage the Plans' prescription-drug benefit, carefully monitor the Plans' PBM and prescription drug costs to ensure that the Plans and participants/beneficiaries paid only reasonable amounts for each prescription drug, and independently assess the formulary placement of each drug and not simply follow the conflicted advice of an EBC or PBM.  In making decisions about the prescription-drug program, Defendants were required to consider all relevant factors and options under the circumstances, including alternative arrangements that were available to the Plans, PBM alternatives, the conflicts of interest of its vendors, whether the prices of drugs under itsthe Plans' contract were reasonable, and steps taken by other companies that successfully lowered their prescription-drug costs.

233.274.    Instead of prudently managing the Plans' prescription-drug program and carefully monitoring the Plans' PBM and prescription drug costs, Defendants effectively abdicated their fiduciary duties to a for-profit PBM, gave the PBM free rein without any meaningful monitoring or review, allowed the Plans and their participants/beneficiaries pay extraordinarily high prices for prescription drugs, ceded control of the Plans' formulary to conflicted third parties, failed to supervise those conflicted third parties or otherwise ensure that decisions were made in the best interests of the Plans and their participants/beneficiaries, failed to conduct adequate reviews of the Plans' prescription-drug costs, failed to steer participants/beneficiaries to lower-cost options, failed to engage in a prudent process for monitoring the Plans' formulary, and failed to take available steps that would have saved the Plans and their participants/beneficiaries millions

of dollars.  Harms to the Plans have taken the form of excessive payments for prescription drugs.

Harms to participants/beneficiaries have taken the form of higher premiums, higher out-of-pocket

drug costs, higher deductibles, higher coinsurance, higher copays, and lower wages or limited

wage growth.

234.275.        Defendants' breaches of fiduciary duty increased the amounts that

PlaintiffPlaintiffs and members of the class were required to pay in premiums, out-of-pocket costs,

deductibles, co-pays, and co-insurance, and resulted in lower wages or limited wage growth.

235.276.        Pursuant to 29 U.S.C. § 1132(a)(2), Plaintiff isPlaintiffs are entitled to

obtain relief under 29 U.S.C. § 1109(a) for Defendants' fiduciary breaches, including: (i) recovery

of losses to the Plans; (ii) disgorgement of profits; and (iii) other equitable or remedial relief as the

Court deems appropriate, such as permanent injunctive relief, removal of the current fiduciaries,

replacement of the Plans' PBM, appointment of an independent fiduciary, surcharge, restitution,

and other remedies.

**COUNT TWO**
**Breach of Fiduciary Duties – 29 U.S.C. §§ 1104(a), 1132(a)(3)**
**(on behalf of PlaintiffPlaintiffs and the Class against All Defendants)**

236.277.        PlaintiffPlaintiffs, on behalf of herselfthemselves and all others similarly

situated, incorporatesincorporate by reference all previous paragraphs of this FirstSecond

Amended Complaint as if fully re-written herein.

237.278.        Defendants were required to discharge their duties with respect to the Plans

solely in the interest of the Plans' participants and beneficiaries, and for the exclusive purpose of

providing benefits to participants and beneficiaries and defraying reasonable expenses of

administering the Plans.  In addition, Defendants were required to act with the care, skill, prudence,

and diligence required by ERISA.

238.279.    These duties required Defendants to (among other things) prudently manage the Plans' prescription-drug benefit, carefully monitor the Plans' PBM and prescription drug costs to ensure that the Plans and participants/beneficiaries paid only reasonable amounts for each prescription drug, and independently assess the formulary placement of each drug and not simply follow the conflicted advice of an EBC or PBM.  In making decisions about the prescription-drug program, Defendants were required to consider all relevant factors and options under the circumstances, including alternative arrangements that were available to the Plans, alternative PBMs, the conflicts of interest of its vendors, whether the high prices of drugs under itsthe Plans' contract were justified by any other features of its PBM agreement, and steps taken by other companies that successfully lowered their prescription-drug costs.

239.280.    Instead of prudently managing the Plans' prescription-drug program and carefully monitoring the Plans' PBM and prescription drug costs, Defendants effectively abdicated their fiduciary duties to a for-profit PBM, gave the PBM free rein without any meaningful monitoring or review, allowed the Plans and their participants/beneficiaries to pay extraordinarily high prices for prescription drugs, ceded control of the Plans' formulary to conflicted third parties, failed to supervise those conflicted third parties or otherwise ensure that decisions were made in the best interests of the Plans and their participants/beneficiaries, failed to conduct adequate reviews of the Plans' prescription-drug costs, failed to steer participants/beneficiaries to lower-cost options, failed to engage in a prudent process for monitoring the Plans' formulary, and failed to take available steps that would have saved the Plans and their participants/beneficiaries millions of dollars.

240.281.    Defendants' breaches of fiduciary duty increased the amounts that ~~Plaintiff~~Plaintiffs and members of the class were required to pay in premiums, out-of-pocket costs, deductibles, co-pays, and co-insurance, and resulted in lower wages or limited wage growth.

241.282.    Pursuant to 29 U.S.C. § 1132(a)(3), ~~Plaintiff~~Plaintiffs and members of the class are entitled to injunctive relief and other equitable relief including, without limitation, the removal of the current fiduciaries, appointment of an independent fiduciary, replacement of the Plans' PBM, surcharge, restitution, and other remedies.

