Michael Eisenkraft
COHEN MILSTEIN SELLERS &
TOLL, PLLC
88 Pine Street, 14th Floor
New York, New York 10005
(212) 838-7797
meisenkraft@cohenmilstein.com

Michelle Yau (*pro hac vice*)
Daniel Sutter (*pro hac vice*)
1100 New York Ave. NW, 8th Floor
Washington, D.C. 20005
(202) 408-4600
myau@cohenmilstein.com
dsutter@cohenmilstein.com

Kai Richter (*pro hac vice*)
400 South 4th Street #401-27
Minneapolis, MN 55415
(612) 807-1575
krichter@cohenmilstein.com

Jamie Crooks (*pro hac vice*)
Michael Lieberman (*pro hac vice*)
FAIRMARK PARTNERS, LLP
400 7th Street NW
Suite 304
Washington, DC 20004
(619) 507-4182
jamie@fairmarklaw.com
michael@fairmarklaw.com

Michael Casper
WHEELER, DIULIO & BARNABEI
P.C.
1650 Arch Street, Suite 2200
Philadelphia, PA 19103
(215) 971-1000
mcasper@wdblegal.com

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| ANN LEWANDOWSKI and ROBERT GREGORY, on their own behalf, on behalf of all others similarly situated, and on behalf of the Johnson & Johnson Group Health Plan and its component plans,<br><br>       Plaintiffs,<br><br>  v.<br><br>JOHNSON AND JOHNSON and THE PENSION & BENEFITS COMMITTEE OF JOHNSON AND JOHNSON,<br><br>       Defendants. | No. 3:24-cv-00671-ZNQ-RLS |

## PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED CLASS ACTION COMPLAINT

# **TABLE OF CONTENTS**

INTRODUCTION ................................................................................1

BACKGROUND ................................................................................2

   I.    Defendants' Mismanagement of J&J's Prescription Drug Program.....3

   II.   Financial Harm to Plaintiffs and Other Participants ...........................6

   III.  Plaintiffs' Claims ...........................................................................7

ARGUMENT.....................................................................................7

   I.    Plaintiffs Have Standing to Assert their Breach of Fiduciary Duty Claims.....................................................................................7

       A.    The Threshold for Standing Is Not "Mount Everest" ...............7

       B.    The Allegations of Higher Out-of-Pocket Costs Support Standing.....................................................................................8

           1.    Injury-in-Fact......................................................................8

           2.    Traceability.......................................................................10

           3.    Redressability ...................................................................11

               a.    Plaintiff Gregory...................................................12

               b.    Plaintiff Lewandowski ...........................................12

       C.    Plaintiffs' Allegations of Higher Premiums Support Standing 15

           1.    Because the Plan Is Self-Funded, Plaintiffs and Other Plan Participants Paid a Portion of the Plan's Overpayments Each Year..............................................16

           2.    There Is an Empirical Link Between Increased Costs and Increased Employee Premiums .....................................18

           3.    Defendants' Unfounded Speculation Is Improper and Unavailing. ....................................................................19

           4.    Defendants' "Non-Fiduciary Function" Argument Is Not Germane to Standing and Misconstrues Plaintiffs' Claims...........................................................................24

           5.    Defendants Ignore Ms. Lewandowski's COBRA Payments. ......................................................................26

       D.    Plaintiffs' Standing Is Not Limited to the Drugs They Purchased................................................................................26

   II.   Plaintiffs State Plausible Breach of Fiduciary Duty Claims ..............29

A.      ERISA Imposes Strict Fiduciary Duties on Plan Fiduciaries...29

B.      Plaintiffs Plausibly Allege that Defendants Breached Their Fiduciary Duties.................................................................31

1.      Plaintiffs Are Not Obligated to Allege Additional Facts Beyond Those in the Second Amended Complaint .......35

2.      Defendants Are Not Entitled to an Inference in Their Favor ...........................................................................39

CONCLUSION .................................................................................40

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*AARP v. EEOC,*
226 F.Supp.3d 7 (D.D.C. 2016) .......................................................17

*Acosta v. City Nat'l Corp.,*
922 F.3d 880 (9th Cir. 2019)..........................................................22

*In re Asbestos Prods. Liab. Litig.,*
822 F.3d 125 (3d Cir. 2016)..............................................................8

*Barragan v. Honeywell Int'l Inc.,*
2024 WL 5165330 (D.N.J. Dec. 19, 2024)......................................26

*Berkelhammer v. ADP TotalSource Grp.,*
2024 WL 5220126 (D.N.J. Dec. 26, 2024)......................................15

*Bodor v. Maximus Fed. Servs., Inc.,*
2021 WL 4941503 (E.D. Pa. Oct. 22, 2021) ...................................14

*Boley v. Universal Health Servs., Inc.,*
36 F.4th 124 (3d Cir. 2022)......................................................27, 28

*Braden v. Wal-Mart Stores, Inc.,*
588 F.3d 585 (8th Cir. 2009)....................................................35, 36

*Brotherston v. Putnam Invs., LLC,*
907 F.3d 17 (1st Cir. 2018) .............................................................10

*Browe v. CTC Corp.,*
15 F.4th 175 (2d Cir. 2021)..............................................................21

*CIGNA Corp. v. Amara,*
563 U.S. 421 (2011)........................................................................15

*City of Columbus v. Trump,*
453 F. Supp. 3d 770 (D. Md. 2020).................................................15

*Collins v. Yellen,*
594 U.S. 220 (2021).........................................................................7

iii

*Constitution Party v. Aichele*,
  757 F.3d 347 (3d Cir. 2014)................................................................8

*Cottrell v. Alcon Lab'ys.*,
  874 F.3d 154 (3d Cir. 2017)...........................................................8, 16

*Danvers Motor Co. v. Ford Motor Co.*,
  432 F.3d 286 (3d Cir. 2005)...........................................................8, 23

*Dieffenbach v. Barnes & Noble, Inc.*,
  887 F.3d 826 (7th Cir. 2018)............................................................14

*DiFelice v. U.S. Airways, Inc.*,
  497 F.3d 410 (4th Cir. 2007)........................................................37, 38

*Donovan v. Bierwirth*,
  754 F.2d 1049 (2d Cir. 1985)..............................................20, 21, 22

*Finkelman v. NFL*,
  810 F.3d 187 (3d Cir. 2016)...........................................................8, 27

*Finkelman v. NFL*,
  877 F.3d 504 (3d Cir. 2017)............................................................24

*Geissal v. Moore Med. Corp.*,
  524 U.S. 74 (1998)........................................................................26

*Gimeno v. NCHMD, Inc.*,
  38 F.4th 910 (11th Cir. 2022)..........................................................15

*Graden v. Conexant Sys. Inc.*,
  496 F.3d 291 (3d Cir. 2007)..............................................21, 22, 24

*Harzewski v. Guidant Corp.*,
  489 F.3d 799 (7th Cir. 2007)............................................................24

*HIV & Hepatitis Policy Inst. v. U.S. Dept. of Health & Human Servs.*,
  2023 WL 10669681 (D.D.C. Dec. 22, 2023)....................................13

*Horvath v. Keystone Health Plan East, Inc.*,
  333 F.3d 450 (3d Cir. 2003)............................................................21

*Hughes v. Nw. Univ.*,
  595 U.S. 170 (2022)..................................................................................34

*Hutchins v. HP Inc.*,
  737 F.Supp.3d 851 (N.D. Cal. 2024)......................................................26

*ICTSI Or., Inc. v. Int'l Longshore & Warehouse Union*,
  2022 WL 16924139 (D. Or. Nov. 14, 2022)............................................20

*Johnson v. PNC Fin. Servs. Grp., Inc.*,
  2022 WL 973581 (W.D. Pa. Mar. 31, 2022) .....................................33, 35

*Knudsen v. MetLife Grp., Inc.*,
  117 F.4th 570 (3d Cir. 2024).............................................................*passim*

*Kruchten v. Ricoh USA, Inc.*,
  2024 WL 3518308 (3d Cir. July 24, 2024).......................................33, 34

*Mator v. Wesco Distrib., Inc.*,
  102 F.4th 172 (3d Cir. 2024).............................................................*passim*

*McCaffree Fin. Corp. v. ADP, Inc.*,
  2023 WL 2728787 (D.N.J. Mar. 31, 2023)..............................................37

*McGowan v. Barnabas Health, Inc.*,
  2021 WL 1399870 (D.N.J. Apr. 13, 2021)........................................33, 39

*MSPA Claims 1, LLC v. Tenet Fla., Inc.*,
  918 F.3d 1312 (11th Cir. 2019)...............................................................14

*Navarro v. Wells Fargo & Co.*,
  2025 WL 897717 (D. Minn. Mar. 24, 2025) ...........................................25

*Nicolas v. Trs. of Princeton Univ.*,
  2017 WL 4455897 (D.N.J. Sept. 25, 2017) .............................................33

*Peterson v. Ins. Servs. Off., Inc.*,
  2021 WL 1382168 (D.N.J. Apr. 13, 2021)..............................................33

*Pfeil v. State St. Bank & Tr. Co.*,
  671 F.3d 585 (6th Cir. 2012)...................................................................37

*Pinnell v. Teva Pharms. USA, Inc.*,
  2020 WL 1531870 (E.D. Pa. Mar. 31, 2020)....................................................33

*Rodriguez v. Intuit, Inc.*,
  744 F.Supp.3d 935 (N.D. Cal. 2024)............................................................25

*Sigetich v. Kroger Co.*,
  2023 WL 2431667 (S.D. Ohio Mar. 9, 2023)................................................25

*Silva v. Enovik Corp.*,
  2020 WL 12574912 (D.N.J. Dec. 30, 2020)..................................................33

*Sweda v. Univ. of Pa.*,
  923 F.3d 320 (3d Cir. 2019).................................................................*passim*

