David R. Kott
MCCARTER & ENGLISH, LLP
Four Gateway Center
100 Mulberry Street
Newark, NJ 07102
Telephone: (973) 622-4444
dkott@mccarter.com

Scott D. Stein (*pro hac vice*)
Eric S. Mattson (*pro hac vice*)
Caroline A. Wong (*pro hac vice*)
SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, IL 60603
Telephone: (312) 853-7000
sstein@sidley.com
emattson@sidley.com
caroline.wong@sidley.com

*Attorneys for Defendants*

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| ANN LEWANDOWSKI and ROBERT GREGORY, on their own behalf, on behalf of all others similarly situated, and on behalf of the Johnson & Johnson Group Health Plan and its component plans,<br><br>Plaintiffs,<br><br>v.<br><br>JOHNSON & JOHNSON and THE PENSION & BENEFITS COMMITTEE OF JOHNSON & JOHNSON,<br><br>Defendants. | Case No. 3:24-cv-00671-ZNQ-RLS<br><br>**ORAL ARGUMENT REQUESTED** |

**REPLY IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS
COUNTS ONE AND TWO OF THE SECOND AMENDED COMPLAINT**

# **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................. 1

    I.    Plaintiffs lack Article III standing to pursue Counts One and Two. ............ 2

        A.    Plaintiffs' payment of premiums does not confer standing. ............. 2

        B.    Plaintiffs' out-of-pocket costs also do not confer standing. .............. 5

        C.    Plaintiffs lack standing to challenge generic specialty drug prices and conduct that did not affect them. ............................................... 7

    II.    Counts One and Two do not state a claim under Rule 12(b)(6). ................. 9

        A.    Plaintiffs misstate the case law on benchmark comparisons. ........... 9

        B.    Plaintiffs never cite a meaningful benchmark suggesting that Defendants acted imprudently. ........................................................ 11

        C.    Plaintiffs fail to rebut the obvious alternative explanation: that Defendants negotiated a reasonable overall deal for the Plan. ........ 14

CONCLUSION .................................................................................................... 15

# **TABLE OF AUTHORITIES**

Page(s)

**Cases**

*Alves v. Harvard Pilgrim Health Care Inc.*,
 204 F. Supp. 2d 198 (D. Mass. 2002) ................................................................. 10

*Barclift v. Keystone Credit Servs., LLC*,
 93 F.4th 136 (3d Cir. 2024) ................................................................................... 6

*Bell Atl. Corp. v. Twombly*,
 550 U.S. 544 (2007) ............................................................................................ 14

*Boley v. Universal Health Servs., Inc.*,
 36 F.4th 124 (3d Cir. 2022) ............................................................................. 7, 8

*HIV & Hepatitis Pol'y Inst. v. U.S. Dep't of Health & Hum. Servs.*,
 728 F. Supp. 3d 1 (D.D.C. 2023) ..................................................................... 6, 7

*Hughes v. Northwestern Univ.*,
 595 U.S. 170 (2022) ............................................................................................ 13

*Knudsen v. MetLife Grp., Inc.*,
 117 F.4th 570 (3d Cir. 2024) ................................................................................ 4

*Kruchten v. Ricoh USA, Inc.*,
 2024 WL 3518308 (3d Cir. July 24, 2024) ............................................ 10, 11, 13

*Lujan v. Defs. of Wildlife*,
 504 U.S. 555 (1992) .............................................................................................. 7

*Mator v. Wesco Distrib., Inc.*,
 102 F.4th 172 (3d Cir. 2024) ........................................................................ passim

*McCaffree Fin. Corp. v. ADP, Inc.*,
 2023 WL 2728787 (D.N.J. Mar. 31, 2023) .................................................. 10, 11

*Navarro v. Wells Fargo & Co.*,
 2025 WL 897717 (D. Minn. Mar. 24, 2025) ............................................... passim