### COUNT THREE
### Failure to Provide Documents upon Request – 29 U.S.C. §§ 1024(b)(4) and 1132(c)
### (on behalf of Plaintiff Lewandowski against All Defendants)

242.283.    Plaintiff Lewandowski incorporates by reference all previous paragraphs of this ~~First~~Second Amended Complaint as if fully re-written herein.

243.284.    Under 29 U.S.C. § 1024(b)(4), a plan administrator must, upon written request of any participant or beneficiary, furnish a copy of plan documents, trust agreements, contracts, and other documents under which the plan is established or operated.

244.285.    Under 29 U.S.C. § 1132(c)(1), any plan administrator "who fails or refuses to comply with a request for any information which such administrator is required by [ERISA] to furnish to a participant or beneficiary … within 30 days after such request may in the court's discretion be personally liable to such participant or beneficiary in the amount of up to $100 a day from the date of such failure or refusal, and the court may in its discretion order such other relief as it deems proper."  By regulation, the penalty has been increased to $110 per day.  *See* 29 C.F.R. § 2575.502c-1.

245.286.    The Committee failed to timely and completely comply with ~~Plaintiff's~~Lewandowski's written requests for documents.

246.287.    The Committee only belatedly provided PlaintiffLewandowski with the "General/Administrative Information Plan Details" document on February 19, 2024, more than 30 days after she initially requested it and only after this suit was filed.

247.288.    The Committee also has completely failed to turn over other documents that have been requested by PlaintiffLewandowski in subsequent written requests, including but not limited to, the Plans' PBM contract relating to the operation of the Plans' prescription drug program.

248.289.    Pursuant to 29 U.S.C. § 1132(c)(1), the Committee is liable to PlaintiffLewandowski for statutory penalties for failing to produce the requested documents within 30 days, and for other relief the court deems proper, including but not limited to an order mandating the production of any requested documents not yet produced.

## DEMAND FOR JUDGMENT

WHEREFORE, PlaintiffPlaintiffs respectfully requestsrequest that this Court enter judgment on hertheir behalf and that of the Plans and Proposed Class as follows:

249.290.    Certifying and maintaining this action as a class action, with PlaintiffPlaintiffs designated as class representativerepresentatives and with hertheir counsel appointed as class counsel;

250.291.    Finding and declaring that Defendants have breached their fiduciary duties as described above;

251.292.    Enjoining Defendants from any further such violations of ERISA;

252.293.    Ordering Defendants to make good to the Plans all losses to the Plans resulting from each breach of fiduciary duty, and to otherwise restore the Plans to the position they would have occupied but for the breaches of fiduciary duty;

253.294.         Awarding surcharge, restitution, or other make-whole equitable relief to PlaintiffPlaintiffs and members of the class to remedy Defendants' breaches of fiduciary duty;

254.295.         Awarding statutory penalties to Plaintiff Lewandowski in connection with her claim in Count IIIThree;

255.296.         Removing the Plans' fiduciary or fiduciaries and appointing an independent fiduciary or fiduciaries to run the Plans;

256.297.         Removing and replacing the Plans' PBM and/or requiring a search for alternative PBM candidates to replace the Plans' PBM;

257.298.         Awarding, as appropriate, other forms of monetary, injunctive, and other equitable relief;

258.299.         Awarding pre-judgment, post-judgment, and statutory interest;

259.300.         Awarding attorneys' fees and costs; and

260.301.         Awarding such other and further relief as the Court may deem just and proper.

Dated: MayMarch 10, 20242025

Respectfully Submitted,

/s/ Michael Eisenkraft
Michael Eisenkraft (NJ Bar No. 016532004)
COHEN MILSTEIN SELLERS & TOLL, PLLC
88 Pine Street, 14th Floor
New York, New York 10005
(212) 838-7797
meisenkraft@cohenmilstein.com

Michelle Yau (admitted *pro hac vice*)
Daniel Sutter (admitted *pro hac vice*)
COHEN MILSTEIN SELLERS & TOLL, PLLC
1100 New York Ave. NW, FifthEighth Floor
Washington, D.C. 20005
(202) 408-4600

myau@cohenmilstein.com
dsutter@cohenmilstein.com

Kai Richter (admitted *pro hac vice*)
COHEN MILSTEIN SELLERS & TOLL, PLLC
400 South 4th Street #401-27
Minneapolis, MN 55415
(612) 807-1575
krichter@cohenmilstein.com

Jamie Crooks (admitted *pro hac vice*)
Michael Lieberman (admitted *pro hac vice*)
FAIRMARK PARTNERS, LLP
1001 G Street NW
Suite 400 East
Washington, DC 20001
Ph: (619) 507-4182
Email: jamie@fairmarklaw.com
michael@fairmarklaw.com

Michael Casper
WHEELER, DIULIO & BARNABEI, P.C
1650 Arch Street, Suite 2200
Philadelphia, PA 19103
(215) 971-1000
mcasper@wdblegal.com

*Attorneys for ~~Plaintiff~~Plaintiffs and the Proposed Class*