*Tibble v. Edison Int'l*,
  843 F.3d 1187 (9th Cir. 2016) (en banc) ......................................................30

*TransUnion LLC v. Ramirez*,
  594 U.S. 413 (2021).......................................................................................7

*In re U.S. Off. of Pers. Mgmt. Data Sec. Breach Litig.*,
  928 F.3d 42 (D.C. Cir. 2019) ......................................................................14

*Van v. LLR, Inc.*,
  962 F.3d 1160 (9th Cir. 2020).....................................................................14

**Statutes and Regulations**

29 U.S.C. § 1001(a) ...........................................................................................29

29 U.S.C. § 1104................................................................................................29

29 U.S.C. § 1104(a)(1)(A) .................................................................................30

29 U.S.C. § 1104(a)(1)(B) .................................................................................30

29 U.S.C. § 1109(a) ...........................................................................................15

29 U.S.C. § 1132(a)(2).......................................................................................15

29 U.S.C. § 1132(a)(3).......................................................................................15

84 Fed. Reg. 17454 (Apr. 25, 2019)..................................................................13

**Other Authorities**

DOL, Meeting Your Fiduciary Responsibilities (Sept. 2021) *available at* https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/publications/meeting-your-fiduciary-responsibilities-booklet-2021.pdf.....................................................................30

Restatement (Third) of Trusts § 88 cmt. a (2007).................................................30

## **INTRODUCTION**

Congress enacted ERISA with a singular purpose: to protect hard-earned employee benefits from erosion through fiduciary misconduct and imprudence. When fiduciaries of an employer-sponsored health plan squander plan assets, ERISA's remedial provisions command restoration of the wasted funds to the plan and its participants. This case presents a textbook example of fiduciary neglect: Defendants—Johnson & Johnson and its Pension & Benefits Committee—handed control of the Plan's prescription-drug program to Express Scripts with virtually no oversight, enabling Express Scripts to extract staggering markups that forced participants to pay inflated costs for essential medications while enriching the very service provider Defendants were duty-bound to monitor.

Plaintiffs Ann Lewandowski and Robert Gregory were among the tens of thousands of J&J employees adversely affected by these overcharges. This Court previously dismissed Ms. Lewandowski's claims for lack of Article III standing, but the Second Amended Complaint ("SAC") remedies those deficiencies. Plaintiffs allege two forms of monetary harm that independently establish standing. First, Plaintiffs paid inflated costs at the pharmacy counter—injuries this Court previously recognized as "clear" and "traceable to Defendants' alleged ERISA violations." ECF 70 at 10. While this Court previously ruled that these injuries were not redressable because Ms. Lewandowski "reached her prescription drug cap," *id*. at 11, the SAC

corrects this deficiency by: (1) adding Mr. Gregory, who did not reach his prescription drug cap in any year, and (2) showing that Ms. Lewandowski reached her cap only as an accounting matter, not in terms of her actual out-of-pocket outlays.

Second, Plaintiffs paid higher premium contributions due to Defendants' mismanagement. The SAC remedies the Court's concerns about speculation by (1) detailing how the self-funded nature of the J&J Plan means that Plaintiffs always paid a portion of the Plan's expenses—including overcharges for prescription drugs, and (2) citing extensive research confirming the link between higher costs and higher premium contributions. Indeed, Defendants now *admit* that "the costs of [] prescription drugs" affected premium levels. ECF 75-2, PageID 987, ¶ 2.

Defendants' merits arguments are likewise unavailing. Each of Defendants' arguments directly contradicts binding Third Circuit precedent and ignores or mischaracterizes the SAC's allegations. Plaintiffs are not required to directly allege how Defendants' process for managing the Plan was flawed, but they have done so. Plaintiffs are not required to support their cost allegations with any comparisons to other plans, but once again, they have done so. And Plaintiffs are not obligated to rebut Defendants' so-called explanation for the challenged conduct, but regardless, they have done that too.

## **BACKGROUND**

Employees and retirees of Johnson & Johnson ("J&J") and its affiliated

companies receive healthcare benefits, including prescription-drug benefits, through the J&J Group Health Plan and its component plans (the "Plan"). SAC ¶¶ 14-15. Plaintiffs are two examples. Ms. Lewandowski worked for J&J from November 2021 until April 2024 and participated in the Salaried Medical Plan component of the Plan. *Id.* ¶ 12. After J&J terminated her employment, she continued her coverage pursuant to the Consolidated Omnibus Budget Reconciliation Act ("COBRA"), until October 2024. *Id.* Mr. Gregory worked for J&J from June 1999 until September 2020, and currently remains enrolled in the Plan as a retiree. *Id.* ¶¶ 13, 211.

J&J is the Plan sponsor and a fiduciary of the Plan, and has appointed the Pension & Benefits Committee of J&J ("Committee") to assist it in administering the Plan and carrying out its fiduciary functions. *Id.* ¶¶ 17-18.[1] As Plan fiduciaries, J&J and the Committee ("Defendants") have a duty to manage the Plan prudently and in the interest of participants and beneficiaries. *Id.* ¶¶ 25-27. This includes a responsibility to monitor Plan service providers and minimize costs. *Id.* ¶¶ 27-28.

## I.    Defendants' Mismanagement of J&J's Prescription Drug Program.

Defendants contracted with Express Scripts to serve as the Plan's pharmacy benefit manager ("PBM"), setting terms for drug pricing, formulary management, pharmacy networks, and administrative services. *Id.* ¶ 94. However, instead of prudently managing the prescription drug program and carefully monitoring the

---

[1] J&J has stipulated that it is responsible for "the actions or omissions of J&J or the Committee" and "any current or former members of the Committee." *Id.* ¶ 18.

PBM, Defendants gave Express Scripts free rein, with no meaningful oversight. *Id.* ¶¶ 8, 92, 274, 280. This enabled Express Scripts to engage in harmful practices like imposing excessive spread pricing, retaining manufacturer rebates/revenue sharing (instead of passing them on the Plan and its participants), steering participants to its own higher-cost pharmacy, and structuring formularies to favor higher-cost drugs. *Id.* ¶¶ 15, 41, 47, 52, 98-101, 130-40. Express Scripts' profits soared, while participants shouldered the burden of inflated drug prices, higher premiums, and rising out-of-pocket costs. *Id.* ¶¶ 3, 141, 192, 274, 281

In one example, Express Scripts charged the Plan and participants a staggering $10,239.69 for a 90-day supply of the generic drug teriflunomide (used to treat multiple sclerosis), despite the pharmacy's acquisition cost being just $81.90. *Id.* ¶ 116. This reflects an astonishing markup of **12,403%**. *Id.* Meanwhile, a participant could have purchased the same prescription at retail for a fraction of the cost *without even using insurance* – $40.55 at Wegmans or $77.41 at Rite Aid. *Id.* ¶ 117. This is by no means an isolated example: Across all generic-specialty drugs for which there is publicly available data on acquisition costs, Defendants agreed to make the Plan and its participants pay, on average, a markup of **498%**. *Id.* ¶¶ 5, 118.

The markups are also excessive for non-specialty generics. *Id.* ¶ 125. For instance, the drug valacyclovir, which has an average acquisition cost of $82.80, was priced at $303.68 – a **267%** markup. *Id.* ¶¶ 126, 221. Ms. Lewandowski paid that

inflated amount out-of-pocket. *Id.* ¶ 221. Across all generic drugs prescribed to Ms. Lewandowski since August 2022, Defendants' negotiated prices reflect an average **230%** markup. *Id.* ¶¶ 6, 127.  Likewise, Mr. Gregory was forced to pay more than twice the pharmacy acquisition cost for his prescriptions. *Id.* ¶¶ 6, 235-36. The other generic drugs available under the Plan are similarly overpriced. *Id.* ¶ 128.

A prudent fiduciary would never have agreed to these exorbitant costs. In addition, Defendants further mismanaged the Plan's prescription drug program by:

1. *Failing to conduct an open bidding process for PBM services*, which would have revealed alternative PBMs offering the same drugs at up to 90% lower cost. *Id.* ¶¶ 61, 95, 101, 145-149.

2. *Hiring a conflicted consultant* with financial ties to PBMs to assist in the PBM selection and negotiation process. *Id.* ¶¶ 63-68, 97.

3. *Allowing Express Scripts to steer participants to its own mail-order pharmacy*, Accredo, whose drug prices are routinely higher. *Id.* ¶¶ 131-36.

4. *Failing to promote lower cost-generics over brand-name drug options*, based on Express Scripts' biased recommendations. *Id.* ¶¶ 137-140.

For over a decade, media and research organizations have warned about unmonitored PBMs, exposing how negligent administrators allow PBMs to enrich themselves at plan participants' expense. ¶¶ 151-172. Even J&J acknowledged the growing problem, yet failed to take action to protect Plan participants. *Id.* ¶¶ 173-176. Meanwhile, other fiduciaries saved millions of dollars by engaging in competitive bidding and effectively managing drug costs, proving that responsible administration is not only possible, but also financially prudent. *Id.* ¶¶ 177-191.

5

## II.    Financial Harm to Plaintiffs and Other Participants

Defendants' fiduciary failures harmed Plan participants like Plaintiffs. Among other things, Plaintiffs suffered higher out-of-pocket drug costs and higher premiums to cover the cost of their drug coverage. *Id.* ¶¶ 3, 73-76, 141, 192-197, 206-240.

***Higher Out-of-Pocket Costs*.** While the Plan provided a prescription-drug benefit, not all drug costs were paid by the Plan. Plaintiffs and other participants were typically responsible for the entire cost of their drugs until they met their deductible, and remained responsible for a co-pay or co-insurance amount until hitting their out-of-pocket maximum. *Id.* ¶ 74. As a result, Plaintiffs and other participants suffered a direct financial injury from inflated drug prices because they paid all or a portion of the inflated prices at the pharmacy counter. *Id.* ¶ 100, 200. As detailed below (Argument § I.B), both Plaintiffs suffered this form of harm.