*Sigetich v. Kroger Co.*,
 2023 WL 2431667 (S.D. Ohio Mar. 9, 2023) ....................................................... 3

*Sweda v. Univ. of Pa.*,
   923 F.3d 320 (3d Cir. 2019) ....................................................................9, 10, 14

*Thole v. U.S. Bank N.A.*,
   590 U.S. 538 (2020)............................................................................................14

*TransUnion LLC v. Ramirez*,
   594 U.S. 413 (2021).............................................................................................8

**Other Authorities**

84 Fed. Reg. 17454 (Apr. 25, 2019) ..........................................................................6

85 Fed. Reg. 29164 (May 14, 2020) .........................................................................6

# **INTRODUCTION**

Both Plaintiffs lack Article III standing for the reasons articulated in this Court's earlier dismissal ruling and in *Navarro v. Wells Fargo & Co.*, 2025 WL 897717 (D. Minn. Mar. 24, 2025)—a decision the opposition brief barely mentions. Plaintiffs cannot manufacture standing based on speculation about their preferred plan design changes or the prices of a few drugs cherry-picked from a large and comprehensive package of benefits. Because Plaintiffs lack standing, Counts One and Two should be dismissed.

Even if Plaintiffs had standing, Counts One and Two should be dismissed under Rule 12(b)(6). At a minimum, Plaintiffs must plausibly allege that the *overall* costs of the Plan's drugs and healthcare services—not just the prices of a tiny subset of the drug portion of the Plan—were excessive compared to meaningful benchmarks. But the Second Amended Complaint ("Complaint") does not compare overall plan costs, nor does it point to meaningful benchmarks. Plaintiffs also fail to rebut Defendants' more likely explanation for their conduct: that J&J, which pays for the vast majority of the healthcare benefits in the Plan, negotiated a reasonable overall deal for those benefits.

# ARGUMENT

## I. Plaintiffs lack Article III standing to pursue Counts One and Two.[1]

### A. Plaintiffs' payment of premiums does not confer standing.

Plaintiffs' core theory of standing—that their premiums were indirectly inflated by the allegedly excessive costs of a small subset of the drugs in the Plan's formulary, only 15 of which they allege they actually paid for, Compl. ¶¶ 6, 126–27, 235—fails for multiple reasons.

To begin, Plaintiffs concede that setting premiums—something done by J&J, the Plan sponsor, at the beginning of each Plan year—is a non-fiduciary act. Opp. 24–25. That forecloses standing under their premium-setting theory: Article III requires Plaintiffs to show an injury that is fairly traceable to Defendants' *fiduciary* conduct. *See* Dkt. 70 ("MTD Order") at 6. Since establishment of premiums is indisputably a plan design feature, Mot. 11–13, that conduct cannot be fairly traced to the alleged breaches, nor can it be redressed in this Court—Plaintiffs have no legal right to lower premiums. Here, as in *Navarro*, the Plan gives Defendants "sole discretion" to set participant contribution amounts. *Navarro*, 2025 WL 897717, at *9; Dkt. 75-2, Ex. A, § 4.01; Dkt. 75-2, Ex. D, ¶ 2. That closes the door

---

[1] Plaintiffs assert that Defendants raise a facial rather than factual standing challenge because there are no factual disputes. Opp. 8 n.3. That ignores the disputes over whether drug prices affected Ms. Lewandowski's out-of-pocket costs at all and whether premiums for the J&J Plan reflect a "fixed" cost-sharing ratio. *Compare* Opp. 6, 12 *with* Dkt. 75-2, Ex. D, ¶¶ 2–3, 11.

2

on Plaintiffs' "premium" theory of standing, including with respect to COBRA premium payments, the determination of which are also a settlor/non-fiduciary function by J&J, *see* Opp. 26.