***Higher Premium Contributions*.**  For the portion of drug costs that were paid by the Plan, Defendants passed a consistent percentage of those costs on to Plaintiffs and other participants through premium contributions. *Id.* ¶ 194.[2] Under J&J's fixed cost-sharing structure, participants generally paid 17-18% of total Plan expenses, ensuring that inflated drug costs automatically increased their required premium payments. *Id.* ¶¶ 205-06. As a result, Plaintiffs suffered a direct financial injury every

---

[2] This is true regardless of the specific drugs purchased by Plaintiffs and other participants, since the Plan's costs are spread across the Plan and all of its participants. *Id.* ¶¶ 80, 125. Such is the nature of insurance.

month when these elevated premiums were deducted from their paychecks.

## III.    Plaintiffs' Claims

In Counts 1 and 2, Plaintiffs allege that Defendants breached their fiduciary duties under 29 U.S.C. § 1104 by failing to prudently manage the Plan's prescription drug program and carefully monitor the Plan's PBM and prescription drug costs, entitling Plaintiffs and the class to plan-wide relief under 29 U.S.C. §§ 1109(a) and § 1132(a)(2), and other equitable relief pursuant to 29 U.S.C. § 1132(a)(3).

## ARGUMENT

## I.    Plaintiffs Have Standing to Assert their Breach of Fiduciary Duty Claims

Defendants once again challenge Plaintiffs' standing to assert their breach of fiduciary duty claims. However, they gloss over certain aspects of the Court's earlier Opinion (including its determination that Ms. Lewandowski suffered an injury-in-fact from higher out-of-pocket drug costs), and fail to engage with the additional facts pled by Plaintiffs, which resolve the issues the Court previously identified.

### A.    The Threshold for Standing Is Not "Mount Everest"

To satisfy Article III standing, Plaintiffs must allege: (1) an injury in fact; (2) traceable to the challenged action of the defendant; (3) that would likely be redressed by judicial relief. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). This "is not Mount Everest." *Knudsen v. MetLife Grp., Inc.*, 117 F.4th 570, 577 (3d Cir. 2024). Any financial injury suffices. *Collins v. Yellen*, 594 U.S. 220, 222 (2021).

When assessing standing, courts must "assume … that a plaintiff has stated valid legal claims." *Cottrell v. Alcon Lab'ys.*, 874 F.3d 154, 162 (3d Cir. 2017). In addition, the complaint's allegations must be "accept[ed] as true" and the Court must draw all inferences "in favor of the plaintiff." *Danvers Motor Co. v. Ford Motor Co.*, 432 F.3d 286, 288 (3d Cir. 2005). The same "plausibility" standard that applies to 12(b)(6) motions applies to allegations on standing. *Finkelman v. NFL*, 810 F.3d 187, 194 (3d Cir. 2016). Accordingly, accepting as true that Defendants caused the Plan and its participants to overpay for prescription drugs, the question before the Court is whether it is plausible—not certain, but plausible—that these overpayments harmed Plaintiffs in any amount and can be redressed by judicial relief.[3]

## B. The Allegations of Higher Out-of-Pocket Costs Support Standing.

### 1. Injury-in-Fact

In the SAC, Plaintiffs allege that they personally paid for prescriptions they purchased through the Plan, either in full (where they had not met their deductible)

---

[3] Defendants mischaracterize their motion as a "factual" challenge when it is really a "facial" challenge. *See generally Constitution Party v. Aichele*, 757 F.3d 347, 357-58 (3d Cir. 2014). A "factual" challenge is one that accepts the sufficiency of the complaint as written, but contends that the allegations are factually false. *Id.* A "facial" challenge, in contrast, accepts the allegations as true and challenges only their sufficiency. *Id.* Defendants' challenge is "facial": it does not argue that Plaintiffs' allegations are false, but that the facts as pleaded do not establish standing. *See, e.g.*, Defs.' Br.11 ("Plaintiffs' premium allegations do not establish Article III standing."). While Defendants attached evidence to their motion, that evidence does not dispute any allegation in the SAC. The Court may consider this additional information, *see In re Asbestos Prods. Liab. Litig.*, 822 F.3d 125, 133 n.7 (3d Cir. 2016), but it does not make Defendants' challenge a "factual" one. "A factual attack requires a factual dispute, and there is none here." *Const. Party*, 757 F.3d at 358.

or in part (where subject to co-insurance). SAC ¶ 74; *see also id.* ¶¶ 13, 218. Plaintiffs allege that their out-of-pocket costs for these drugs were unreasonable and higher than they would have been but for Defendants' unlawful conduct. *See id.* ¶¶ 192, 213, 218-21, 227, 230, 234-38, 240, 275, 281. Based on the same allegations, this Court previously determined that Ms. Lewandowski "suffered an injury-in-fact that is traceable to Defendants' alleged ERISA violations." ECF 70 at 10.

Defendants ignore the Court's earlier finding of an injury-in-fact, and there is no reason to depart from it. Contrary to Defendants' arguments, there is nothing "speculative" about Plaintiffs' allegations with respect to increased out-of-pocket costs. Plaintiffs allege that they ***directly*** bore these costs at the pharmacy counter and precisely identify the amounts they were overcharged. SAC ¶¶ 220-21, 227, 235-36.

Defendants' argument regarding their "discretion to set premiums and participant contribution[] levels," Defs.' Br. 17, has nothing to with out-of-pocket costs. Defendants are improperly conflating Plaintiffs' injury from higher out-of-pocket costs with their injury from increased premiums, which is addressed below.

Similarly, the fact that the Plan paid some (or even most) of the charges for Plaintiffs' prescription drugs is a red herring, and irrelevant to whether Plaintiffs suffered an injury-in-fact by overpaying for medications that they personally paid for. The focus of the injury-in fact inquiry is "*whether* the plaintiff suffered harm," not how much. *Knudsen*, 117 F.4th at 577. Plaintiffs do not need to show that their

financial injury exceeded J&J's benefit payments on their behalf. *See Brotherston v. Putnam Invs., LLC*, 907 F.3d 17, 29 (1st Cir. 2018) ("Putnam's discretionary contributions … are irrelevant to the analysis. … To hold otherwise would be to allow employers to claw back with their fiduciary hands compensation granted with their employer hands."). J&J's payments were earned compensation, not charity.

Finally, it is Defendants who speculate by asserting that the markup on the drugs Plaintiffs purchased may have been offset by "savings on other drugs." *See* Defs.' Br. 18. Plaintiffs expressly allege otherwise, *see* SAC ¶ 129,[4] and Defendants offer no evidence to dispute this allegation. *See infra* at § II.B.2. Defendants do not identify even a single drug that Plaintiffs purchased below market cost, much less that any purported underpayments exceeded the overpayments. Tellingly, Defendants assert only that the "the Plan *may* have provided savings on other drugs," not that it did. Defs.' Br. 18 (emphasis added). Such "may have" allegations do not make – or break – the injury-in-fact analysis. *See Knudsen*, 117 F.4th at 582.

### 2.    Traceability

The traceability requirement is also satisfied. Plaintiffs expressly allege that their higher out-of-pocket costs were the "result of Defendants' fiduciary breaches." SAC ¶ 192. Defendants do not contest traceability with respect to Mr. Gregory, and

---

[4] Defendants wrongly assert that the SAC alleges only that "57" drugs covered by the Plan were overpriced. Defs.' Br.14. The SAC alleges that the Plan's *entire* formulary was overpriced. *See infra* Part II.B.1; SAC ¶¶ 85, 125-29, 235-37.

this Court has already determined that Ms. Lewandowski's higher out-of-pocket drug costs were "traceable to Defendants' ERISA violations." ECF 70 at 10.

Despite the Court's prior ruling, Defendants argue that Ms. Lewandowski's overpayments are not traceable to them "given the way [her] copay assistance card worked." Defs.' Br. 19. This conflates two separate transactions. Ms. Lewandowski paid the full cost of her valacyclovir and tizanidine prescriptions—which were marked up approximately 270%—out of her own pocket because she had not yet met her deductible. SAC ¶¶ 220-21. None of these charges were covered by her copay assistance card. *See id.* ¶ 229. Instead, the copay card was used to pay for an infusion of a different drug, *id.* ¶ 224, which Defendants admit was a separate treatment that was "not part of the prescription drug benefit." ECF 75-2 at PageID 993 n.2. Thus, her overpayments for tizanidine and valacyclovir have nothing to do with her copay card, and are fully traceable to Defendant's fiduciary misconduct.

### 3.    Redressability

The only reason the Court previously found standing lacking for Ms. Lewandowski's out-of-pocket harm was redressability. Specifically, the Court found that her "injury is not redressable because … she ha[d] reached her prescription drug cap for each year" during the relevant period. ECF 70 at 11. The Court "expresse[d] no opinion as to the standing of a hypothetical plaintiff in the same situation who has *not* reached its annual out-of-pocket cap for expenditures." *Id.* at n.7

11

### a.    Plaintiff Gregory

The Court's redressability concerns regarding Ms. Lewandowski do not apply to Mr. Gregory because it is undisputed that he did not hit his out-of-pocket maximum in any relevant year. *See* ECF 75-2 at PageID 996-97 (stating that "Mr. Gregory's family out-of-pocket maximum is $12,000" and showing that his "Total Patient Responsibility" never came close to that in any year). Defendants do not advance any redressability argument with respect to Mr. Gregory.