Plaintiffs' cases are non-binding and non-responsive. *Id.* at 25–26. Only one, *Sigetich v. Kroger Co.*, 2023 WL 2431667, at *8 (S.D. Ohio Mar. 9, 2023), even discusses standing. Plaintiffs cite its statement that the defendants did not "explain" how the fiduciary/non-fiduciary distinction "goes to" standing, but Defendants here have done exactly that. Neither *Sigetich* nor any of the other cases Plaintiffs cite hold that non-fiduciary acts can create standing for fiduciary claims.

The second and equally dispositive problem with Plaintiffs' premium theory is that it is just as speculative as it was when the Court dismissed it last time. *See* MTD Order at 9. Even if the Plan followed a fixed contribution ratio for premiums—which it does not, as Plaintiffs' own chart and Defendants' declaration confirm, Mot. 14—it is rank speculation to suggest that the cost of 57 drugs, out of thousands of covered drugs (not to mention the many healthcare services provided under the Plan) "necessarily increased total Plan spending and, by extension, participant premium contributions." *See* Opp. 18. Many variables influence premiums, not the least of which is the plan sponsor's discretion in setting them. *See Navarro*, 2025 WL 897717, at *9; Dkt. 75-2, Ex. D, Decl. ¶ 2.

Plaintiffs claim that Defendants ask the Court to "ignore a significant cost driver simply because it is not the only cost driver." Opp. 18. This reverses the burden to show standing. Plaintiffs must provide a plausible basis to conclude the alleged overcharges of a fraction of drugs were the "but-for-cause" of higher premiums *after* accounting for other cost drivers. *See Knudsen v. MetLife Grp., Inc.*, 117 F.4th 570, 581–82 (3d Cir. 2024). They have not done so.

Plaintiffs offer unsupported assertions about J&J's "*entire* formulary" supposedly being overpriced, Opp. 10 n.4, and refer to academic studies not specific to the J&J Plan, *id.* at 18–19. They also cite cases from the merits and statutory standing context instead of the Article III context. *Id.* at 20–22 & n.7. None of this satisfies *Knudsen*, a decision this Court recognized as "controlling and dispositive." MTD Order at 9. The plaintiffs in *Knudsen* claimed they were injured because they had to pay "around 30% of overall contributions to the Plan"— contributions allegedly inflated due to imprudence. 117 F.4th at 574, 581–82. Plaintiffs' allegations here are indistinguishable, except they allege a lower cost sharing ratio. Opp. 6–7. Both theories suffer from "inferential gaps" between the narrow categories of alleged waste and the leap to a claim of increased total costs. *Knudsen*, 117 F.4th at 582; *Navarro*, 2025 WL 897717, at *9–10.

4

### B. Plaintiffs' out-of-pocket costs also do not confer standing.

In pointing to their out-of-pocket costs, Plaintiffs ignore *Navarro*'s ruling that plaintiffs fail to show Article III redressability when, as here, defendants have "sole discretion" to set contribution rates, at least when "participant contribution amounts may be affected by several factors having nothing to do with prescription drug benefits." 2025 WL 897717, at *9–10. As *Navarro* noted, injunctive and monetary relief "*could* result in lower contribution rates and out-of-pocket costs," but "there is no guarantee that it *would*." *Id.* at *10.

Plaintiffs have also not cited comparable healthcare plans that pay lower prices for the drugs singled out in the Complaint. *See, e.g.*, Compl. ¶ 103 (citing "NADAC" database of selected pharmacies' acquisition costs for drugs—not the amounts plans actually pay). Plaintiffs must provide more than an "academic exercise in the conceivable" to satisfy Article III. *Navarro*, 2025 WL 897717, at *10 (citation modified). "[S]elective allegations regarding the markups on a subset of prescription drugs in the Plan's formulary, which itself represents only a subset of the total benefits whose costs Plan participants' contributions may be used to cover, are not sufficient to establish a causal connection between Plaintiffs' increased costs and ESI's administrative fees." *Id.* at *9 (citation modified).