### b.    Plaintiff Lewandowski

With respect to Ms. Lewandowski, the new allegations in the SAC show that she personally paid more in out-of-pocket costs than she otherwise would have, even though she nominally hit her out-of-pocket maximum. The SAC's new allegations, *see* SAC ¶¶ 213-30, describe the circumstances and accompanying harm in meticulous detail. Ms. Lewandowski's ***actual*** out-of-pocket payments in 2023 were $979.57, and absent Defendants' misconduct, those payments would have been $210 less, or $769.57. *Id.* ¶ 227. Defendants conspicuously do not dispute the math, *i.e.,* that if Ms. Lewandowski had paid less for these drugs, she would have paid less out-of-pocket overall notwithstanding the out-of-pocket cap. *See id.* ¶¶ 227-29.

The reason Ms. Lewandowski did not actually pay the full $3,500 out-of-pocket maximum is because after paying for tizanidine and valacyclovir out-of-pocket, she used a copayment assistance card to pay for an expensive infusion

treatment. *Id.* ¶¶ 222-29. Critically, the amount covered by the copay assistance card counted toward her out-of-pocket maximum pursuant to federal law and Plan terms. *Id.* ¶ 225. The result, as detailed in the SAC, is that the inflated amounts she paid for valacyclovir and tizanidine caused her to pay about $210 more out-of-pocket in 2023 than she would have absent Defendants' fiduciary misconduct. *See id.* ¶¶ 213-30.

| Actual Spending, 2023 | | | | |
|---|---|---|---|---|
| Expense | Charged to Plaintiff | Paid OOP by Plaintiff | Paid by Copay Card | Counted as OOP by Plan |
| Valacyclovir | $303.68 | $303.68 | $0 | $303.68 |
| Tizanidine | $18.72 | $18.72 | $0 | $18.72 |
| Other drugs and medical services | $594.34 | $594.34 | $0 | $594.34 |
| Infusion | $2,583.26 | $62.83 | $2,520.43 | $2,583.26 |
| TOTAL for Year | $3,500.00 | $979.57 | $2,520.43 | $3,500.00 |

| Spending Absent Defendants' Unlawful Conduct, 2023 | | | | |
|---|---|---|---|---|
| Expense | Charged to Plaintiff | Paid OOP by Plaintiff | Paid by Copay Card | Counted as OOP by Plan |
| Valacyclovir | $103.68 | $103.68 | $0 | $103.68 |
| Tizanidine | $8.72 | $8.72 | $0 | $8.72 |
| Other drugs and medical services | $594.34 | $594.34 | $0 | $594.34 |
| Infusion | $2,793.26 | $62.83 | $2,730.43 | $2,793.26 |
| TOTAL for Year | $3,500.00 | $769.57 | $2,730.43 | $3,500.00 |

Defendants do not dispute these allegations, and do not advance any unique redressability arguments. They merely argue that "[t]he Plan was not required to credit the copay assistance card payment toward Ms. Lewandowski's out-of-pocket maximum." Defs.' Br. at 20. That is both wrong and irrelevant. Federal law does, in fact, require Defendants to credit copay card payments.[5] And even if the law were

---

[5] *See* Patient Protection & Affordable Care Act; HHS Notice of Benefit Payment Parameters for 2020, 84 Fed. Reg. 17454, 17545 (Apr. 25, 2019) ("amounts paid toward cost sharing using any form of direct support offered by drug manufacturers must be counted toward the annual limitation on cost sharing"); *HIV & Hepatitis Policy Inst. v. U.S. Dept. of Health & Human Servs.*, 2023 WL 10669681, at *3 (D.D.C. Dec. 22, 2023) (reinstating this rule after vacating subsequent rule that would have "permitted … group health plans to decline to credit certain financial assistance provided to patients by drug manufacturers when calculating whether those patients have met their cost-sharing obligations").

otherwise, Defendants *did* credit the copay assistance card payments, and because they did so, they cannot rely on the out-of-pocket maximum to negate Plaintiffs' injury. Plaintiffs are not alleging a "failure to let Ms. Lewandowski use a copay assistance card to offset" her out-of-pocket maximum (Defs.' Br. at 20); to the contrary, Plaintiffs allege that given Defendants' decision[6] to count the copay card payments against her out-of-pocket maximum, they cannot assert that she would have wound up in the same place financially regardless of her drug overpayments.

Even if Ms. Lewandowski had not paid more out-of-pocket costs *in total* (which she did), there is no dispute that she paid those out-of-pocket costs "sooner that she otherwise would have." SAC ¶ 231. Contrary to Defendants' arguments, it is well-established that "[t]he temporary loss of use of one's money constitutes an injury in fact for purposes of Article III." *Van v. LLR, Inc.*, 962 F.3d 1160, 1164 (9th Cir. 2020); *see also, e.g.*, *MSPA Claims 1, LLC v. Tenet Fla., Inc.*, 918 F.3d 1312, 1318 (11th Cir. 2019); *In re U.S. Off. of Pers. Mgmt. Data Sec. Breach Litig.*, 928 F.3d 42, 66 (D.C. Cir. 2019); *Dieffenbach v. Barnes & Noble, Inc.*, 887 F.3d 826, 828 (7th Cir. 2018). Simply put, "Plaintiff's claims to economic loss, even temporary, is a concrete and actual injury sufficient to establish standing." *Bodor v. Maximus Fed. Servs., Inc.*, 2021 WL 4941503, at *2 (E.D. Pa. Oct. 22, 2021).

*    *    *

---

[6] This is not a situation involving "a plaintiff's 'purely voluntary decision' not attributable to a defendant." Defs.' Br. 20 (citation omitted).

14

To redress and recoup the excess drug charges they paid out-of-pocket, Plaintiffs seek (among other things) equitable monetary relief in the form of a surcharge. *See* SAC ¶¶ 282, 294; *see also id.* ¶ 31. Defendants do not deny that this relief is available under ERISA—nor could they, as the Supreme Court has ruled that surcharge is one of the equitable remedies available against breaching fiduciaries under 29 U.S.C. § 1132(a)(3). *CIGNA Corp. v. Amara,* 563 U.S. 421, 442 (2011). "Since Amara, every circuit court to address the issue has recognized that Section 1132(a)(3) creates a cause of action for monetary relief for breaches of fiduciary duty." *Gimeno v. NCHMD, Inc.*, 38 F.4th 910, 914-15 (11th Cir. 2022) (citing numerous cases); *see also Berkelhammer v. ADP TotalSource Grp.*, 2024 WL 5220126, at *2 (D.N.J. Dec. 26, 2024). Mr. Gregory, as a current Plan participant, also seeks injunctive relief and other prospective equitable relief. SAC ¶¶ 296-97. Defendants do not dispute that these injunctive and equitable remedies also are available under ERISA. *See* 29 U.S.C. §§ 1132(a)(2), 1132(a)(3), § 1109(a).

### C. Plaintiffs' Allegations of Higher Premiums Support Standing

Plaintiffs also allege Article III injury in the form of inflated monthly premiums. *See City of Columbus v. Trump*, 453 F. Supp. 3d 770, 787 (D. Md. 2020) ("[An] increase in premiums constitutes economic harm and is therefore a classic and paradigmatic form of injury in fact."). In self-funded plans like J&J's, all plan expenses must be paid with money contributed by either the employer or plan

participants. Accepting Plaintiffs' allegation that drug costs were inflated, *see Cottrell*, 874 F.3d at 162, the question is whether it is plausible that Plaintiffs bore a portion of those overcharges as increased premium contributions, as opposed to J&J bearing all overcharges itself. The answer is yes for both Plaintiffs.

### 1.    Because the Plan Is Self-Funded, Plaintiffs and Other Plan Participants Paid a Portion of the Plan's Overpayments Each Year.

Employer-sponsored health plans can either be "fully-insured" or "self-funded." In a fully-insured plan, a third-party insurance company bears the insurance risk and pays all covered medical expenses incurred by plan participants. The J&J Plan, in contrast, is a self-funded plan, which means that the Plan itself bears all insurance risk and pays all covered medical expenses incurred by plan participants. *See* SAC ¶¶ 16, 76. While administrative functions may be performed by third-party service providers, those entities are "not responsible for any of the plan's expenses or actuarial risks." *Id.* ¶ 76. Instead, the Plan must pay 100% of all medical expenses, including prescription-drug costs, fees, and other healthcare claims. *Id.* ¶¶ 16, 76.

The fact that ***the Plan*** is responsible for covered expenses does not mean that ***J&J*** foots the entire bill. Rather, the Plan pays its bills through a trust fund financed by a combination of (1) employer contributions and (2) participant contributions deducted from their paychecks. *See* ECF 75-2 at PageID 942, ¶ 4.02 ("Benefits under this Plan shall be funded through contributions made by the Company and by

16

enrolled Participants."). Defendants determine the amount of these contributions "before each Plan year," ECF 75-2 at PageID 987, ¶ 2, based on an actuarial projection of the Plan's expenses, SAC ¶¶ 193-97. During the class period, Defendants consistently required participants to pay about 17-18%, with J&J paying the remaining 82-83%. SAC ¶¶ 195-96.

Because Plan participants like Plaintiffs were required to pay a fixed percentage of Plan expenses each year, they necessarily were harmed by the Plan's overpayments for prescription drugs. In 2020, for example, Defendants required participants to pay 17.24% of total Plan expenses, with J&J covering the other 82.76%. That year, total Plan expenses were $835.72 million, so participants' 17.24% share was $144.11 million. If Defendants had acted prudently and reduced prescription drug costs by, *e.g.*, $50 million, that would have lowered total Plan expenses to $785.72 million and participants' 17.24% share to $135.46 million—an $8.62 million reduction in total participant contributions, or $170.90 per participant.

The same analysis applies for the entire class period. Each year, Defendants "passed through" a set percentage of Plan expenses to Plan participants. SAC ¶ 195. If Plan expenses had been lower, participants' percentage of the lower amount would have been lower as well. Defendants' failure to achieve those lower prices therefore resulted in Plaintiffs and Plan participants paying more in premium contributions— a type of injury that courts regularly find sufficient for standing. *See, e.g., AARP v.*

*EEOC*, 226 F.Supp.3d 7, 18 (D.D.C. 2016) ("An increase in premiums would certainly constitute an injury.").