Plaintiffs point to Defendants' "decision" to allow third-party copay assistance that Ms. Lewandowski received to offset her out-of-pocket maximum—

5

the theory that she suffered harm by paying $980 rather than $770 (compared to more than $200,000 in expenses the Plan paid on her behalf). But a reduced benefit from a third party is not a concrete, cognizable injury; it does not closely relate to traditionally recognized legal harm. *See Barclift v. Keystone Credit Servs., LLC*, 93 F.4th 136, 145–46 (3d Cir. 2024). Ms. Lewandowski paid *less* than her $3,500 out-of-pocket maximum, and the Plan was not required to credit the copay assistance toward that maximum. Dkt. 75-2, Ex. D, Decl. ¶ 11. She cannot demonstrate standing by alleging only that she would have preferred having *even more* copay assistance be counted toward the maximum. Her allegation that she received less of a non-obligatory benefit from a third party is not cognizable financial harm.

Plaintiffs cite a federal regulation that concerns copay assistance for "specific prescription brand drugs that have a generic equivalent," but Ms. Lewandowski does not allege that the drug for which she received copayment assistance was such a drug. *See* 84 Fed. Reg. 17454, 17545 (Apr. 25, 2019); Opp. 13. Plaintiffs also ignore the guidance in effect when Ms. Lewandowski incurred the relevant expense, which permitted, but did not require, the Plan to credit the copay assistance toward the out-of-pocket maximum. HHS Notice of Benefit and Payment Parameters for 2021, 85 Fed. Reg. 29164, 29233 (May 14, 2020); *compare* Opp. 13 n.5 *with HIV & Hepatitis Pol'y Inst. v. U.S. Dep't of Health & Hum. Servs.*, 728 F. Supp. 3d 1 (D.D.C. 2023) (reinstating regulation in September

6

2023), *opinion clarified*, 2023 WL 10669681 (D.D.C. Dec. 22, 2023). Soon after the regulation was reinstated, the Department of Health and Human Services noted that it does not intend to initiate enforcement actions against plans that do not credit third-party copay assistance toward annual limitations on cost sharing. *HIV & Hepatitis Pol'y Inst.*, 2023 WL 10669681, at *1. Plaintiffs effectively assert that something that saved Ms. Lewandowski thousands of dollars somehow "injured" her.

Plaintiffs also ignore that an injury is not "fairly traceable" to a defendant if it arises from the "independent action of some third party not before the court." *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (cleaned up); Mot. 19–20. Here, Ms. Lewandowski's asserted injury depends on a third party's independent decision to relieve her of a significant portion of her already limited out-of-pocket maximum under the Plan.

Finally, the lost time value of money is not a "well established" way to allege a cognizable constitutional injury, and the Third Circuit has never recognized it as such. *Compare* Opp. 14 *with* Mot. 20–21.

### C. Plaintiffs lack standing to challenge generic specialty drug prices and conduct that did not affect them.

Plaintiffs may have standing to challenge "the same decisions or courses of conduct" as those that affected them, *Boley v. Universal Health Servs., Inc.*, 36 F.4th 124, 132 (3d Cir. 2022), but that does not give them standing to sue over a

7

class of drugs they never bought (generic specialty drugs) and other, distinct practices that could not have harmed them, *TransUnion LLC v. Ramirez*, 594 U.S. 413, 427 (2021). These alleged practices include "agreeing to steer beneficiaries toward Express Scripts' mail-order pharmacy, Accredo," Compl. ¶ 131, and "failing to disincentivize the use of high-priced branded drugs on the Plans' formulary in favor of lower-priced generics," *id.* ¶ 137.[2] Plaintiffs do not allege that they were ever "steered" toward Accredo or that they ever used a branded drug instead of an equivalent generic. These discrete issues—none of which affected Plaintiffs—differ from the challenged conduct in *Boley*, which affected all the plaintiffs in that case: offering a suite of funds that "were imprudent for the same reasons" (every plaintiff had invested in at least one of them); "charging each Plan participant [an excessive] annual recordkeeping and administrative fee"; and failing to prudently evaluate investments and monitor appointees in a manner that resulted in each plaintiff paying higher fees. 36 F.4th at 131–32.