Defendants argue that even if the Plan overpaid for prescription drugs, "[m]any [other] factors … can influence the amount of premiums set each year," like "administrative expenses" and "non-drug medical costs." Defs.' Br.14. That is a non-sequitur. Defendants admit that the "costs of [] prescription drugs" affect overall Plan spending. ECF 75-2 at PageID 987; *see also* SAC ¶ 201. When fiduciary misconduct inflated this major cost category, it necessarily increased total Plan spending and, by extension, participant premium contributions under J&J's chosen cost-sharing structure. Defendants' position asks the Court to ignore a significant cost driver simply because it is not the *only* cost driver—a standard that would allow fiduciaries to escape liability for misconduct merely because their plan has multiple expense categories, as virtually all plans do.

### 2. There Is an Empirical Link Between Increased Costs and Increased Employee Premiums

The SAC's allegations that Plaintiffs paid more in premium contributions than they would have paid absent Defendants' fiduciary failure to monitor and control prescription drug costs is supported by government studies and empirical research. The Federal Trade Commission has explicitly found that inflated drug costs "result in higher premiums" for recipients of employer-provided insurance. *Id.* ¶ 76. And independent research confirms this link. *Id.* ¶¶ 200-205.

- A 2023 report by the Center for American Progress, an independent nonpartisan policy institute, found that inflated drug prices "ultimately raise[] costs for consumers through higher cost sharing and premiums." *Id.* ¶ 200.

- A 2023 article about PBMs also notes the connection between premiums and the higher costs of drugs, explaining that when drug costs increase, premium costs increase as well, because "[i]nsurance premiums and copayments are based on list prices." *Id.* ¶ 202.

- An article from the Peterson Center on Healthcare states, "Prescription drugs are one of the leading contributors to health spending growth," and that "growth in prescription drug spending may have a relatively large effect on employer-sponsored health insurance premiums." *Id.* ¶ 203.

- In a 2024 report, RAND Corporation (a nonprofit, nonpartisan research organization) found that "[h]igher drug spending will, holding all else constant, lead to higher premiums." *Id.* ¶ 204. The report also found that, for employer-sponsored health insurance coverage, "[t]he employer share of the premium remained steady at 82-83 percent per year across 2014-2023." *Id.*

The RAND report's findings—that the employer's share of the premium remains steady at close to 82 to 83 percent even when healthcare costs go up—align perfectly with Defendants' practice of maintaining employee contributions at 17 to 18 percent. *Id.* ¶ 205. As a result, participants necessarily bore a portion of the excess costs.

### 3.    Defendants' Unfounded Speculation Is Improper and Unavailing.

Unable to deny real-world facts about how Plan expenses were passed through to Plan participants each year, Defendants resort to speculation. They suggest that in a hypothetical world in which they acted prudently and reduced the Plan's prescription drug spending, they might have also changed the participant contribution percentage from their standard 17-18% to some higher percentage that

19

would have resulted in participant contributions remaining at the same absolute amount despite the overall Plan savings. *See, e.g.*, Defs.' Br.14 ("If Plan costs had been lower, the Plan could have charged the same amounts."); *id*. at 17 (noting "the plan sponsor's discretion to change those premiums").

Defendants' speculation is legally irrelevant. In assessing the "but-for" world in which the defendant did not engage in unlawful conduct, "the but-for scenario differs from what actually happened *only with respect to the harmful act*." Fed. Judicial Center, Reference Guide on Estimation of Econ. Damages, Reference Manual on Scientific Evid. 432 (3d ed. 2011) (emphasis added). The "actual real world conditions during the entire damages period" are held constant, "with the only fantastical element being that the unlawful conduct did not occur." *ICTSI Or., Inc. v. Int'l Longshore & Warehouse Union*, 2022 WL 16924139, at *9 (D. Or. Nov. 14, 2022). Thus, the real-world contribution percentage that J&J selected remains the same. The only question is whether Plaintiffs' contribution would have been lower, at that percentage, if the Plan's overall spending was lower. The answer is yes.

This is a well-established principle under ERISA. When an ERISA fiduciary imprudently invests plan assets, the amount of loss is the difference between "what the Plan actually earned on the [imprudent] investment [and] what the Plan would have earned had the funds been available for other Plan purposes." *Donovan v. Bierwirth*, 754 F.2d 1049, 1056 (2d Cir. 1985). In determining "what the Plan would

have earned" in the but-for world, courts look at what the defendant actually did in the real world—they "presume that the funds would have been treated like other funds being invested during the same period in proper transactions." *Graden v. Conexant Sys. Inc.*, 496 F.3d 291, 301 (3d Cir. 2007) (quoting *Donovan*, 754 F.2d at 1056). Courts do not indulge defendants' *post hoc* speculation about how they might have invested differently in the but-for world; they instead presume that defendants would have acted just as they did in the real world, other than the misconduct itself. *Id.*; *see also Browe v. CTC Corp.*, 15 F.4th 175, 198 (2d Cir. 2021) ("[T]o limit liability on this basis [that Defendants might have acted differently in the but-for world] would breach the cardinal rule that uncertainties in fixing damages are to be resolved against the breaching fiduciary.").

Defendants' cases do not depart from these fundamental principles or authorize rewriting real-world facts. To the contrary, in *Horvath v. Keystone Health Plan East, Inc.*, 333 F.3d 450 (3d Cir. 2003), the plaintiff lacked standing precisely because the court held real-world facts constant. The employer in *Horvath* "pa[id] all premiums" itself in the real world, so the court presumed that no savings would have flowed through to the plaintiff in the but-for world. *Id.* at 452. In *Knudsen v. MetLife Group, Inc.*, 117 F.4th 570 (3d Cir. 2024), there were no relevant real-world facts to hold constant. That case involved income to the plan in form of "rebates," and rebate money had *never* been used in setting participant premiums. *Id.* at 582.

21

Without any real-world practice of rebates being shared with participants, the plaintiffs could only speculate that the plan "may have" shared them in the but-for world. *Id.* Here, in contrast, the Plan actually did pass through a known percentage of all Plan expenses to participants each year. *See, e.g.*, SAC ¶¶ 192-207; *see also* SAC ¶¶ 16, 76. Neither case authorizes ignoring these real-world, historical facts in favor of Defendants' *post hoc* speculation. *See Graden*, 496 F.3d at 301.[7]

In all events, even if Plaintiffs needed to allege that Defendants would have passed through a similar percentage of Plan expenses in the but-for world as they did in the real-world, the SAC does so. Specifically, the SAC alleges that "[i]f the Plan's costs were higher or lower in any given year, Defendants would have maintained the same static split of employee and employer contributions." SAC ¶ 195. This allegation does not stand alone: it is supported by detailed, specific factual allegations that for the past 10 years, Defendants had a policy or practice of requiring participants to cover 17-18% of Plan expenses. *See* SAC ¶¶ 196-97. This policy or practice was not dependent on the overall level of Plan spending. *Id.* In 2013, when Plan healthcare spending was $14,508 per-participant, Defendants required participants to pay 17.9%. In 2019, when spending was substantially

---

[7] Defendants assert that "holding all else constant" is "an impossibility given the size of the Plan, the innumerable inputs that affect premiums, and the plan sponsor's discretion to change those premiums." Defs.' Br. 17. As just shown, however, ERISA *requires* holding all else constant in assessing harm, with any "uncertainties" "resolved against the wrongdoer" rather than leveraged *by* the wrongdoer. *Bierwirth*, 754 F.2d at 1056; *Acosta v. City Nat'l Corp.*, 922 F.3d 880, 888 (9th Cir. 2019).

higher—$17,377 per participant—Defendants required participants to pay almost the same percentage, 17.4%. *Id.* ¶ 196 (chart). Put another way, we already know whether Defendants would have required participants to cover the same percentage of overall spending if overall spending were substantially lower, because overall spending ***was*** substantially lower several years ago, and Defendants set participant contributions at the same percentage.

This is not Plaintiffs making wild guesses in the dark; they allege actual facts about what Defendants intentionally did for 10 straight years, *i.e.*, passed through a consistent percentage of Plan expenses to participants like Plaintiffs. *Id.* ¶¶ 194-97. This is also supported by the RAND study, *supra* at 19, and it is not speculative for Plaintiffs to allege that Defendants would have done the same thing they actually did. What is speculative is Defendants' *post hoc* assertion that they may have, in some hypothetical world, scrapped their longstanding policy or practice of passing through Plan expenses. At the pleading stage, Defendants' speculation cannot be credited; all inferences must be drawn in Plaintiffs' favor. *Danvers*, 432 F.3d at 288.

Defendants argue that the SAC's detailed allegations are "indistinguishable" from the allegations rejected in *Knudsen*, 117 F.4th at 582, but Defendants' superficial analysis is wrong. *Knudsen* criticized the plaintiff for failing to specify "which [] costs increased, in what years, or by how much." 117 F.4th at 582; *see* Defs.' Br.15-16. Here, in contrast, the SAC specifies each of those things—it alleges

which costs increased (monthly premium contributions, SAC ¶¶ 192-212); in what years they increased (every year in the class period, *id.* ¶¶ 195-97); and by how much they increased (by 17-18% of the overcharge,[8] *id.* ¶ 197).