---

[2] Plaintiffs assert Plan mismanagement for "failing to promote lower-cost generics over brand-name drug options." Opp. 5 (cleaned up; emphasis omitted). But this is another non-fiduciary plan design decision made by the plan sponsor. J&J chose not to place plan participants who have success with brand-name drugs at a financial disadvantage that might compel them to switch to a generic drug.

## II. Counts One and Two do not state a claim under Rule 12(b)(6).

### A. Plaintiffs misstate the case law on benchmark comparisons.

Although the parties agree the Complaint must support a "reasonable inference" of an imprudent process, Opp. 35–36; Mot. 22, Plaintiffs say they need not allege any facts suggesting that the Plan's expenses compared unfavorably with those of any other plan. Opp. 36. But the Third Circuit has held that plaintiffs must "provide specific plan comparators" and must "plausibly allege that the services purchased were sufficiently similar to render the comparisons valid." *Mator v. Wesco Distrib., Inc.*, 102 F.4th 172, 188 (3d Cir. 2024) (citing *Matousek v. MidAmerican Energy Co.*, 51 F.4th 274, 278–79 (8th Cir. 2022); *Smith v. CommonSpirit Health*, 37 F.4th 1160, 1164–65 (6th Cir. 2022)); Mot. 22–23 (citing other cases). "The way to plausibly plead a claim of this type is to identify similar plans offering the same services for less." *Mator*, 102 F.4th at 188 (quoting *Matousek*, 51 F.4th at 279–80).

Plaintiffs claim the Third Circuit held that a "plaintiff plausibly alleged excessive fees even though she 'did not support [her] allegation[s] with ***any*** comparisons to other plans.'" Opp. 36 (alterations by Plaintiffs; quoting *Mator*'s discussion of *Sweda v. Univ. of Pa.*, 923 F.3d 320, 325–26 (3d Cir. 2019), *partial abrogation recognized in Mator*, 102 F.4th at 184 n.3). But *Mator* went on to say that the *Sweda* plaintiff compared the plan's fees to "what similar plans paid." 102

9

F.4th at 185; *see also Sweda*, 923 F.3d at 330. As another judge in this district explained, citing *Sweda*, "courts in this Circuit evaluating a claim for excessive fees" examine "whether the complaint includes a sound basis for comparison [or] meaningful benchmark to show that the practices of similarly situated fiduciaries for the same services differed." *McCaffree Fin. Corp. v. ADP, Inc.*, 2023 WL 2728787, at *14 (D.N.J. Mar. 31, 2023) (citation modified). *Mator* even suggested that the less detailed allegations in *Sweda* would not satisfy current pleading standards. 102 F.4th at 184 n.3 (discussing *Sweda*'s partial abrogation).

Plaintiffs also cannot escape the requirement to compare overall plan expenses rather than the costs of "individual drugs or categories of drugs," Opp. 36–37. Again, the test is whether "comparable" plans paid less for "sufficiently similar" services. *Mator*, 102 F.4th at 188; *Kruchten v. Ricoh USA, Inc.*, 2024 WL 3518308, at *3 (3d Cir. July 24, 2024); *see also Alves v. Harvard Pilgrim Health Care Inc.*, 204 F. Supp. 2d 198, 210 (D. Mass. 2002) ("[T]he fact that the copayment sometimes exceeded the [sponsor] defendants' per-unit cost does not, per se," breach fiduciary duty), *aff'd*, 316 F.3d 290 (1st Cir. 2003). The benefit provided by the Plan is access to a suite of thousands of health services and prescription drugs. Sponsors may also consider group health plan market trends,