Similarly, while the *Knudsen* plaintiff did not allege that drug rebates had *ever* been "used to calculate Plan participants' [] costs and that the effect of these [rebates] would decrease costs," 117 F.4th at 582, the SAC expressly alleges, based on historical facts and the Plan's Department of Labor filings, that Defendants *always* passed through the Plan's prescription-drug expenses to participants in the form of premium contributions, SAC ¶¶ 76, 194-95, and that decreases in expenses accordingly "would result in proportionally lower employee contributions," *id.* ¶ 197. As required, Plaintiffs have "alleged a causal chain justifying *why* the [overpayments] set into motion a series of events that ultimately raised [participant contributions]." *Finkelman v. NFL*, 877 F.3d 504, 512 (3d Cir. 2017); *see* SAC ¶¶ 16, 76, 192-206. Nothing could be less speculative than alleging that Defendants would have continued the same established practice absent their ERISA violations.

### 4. Defendants' "Non-Fiduciary Function" Argument Is Not Germane to Standing and Misconstrues Plaintiffs' Claims.

Defendants argue that "J&J's decision-making on premiums is a non-

---

[8] Pleading harm as a percentage overcharge, rather than a specific amount, is proper under ERISA: "there is nothing in ERISA to suggest that a benefit must be a liquidated amount in order to be recoverable." *Graden*, 496 F.3d at 301 (quoting *Harzewski v. Guidant Corp.*, 489 F.3d 799, 807 (7th Cir. 2007)).

fiduciary function." Defs.' Br. 11. But this argument has nothing to do with standing (*i.e.*, whether Plaintiffs suffered an injury-in-fact). Instead, it goes to the merits of Plaintiffs' breach of fiduciary duty claims (*i.e.*, whether Defendants are liable for breaching their fiduciary duties). For this reason alone, Defendants' standing argument should be rejected. *See Sigetich v. Kroger Co.*, 2023 WL 2431667, at *8 (S.D. Ohio Mar. 9, 2023) ("Defendants fail to explain how this analysis goes to the Court's standing inquiry.").[9]

In any event, Defendants' argument misconstrues Plaintiffs' allegations and the scope of their fiduciary duties. Plaintiffs do not allege that Defendants breached their fiduciary duties by setting employee premium contributions at 17-18% of total Plan expenses. Rather, Plaintiffs allege that *given the cost-sharing arrangement Defendants chose to adopt*, which shifted some of the cost for prescription drugs to Plan participants, Defendants had a duty to monitor those costs and ensure they were reasonable—a duty they breached. SAC ¶¶ 273-75, 279-281. Thus, Plaintiffs' claims do not challenge "non-fiduciary" functions. *See Rodriguez v. Intuit, Inc.*, 744 F.Supp.3d 935, 943 (N.D. Cal. 2024) (rejecting argument that plaintiffs were challenging "settlor function," as "defendants' interpretation mischaracterizes the

---

[9] Defendants incorrectly claim that the *Navarro* court accepted this argument. Defs.' Br. 13. The *Navarro* court expressly rejected it: "Wells Fargo [contends] that the conduct Plaintiffs challenge … are settlor functions that are not subject to review under ERISA. Wells Fargo does not 'explain how this analysis goes to the Court's standing inquiry.'" *Navarro v. Wells Fargo & Co.*, 2025 WL 897717, at *10 n.12 (D. Minn. Mar. 24, 2025).

nature of the allegations"); *Barragan v. Honeywell Int'l Inc.*, 2024 WL 5165330, at *3 (D.N.J. Dec. 19, 2024) ("Although … Plan *terms* are design decisions made in a settlor capacity, [Plaintiff] challenges Honeywell's *decision* [about how] to *use* forfeited amounts."); *Hutchins v. HP Inc.*, 737 F.Supp.3d 851, 861 (N.D. Cal. 2024).

### 5. Defendants Ignore Ms. Lewandowski's COBRA Payments.

Defendants also ignore that Ms. Lewandowski was enrolled in COBRA for several months in 2024 and paid all required COBRA premiums (both the employer share and employee share). *See* SAC ¶¶ 12, 208-09. COBRA is a federal law that allows former employees to continue their group health insurance for a limited time after a job loss. But the employer is not required to pay for the former employee's coverage; rather, the former employee must cover her *pro rata* share of **both** the employer contribution and the participant contribution. *Geissal v. Moore Med. Corp.*, 524 U.S. 74, 80 (1998) ("The beneficiary who makes the election must pay."); *see* SAC ¶¶ 208-10. Because of that requirement, Ms. Lewandowski paid her share of both the participant contribution **and** the employer contribution, with J&J bearing no responsibility. *Id.* Because the inflated costs for prescription drugs were built into those contribution amounts, Ms. Lewandowski was harmed, irrespective of the employee share of the premium.

### D. Plaintiffs' Standing Is Not Limited to the Drugs They Purchased

Defendants argue that even if Plaintiffs have standing to challenge

Defendants' conduct with respect to the specific drugs they were prescribed, they lack standing to challenge the prices of other drugs. Defs.' Br. 21-22. This misconstrues the nature of Plaintiffs' claims and ignores circuit precedent.

First of all, Defendants' fiduciary breaches resulted in *plan-wide* overcharges that increased monthly premium contributions for everyone, regardless of which drugs they were prescribed or whether they were prescribed any drugs at all. *See* SAC ¶¶ 76, 125, 194-207. That makes Defendants' citation to *Finkelman v. NFL*, 810 F.3d 187 (3d Cir. 2016), entirely inapposite. The plaintiff there alleged that the NFL's conduct inflated the price of Super Bowl tickets, but he lacked standing because he did not buy a ticket. *Id.* at 195. But imagine if the NFL charged a monthly subscription fee for the *option* to buy tickets to NFL games, and that monthly fee was inflated by illegal conduct. A plaintiff who paid the inflated monthly fee would suffer harm even in months that he did not exercise his option to buy a ticket, because the subscription fee itself was inflated.  That is the proper analogy here in light of Plaintiffs' monthly premiums, and it confirms standing.[10]

Even setting premiums aside and focusing on out-of-pocket harm, circuit precedent forecloses Defendant's argument. In *Boley v. Universal Health Servs.,*

---

[10] The same point answers Defendants' argument that Plaintiffs cannot challenge Defendants' imprudence in "agreeing to steer beneficiaries toward Express Scripts' mail-order pharmacy, Accredo," SAC ¶ 131, and "failing to disincentivize the use of high-price branded drugs on the Plan's formulary in favor of lower-priced generics," *id.* ¶ 137; *see* Defs.' Br. 22. Those fiduciary breaches resulted in plan-wide overcharges that increased monthly premiums for everyone, including Plaintiffs.

*Inc.*, 36 F.4th 124 (3d Cir. 2022), the plaintiffs alleged that their employer "lacked a prudent investment evaluation process when choosing and evaluating investments offered to [retirement] Plan participants." *Id.* at 131 (cleaned up). The defendant argued that the plaintiffs had standing only with respect to the specific investment options they chose, not other investment options they did not choose. That is the same argument Defendants make here—that Plaintiffs can bring their challenge only with respect to the prescription drugs they took, not others.

The Third Circuit rejected this argument: "Article III does not prevent the Named Plaintiffs from representing parties who invested in funds that were allegedly imprudent due to the same decisions or courses of conduct." *Id.* at 132. The court explained that the plaintiffs were not alleging "thirty-seven individual breaches of fiduciary duty, but rather several broader failures … affecting multiple funds in the same way." *Id.* So too here. Plaintiffs are not alleging individual breaches of fiduciary duty for each prescription drug, but rather that Defendants' overall failures in selecting, negotiating with, and supervising their PBM affected multiple prescription drugs in the same way. They have standing to challenge those overall failures. *See id.*; *see also Sweda v. Univ. of Pa.,* 923 F.3d 320, 334 n.10 (3d Cir. 2019) (plaintiffs had standing because they invested in some of the underperforming investment options).

## II.     Plaintiffs State Plausible Breach of Fiduciary Duty Claims

Defendants' substantive challenges to the SAC are just as baseless as their standing challenges. The Supreme Court, Third Circuit, and numerous district courts have all recognized – consistent with established trust law and the text of ERISA – that fiduciaries have a responsibility to monitor plan costs and ensure such costs are reasonable. Here, the SAC contains extensive allegations showing that Defendants breached this basic duty with respect to management of the Plan's prescription-drug program. These allegations are more than sufficient to state a claim.[11]

### A.     ERISA Imposes Strict Fiduciary Duties on Plan Fiduciaries

"Congress enacted ERISA to protect 'employees and their dependents' whose 'well-being and security' was affected by 'the lack of ... adequate safeguards' for employee benefit plans." *Mator*, 102 F.4th at 183 (citing 29 U.S.C. § 1001(a)). One of the important ways it did so is by establishing certain fiduciary duties in 29 U.S.C. § 1104, which are drawn from trust law. *See Sweda*, 923 F.3d at 327.

Under this section of ERISA, plan fiduciaries must act "solely in the interest of the participants and beneficiaries … for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) *defraying reasonable*

---

[11] When considering a Rule 12(b)(6) motion to dismiss, a court must "construe the complaint in the 'light most favorable to the plaintiff.'" *Sweda*, 923 F.3d at 325. "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 325-26. This standard is "less demanding" than a probability requirement. *Mator v. Wesco Distrib., Inc.*, 102 F.4th 172, 189 (3d Cir. 2024).

*expenses of administering the plan.*"  29 U.S.C. § 1104(a)(1)(A) (emphasis added). In addition, fiduciaries must act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B). These twin fiduciary duties are considered "the highest known to the law." *Sweda*, 923 F.3d at 333.