10

administrative costs, and non-drug medical expenses, among other factors. Dkt. 75-2, Ex. D, ¶ 2.[3]

The argument that Plaintiffs need not discuss "overall" Plan services also contravenes their own theory. Plaintiffs say they are "not alleging individual breaches of fiduciary duty for each prescription drug," but rather seek to challenge "Defendants' *overall* failures in selecting, negotiating with, and supervising their PBM." Opp. 28 (emphasis added). They therefore must offer a "sound basis for comparison," which requires allegations about the overall suite of drugs and services provided by similar plans. *McCaffree*, 2023 WL 2728787, at *14.

### B. Plaintiffs never cite a meaningful benchmark suggesting that Defendants acted imprudently.

Plaintiffs' only "planwide" comparison is a single paragraph describing PepsiCo's plan. Opp. 37 (citing Compl. ¶ 179). Plaintiffs assert that PepsiCo's plan pays two to four times less than the J&J Plan for 56 of the 57 drugs listed in the Complaint. Compl. ¶¶ 118, 126, 179. But this narrow lens ignores the breadth of PBM services, which the Complaint acknowledges elsewhere. *See id.* ¶ 38 (discussing PBMs' "various services"). Plaintiffs thus do not establish the comparability of the plans. *See Mator*, 102 F.4th at 188; *Kruchten*, 2024 WL

---

[3] In addition, Plaintiffs fail to account for the cost of hiring experts to conduct a drug-by-drug analysis of prices and then engaging in lengthier negotiations with the PBM to address each drug and category of drug. These costs could be passed on to participants, outweighing any potential savings on subsets of drugs.

11

3518308, at *3. They fail to compare, for example, premium amounts, scope of coverage (including the thousands of covered drugs), network coverage (*e.g.*, breadth of the pharmacy networks or the density of those networks in J&J workforce population centers), total drug costs, and overall plan costs.

Also insufficient are the allegations untethered to benchmark plans. Opp. 31–33, 38–39. None suggest that any comparable plan pays less than the J&J Plan for a similar universe of health services and drugs or other services provided by PBMs. While Plaintiffs describe alternative measures that may have resulted in occasional cost savings, they do not show that any specific approach is imprudent or that prudent fiduciaries frequently adopt the alternatives. To the contrary, their allegations establish the prevalence of PBMs such as Express Scripts ("ESI") with the same kinds of reimbursement metrics that J&J uses (such as "Average Wholesale Price"). *See* Compl. ¶ 44 (calling "Average Wholesale Price" a "historically prevalent benchmark"); *Navarro*, 2025 WL 897717, at *8 n.9 (noting that "many other companies evidently have" chosen ESI, which undermines the claim that "selecting ESI as the Plan's PBM could form a basis for a claim of breach of fiduciary duty"). Plaintiffs also ignore factors unrelated to costs that fiduciaries may consider when selecting a PBM, including the quality and scope of the PBM's services, which could readily explain any cost differential (and which

12

Plaintiffs have not pleaded). *See Hughes v. Northwestern Univ.*, 595 U.S. 170, 177 (2022) (discussing "the range of reasonable judgments a fiduciary may make").

The cases Plaintiffs say support an inference of imprudence, Opp. 33–35 & n.14, are readily distinguishable. First, Plaintiffs ignore a key factor distinguishing retirement plan cases from healthcare cases like this one: the number of variables at issue. In the retirement plan context, fiduciaries oversee a relatively small number of investment options and a handful of types of administrative fees—a fundamentally different task than engaging a PBM to oversee the purchase of thousands of different types of drugs and medical services, *see* Compl. ¶ 38. Comparisons focusing on plans' individual drug expenses are meaningless without an understanding of the overall services provided.