One necessary component of carrying out these duties is "monitor[ing] plan expenses" and ensuring that they are "reasonable." *Sweda*, 923 F.3d at 328-29; *see also* Restatement (Third) of Trusts § 88 cmt. a (2007) ("Implicit in a trustee's fiduciary duties is a duty to be cost conscious."); *Tibble v. Edison Int'l*, 843 F.3d 1187, 1198 (9th Cir. 2016) (en banc) ("Wasting beneficiaries' money is imprudent …. trustees are obliged to minimize costs."); 29 U.S.C. § 1104(a)(1)(A). As outlined in the DOL's handbook on "Meeting Your Fiduciary Responsibilities," "the plan's fees and expenses should be monitored to determine whether they continue to be reasonable." DOL, MEETING YOUR FIDUCIARY RESPONSIBILITIES at 6 (Sept. 2021).[12]

In this regard, "fiduciaries should be vigilant in 'negotiation of the specific formula and methodology'" by which fee payments will be made, including any indirect compensation that will be paid in the form of "revenue sharing … to plan

---

[12] https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/publications/meeting-your-fiduciary-responsibilities-booklet-2021.pdf

service providers." *Sweda*, 923 F.3d at 328. In addition, fiduciaries of large plans such as the J&J Plan must consider the plan's size and its bargaining power to obtain products at "lower cost" than other purchasers in the market. *Id.* at 328-29.

### B.    Plaintiffs Plausibly Allege that Defendants Breached Their Fiduciary Duties

Plaintiffs plausibly allege that Defendants breached their duty to monitor and control expenses by allowing the Plan and its participants to pay excessive drug costs. As set forth in detail in the SAC, "an analysis of the prices that Defendants agreed to make the Plan and their participants/beneficiaries pay for generic drugs reveals a staggering markup from acquisition costs for those drugs, a staggering markup from the prices that would be charged by a[n] [alternative] 'pass-through' PBM, and a staggering markup from the prices charged to comparable plans by other traditional PBMs." SAC ¶ 98.  Among other things, Plaintiffs allege that:

- "Across all generic-specialty drugs … for which there is publicly available data on average acquisition costs, Defendants agreed to make the Plan and their beneficiaries pay, on average, a markup of ***498%*** above what it costs pharmacies to acquire those drugs*." Id.* ¶ 5; *see also id.* ¶¶ 105-118. In some cases, the markups were over 1,000% (*id.* ¶¶ 112, 114), over 5,000% (*id.* ¶¶ 108, 110) or even over 10,000% (*id.* ¶¶ 3, 116). *See id.* ¶ 118 (chart showing markups for all 42 drugs for which there is publicly-available data on acquisition costs).

- The Plan's prices for all other generic-specialty drugs "are just as unreasonable." *Id.* ¶ 119; *see also id*. ¶¶ 120-23.[13]

---

[13] Because Defendants concealed the Plan's formulary from her, a public version of the Express Scripts formulary was used for purposes of the SAC. *See id.* ¶ 102.

- "Defendants' mismanagement has also caused the Plan and their participants/beneficiaries to overpay for generic drugs that are not designated as 'specialty.'" *Id.* ¶ 125. The average markup that Plaintiff paid was 230%, meaning that she paid more than three times the actual drug acquisition cost. *See id.* ¶¶ 126-27.

- Express Scripts' pharmacy prices are not only severalfold higher than drug acquisition costs, but "routinely higher than prices at other pharmacies." *Id.* ¶ 7; *see also id.* ¶¶ 107, 109, 111, 113, 115, 117, 120-23, 132-33.

- "Defendants squandered their bargaining power and, for many drugs, agreed to make the Plan and [participants] pay more than someone would pay if they just walked into a retail pharmacy and filled the same prescription *without* using insurance." *Id.* ¶ 101; *see also id.* ¶¶ 3, 120, 123.

- Defendants agreed to make the Plan and its participants/beneficiaries pay, on average, over two to four times as much as the PepsiCo plan for the same drugs. *Id.* ¶ 179.

- If Defendants had contracted with a pass-through PBM, they would have saved the Plan over 90% on generic-specialty drugs, and several millions of dollars per year overall, accounting for all drugs, fees, and rebates. *See id.* ¶¶ 146-48.

Further, with respect to process, Plaintiffs allege:

- Defendants failed to conduct an open and diligent RFP process to obtain competitive bids for PBM services and ensure that rates and terms were reasonable. *Id.* ¶¶ 56, 61, 95, 101. Nor did they conduct market surveys or take other measures to ensure reasonable pricing and terms. *Id.* ¶¶ 62, 101.

- "Defendants failed to adequately consider contracting with a pass-through PBM, instead of Express Scripts." *Id.* ¶ 145.

- Defendants failed to re-negotiate their contract with Express Scripts, *id.* ¶ 62, and failed to ensure that manufacturer drug rebates were fully passed on to the Plan instead of retained in full or in part by Express Scripts or its affiliated entities, *see id.* ¶¶ 15, 52-54, 91, contrary to J&J's own "written policy supporting pass-through rebates," *id.* ¶ 174.

- "Defendants allowed their selection of a PBM for the Plan to be guided or managed by a broker with a conflict of interest." *Id.* ¶ 97.

- Defendants were subject to a conflict of interest because J&J is a leading drug maker that earns billions of dollars a month selling drugs, and benefits from high drug prices. *Id.* ¶ 5.

- Defendants imprudently agreed to a pricing model based on a highly manipulable benchmark rather than on a fixed unit-price schedule or with reference to pharmacy acquisition costs for those drugs. *Id.* ¶ 99. Fiduciaries of comparable plans "have reduced their prescription-drug spending by 30% or more" by doing the latter. *Id.* ¶ 143.

- "Defendants also illogically agreed to a pricing model in which some or all generic-specialty drugs are treated the same as branded specialty drugs, instead of being priced as generic drugs." *Id.* ¶ 100; *see also id.* ¶ 144.

- "Defendants have further mismanaged the Plan [] by agreeing to steer beneficiaries toward Express Scripts' mail-order pharmacy, Accredo, even though Accredo's prices are routinely higher than the prices retail pharmacies charge for the same drugs." *Id.* ¶ 131; *see also id.* ¶¶ 132-36.

- Defendants also "fail[ed] to disincentivize the use of high-priced branded drugs on the Plan's formulary in favor of lower-priced generics." *Id.* ¶ 137.

Similar allegations of excessive fees to plan service providers have repeatedly been held sufficient to create an inference of a fiduciary breach.[14] The allegations here are on all fours with those the Third Circuit found sufficient in *Sweda, Mator*, and *Kruchten*. *See Sweda*, 923 F.3d at 330 ("Sweda alleged that Penn paid excessive

---

[14] *See, e.g.*, *Kruchten v. Ricoh USA, Inc.,* 2024 WL 3518308, *3 (3d Cir. July 24, 2024); *Mator*, 102 F.4th at 184-88; *Sweda*, 923 F.3d at 330-34; *Johnson v. PNC Fin. Servs. Grp., Inc.*, 2022 WL 973581, at *5-6 (W.D. Pa. Mar. 31, 2022); *McGowan v. Barnabas Health, Inc.,*, 2021 WL 1399870, *5 (D.N.J. Apr. 13, 2021); *Peterson v. Ins. Servs. Off., Inc.*, 2021 WL 1382168, at *5 (D.N.J. Apr. 13, 2021); *Silva v. Enovik Corp.*, 2020 WL 12574912, at *7-8 (D.N.J. Dec. 30, 2020); *Pinnell v. Teva Pharms. USA, Inc.*, 2020 WL 1531870, at *3-6 (E.D. Pa. Mar. 31, 2020); *Nicolas v. Trs. of Princeton Univ.*, 2017 WL 4455897, at *4 (D.N.J. Sept. 25, 2017). Although many of these cases involved recordkeeping or investment fees, there is no reason to treat prescription drug charges any differently, and Defendants do not make any such argument. *See* Defs.' Br. 22-27.

administrative fees, failed to solicit bids from service providers, failed to monitor revenue sharing, failed to leverage the Plan's size to obtain lower fees or rebates, and failed to comprehensively review Plan management"); *Mator*, 102 F.4th at 185 ("[T]he Mators allege the Plan's fees were several times larger than what similar plans paid; the Plan's fiduciary did not negotiate a fee cap or solicit bids …; the asset-based fee structure caused the Plan's fees to rise when there was no corresponding increase in services; and similarly situated fiduciaries requested proposals and negotiated … to keep fees reasonable."); *Kruchten*, 2024 WL 3518308, *1, 3 (defendants failed to "solicit bids from competing recordkeeping providers," failed to use their "substantial bargaining power due to the Plan's size" to negotiate lower fees, and failed to "reasonably scrutinize[]" the plan's fees).

Defendants invite reversible error by asking the Court to dismiss Plaintiffs' claims. *See, e.g.*, *Hughes v. Nw. Univ.*, 595 U.S. 170, 174 (2022) (district court erred in dismissing ERISA action alleging defendants "failed to monitor and control [] fees …, resulting in unreasonably high costs to plan participants"); *Kruchten*, 2024 WL 3518308, at *4 (reversing district court order dismissing ERISA claim relating to excessive fees); *Mator*, 102 F.4th at 191 (vacating dismissal); *Sweda*, 923 F.3d at 340 (same).[15]

---

[15] Defendants do not cite a single controlling case that dismissed an excessive fee claim like this one. As noted, *Mator* vacated an order granting a motion to dismiss.

### 1. Plaintiffs Are Not Obligated to Allege Additional Facts Beyond Those in the Second Amended Complaint

Defendants advance two arguments for why Plaintiffs' extensive allegations are insufficient to state a claim. Both are meritless.

*First*, Defendants argue that "Plaintiffs' allegations must support the inference that Defendants used an imprudent process in choosing [Express Scripts] as the Plan's pharmacy benefit manager and in negotiating drug prices with that entity." Defs.' Br. 22. However, an ERISA plaintiff is not required to directly allege the details of a defendant's behind-the-scenes process. *See Sweda*, 923 F.3d at 332; *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 596 (8th Cir. 2009). Courts "recognize that 'ERISA plaintiffs generally lack the inside information necessary to make out their claims in detail unless and until discovery commences.'" *Johnson*, 2022 WL 973581, at *6 (quoting *Braden*, 588 F.3d at 598). That is especially so here, where J&J has refused to turn over its PBM contract despite Ms. Lewandowski's lawful request for it. *See* SAC ¶¶ 249-50. The Court may infer from the SAC's allegations that Defendants' process was flawed—*i.e.*, that outcomes this bad plausibly resulted from an imprudent process. *See Sweda*, 923 F.3d at 332. At any rate, Plaintiffs identified several deficiencies in Defendants' processes. *See supra* at 32-33; SAC ¶¶ 141-50.