Setting aside the fundamental differences between retirement plans and healthcare plans, the three Third Circuit retirement plan cases where complaints survived dismissal involved benchmarks alleged with much greater detail than the Complaint provides. In *Mator*, the plaintiffs identified plans receiving "some portion of an overlapping constellation of recordkeeping services" and compared their fees and services to those of their own plan. 102 F.4th at 185–86, 188–89. In *Kruchten*, the plaintiffs listed numerous other plans and the fees they charged, "explained why those other plans were comparable" to theirs, and showed how those comparators "received the same services [as] measured by Form 5500

13

service codes." 2024 WL 3518308, at *3. No similar coding system allows comparisons among PBM services, and Plaintiffs do not try to establish comparability through another metric. Finally, in *Sweda*, the plaintiffs alleged that "similar plans paid [millions less] for the same services" as their plan. 923 F.3d at 330. No similar non-conclusory allegations appear in the Complaint.

      **C.**    **Plaintiffs fail to rebut the obvious alternative explanation: that Defendants negotiated a reasonable overall deal for the Plan.**

Although the Complaint "need not rule out every possible lawful explanation," "the Rules require dismissal when fiduciary defendants offer an alternative explanation for their conduct that is obvious, natural, or simply more likely than the plaintiffs' theory of misconduct." *Mator*, 102 F.4th at 184 (cleaned up). Here, where the sheer number of covered drugs makes it impracticable to negotiate by drug or drug type, the obvious, natural, and far more likely explanation is that J&J negotiated a reasonable overall deal, knowing that it would be primarily responsible for any overcharges. *Cf. Thole v. U.S. Bank N.A.*, 590 U.S. 538, 545 (2020) (employers "are often on the hook for plan shortfalls," so "the last thing a rational employer wants or needs is a mismanaged [] plan"); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 567–68 (2007) (defendants' consciously parallel conduct did not suggest an antitrust conspiracy; the alternative explanation was that they "were sitting tight, expecting their neighbors to do the same thing").

14

Plaintiffs point to their allegation that J&J "is a leading drug maker," Compl. ¶ 5, and leap to the conclusion that it must want higher drug prices. *Id.*; Opp. 40. But the suggestion that J&J would benefit from the Plan paying excessive prices for drugs is absurd, since the J&J Plan "pays 100% for drugs that are manufactured or marketed by" J&J entities, so J&J bears the *entire* cost of J&J drugs prescribed to Plan participants. Dkt. 75-2, Ex. E, at 9. And J&J pays at least 80%—and sometimes much more—of the total cost of all other covered drugs (and medical expenses) utilized by its employees. For example, Ms. Lewandowski received approximately $200,000 in medical services in 2023, for which she herself paid only about $980. Dkt. 72-2 ¶ 8; Compl. ¶ 213.

Plaintiffs never explain why J&J would want to pay more rather than less for the drugs covered by its Plan. The obvious and more likely explanation is simpler: "ESI is one of the 'Big 3' PBMs," with the ability to offer management of the complex prescription drug plan needed to serve J&J's more than 130,000 employees and retirees, and J&J concluded it offered a reasonable deal, "as many other companies evidently have." *Navarro*, 2025 WL 897717, at *8 n.9.

## CONCLUSION

The Court should dismiss Counts One and Two without prejudice (for lack of standing) or with prejudice (under Rule 12(b)(6)).

15

| | |
|---|---|
| Dated: June 9, 2025 | Respectfully submitted, |// 

Dated: June 9, 2025

Respectfully submitted,

*/s/ David R. Kott*
David R. Kott
MCCARTER & ENGLISH, LLP
Four Gateway Center
100 Mulberry Street
Newark, NJ 07102
Telephone: (973) 622-4444
dkott@mccarter.com

Scott D. Stein (*pro hac vice*)
Eric S. Mattson (*pro hac vice*)
Caroline A. Wong (*pro hac vice*)
SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, IL 60603
Telephone: (312) 853-7000
sstein@sidley.com
emattson@sidley.com
caroline.wong@sidley.com

*Attorneys for Defendants*