---

The other appellate cases Defendants cite are out-of-circuit, their district court cases are non-binding, and all are distinguishable on their facts.

*Second*, Defendants argue that the SAC does not contain sufficiently comprehensive cost comparisons between the J&J Plan and other plans. *See* Defs.' Br. 23.  Contrary to Defendant's portrayal, however, Third Circuit precedent does not require comparing "the Plan's overall package of health benefits," *id.*, with the overall package of health benefits provided by other plans. There is no formalistic checklist for pleading plausible claims of fiduciary mismanagement; the question at this stage is simply whether the "pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Sweda*, 923 F.3d at 325-26. That is confirmed by *Sweda* itself, where the Third Circuit held that the plaintiff plausibly alleged excessive fees even though she "did not support [her] allegation[s] with ***any*** comparisons to other plans." *Mator*, 102 F.4th at 185 (discussing *Sweda*) (emphasis added). Likewise in *Mator*, the plaintiffs stated a claim even though their comparisons were "not perfect" and they "did not allege the complete nature and scope of services provided by the alleged comparator plans." *Id.* at 182-88. The rigid requirement that Defendants seek to impose is inconsistent with *Sweda*, *Mator*, and the reality that at the pleading stage, it is impossible for plaintiffs to know every last detail about the "overall package of health benefits" offered by non-defendant third parties. *See Braden*, 588 F.3d at 598.

Defendants are also wrong in suggesting that comparisons may not be based on individual drugs or categories of drugs, and must be made "overall." (Def's Br.

2, 22-23). In the pension plan context, it is well-established that "the prudence of investments or classes of investments offered by a plan must be judged individually," and that "the relevant 'portfolio' that must be prudent is *each* available Fund considered on its own …, not the full menu of Plan funds." *DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 423 (4th Cir. 2007)); *Pfeil v. State St. Bank & Tr. Co.*, 671 F.3d 585, 597 (6th Cir. 2012) ("A fiduciary cannot avoid liability for offering imprudent investments merely by including them alongside a larger menu of prudent investment options.").[16] Likewise here, it is cold comfort to a Plan participant stuck overpaying for teriflunomide, *see* SAC ¶ 3, that some other participant is paying a fair price for some other drug.

Here, the SAC provides multiple, detailed comparisons from which the Court can "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Sweda*, 923 F.3d at 325-26. At the planwide level, Plaintiffs allege that Defendants overpaid "on prescription drug costs across the Plan ***as a whole***, after accounting for all charges for all drugs, fees, and rebates." SAC ¶ 148 (emphasis added); *see also id*. ¶¶ 118-19, 128-29, 143. In support, Plaintiffs compare Plan costs to the PepsiCo plan, and allege the Plan paid two to four times more even though both Defendants and PepsiCo used Express Scripts as their PBM. *See* SAC ¶ 179.

---

[16] Indeed, one of Defendants' cases specifically criticized the plaintiffs for comparing "total plan costs" instead of costs for specific products or services. *McCaffree Fin. Corp. v. ADP, Inc.*, 2023 WL 2728787, at \*15 (D.N.J. Mar. 31, 2023).

Plaintiffs also provide dozens of comparisons between how much Defendants agreed to pay Express Scripts for specific drugs, how much another PBM charges its clients for the same drugs, and how much a customer *not using insurance* would pay for the same drugs at retail pharmacies. *See id.* ¶¶ 101-29, 147-49. Defendants' assertion that the drugs in these comparisons were "cherry-picked" (Defs.' Br. 23) ignores Plaintiffs' allegations (and is also hypocritical given that they refused to produce the Plan's comprehensive formulary for all drugs, *see* SAC ¶ 102). The SAC comprehensively analyzed objectively defined categories of drugs available under the Plan and alleges that Defendants agreed to unreasonable prices across *all* generic-specialty drugs, *id.* ¶¶ 105, 119; that specialty drugs "account for more than 50% of a prescription-drug plan's overall spend," *id.* ¶ 85; that Defendants agreed to unreasonable prices across *all* generic, non-specialty drugs, *id.* ¶¶ 125-28; and that prices for brand-name drugs—the only other kind of drug—"do not reflect special discounts that would offset or justify" the overpayments alleged, *id.* ¶ 129. Defendants' unsupported speculation that some as-yet-unidentified drugs might have been reasonably priced does not erase the massive and undisputed overcharges for the drugs highlighted in the SAC—and those prices "must be judged individually." *DiFelice*, 497 F.3d at 423.

Finally, Plaintiffs compare Defendants' inattention to costs to numerous other plan sponsors who were more attentive and took basic measures that Defendants

failed to adopt. *See id.* ¶¶ 177-91. This is also consistent with *Sweda*, and further demonstrates the sufficiency of Plaintiffs' claims. *See Sweda*, 923 F.3d at 330-31 ("Sweda offered examples of similarly situated fiduciaries who acted prudently, such as fiduciaries at Loyola Marymount who hired an independent consultant to request recordkeeping proposals and consolidated services with a single provider. Sweda pointed to similar moves at Pepperdine, Purdue, and CalTech, as well as Caltech's negotiation for $15 million in revenue sharing rebates."). Indeed, Defendants failed to heed ***J&J's own guidance*** to police PBMs more actively. *See* SAC ¶¶ 173-76; *see also id.* ¶¶ 151-72 (detailing guidance from other sources).

If Plaintiffs' extensive and detailed allegations are not sufficient to state a plausible breach of fiduciary duty claim based on a failure to control plan expenses, it is difficult to see what would be. Defendants "buck[] the Third Circuit's" pleading standards. *See McGowan*, 2021 WL 1399870, at *6 (citing *Sweda*, 923 F.3d at 331).

## 2. Defendants Are Not Entitled to an Inference in Their Favor

Defendants argue that "J&J has every incentive" to negotiate reasonable drug prices for the Plan because it shares part of those costs. Defs.' Br. 26. However, "the law expects more than good intentions. 'A pure heart and an empty head are not enough.'" *Sweda*, 923 F.3d at 329. Whatever J&J's motivations may have been, it did not adequately monitor and control prescription drug costs.

Although Defendants attempt to offer an "alternative explanation" for the high

prices (Defs.' Br. 27), plaintiffs are not required to "rule out every possible lawful explanation" for challenged conduct. *Mator*, 102 F.4th at 184; *see also Sweda*, 923 F.3d at 326 ("To the extent that the District Court required Sweda to rule out lawful explanations for Penn's conduct, it erred."). In any event, the purported explanation – that Defendants negotiated the "best overall deal" – is anything but "obvious." *See* Defs.' Br. 27. Nothing in the SAC or the Grant Declaration submitted by Defendants suggests that Defendants negotiated a good deal (let alone the "best" deal) for the Plan. To the contrary, Plaintiffs allege a "pervasive and systematic problem of unreasonable prescription drug charges," SAC ¶ 9, and Defendants do not dispute those charges. Moreover, J&J has a conflict of interest as a drug manufacturer that benefits from higher drug prices and does billions of dollars more in business with Express Scripts on its product side than on its Plan benefits side. *Id.* ¶ 5. Thus, even if Plaintiffs were required to show that Defendants' "explanation" is not "obvious" – which they are not – they have done so.

 "At this stage, [Plaintiffs'] factual allegations must be taken as true, and every reasonable inference from them must be drawn in [their] favor." *Sweda*, 923 F.3d at 331. Defendants turn the motion to dismiss standard on its head by asking the Court to draw inferences in their favor, and there is no reason to do so on this record.

## CONCLUSION

For the above reasons, Defendants' motion to dismiss should be denied.

Dated: May 19, 2025                    Respectfully Submitted,

                                       */s/ Michael Eisenkraft*
                                       Michael Eisenkraft (NJ Bar No. 016532004)
                                       COHEN MILSTEIN SELLERS & TOLL, PLLC
                                       88 Pine Street, 14th Floor
                                       New York, New York 10005
                                       (212) 838-7797
                                       meisenkraft@cohenmilstein.com

                                       Michelle Yau (admitted *pro hac vice*)
                                       Daniel Sutter (admitted *pro hac vice*)
                                       COHEN MILSTEIN SELLERS & TOLL, PLLC
                                       1100 New York Ave. NW, Eighth Floor
                                       Washington, D.C. 20005
                                       (202) 408-4600
                                       myau@cohenmilstein.com
                                       dsutter@cohenmilstein.com

                                       Kai Richter (admitted *pro hac vice*)
                                       COHEN MILSTEIN SELLERS & TOLL, PLLC
                                       400 South 4th Street #401-27
                                       Minneapolis, MN 55415
                                       (612) 807-1575
                                       krichter@cohenmilstein.com

                                       Jamie Crooks (admitted *pro hac vice*)
                                       Michael Lieberman (admitted *pro hac vice*)
                                       FAIRMARK PARTNERS, LLP
                                       400 7th Street NW
                                       Suite 304
                                       Washington, DC 20004
                                       (619) 507-4182
                                       jamie@fairmarklaw.com
                                       michael@fairmarklaw.com

                                       Michael Casper
                                       WHEELER, DIULIO & BARNABEI, P.C
                                       1650 Arch Street, Suite 2200
                                       Philadelphia, PA 19103

(215) 971-1000
mcasper@wdblegal.com

*Attorneys for Plaintiffs and the Proposed Class*

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 19th day of May, 2025, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record.

*/s/ Michael Eisenkraft*
Michael Eisenkraft